HANSON BRIDGETT LLP
ANDREW G. GIACOMINI, CA SBN 154377
agiacomini@hansonbridgett.com
PATRICK T. BURNS, CA SBN 300219
pburns@hansonbridgett.com
ALENE M. TABER, CA SBN 218554
ataber@hansonbridgett.com
BIANCA A. VELEZ, CA SBN 339795
Bvelez@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366

Attorneys for Plaintiffs
DOES 1-150, Individual Persons

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| DOES 1-150, Individual Persons, | Case No. |
| Plaintiffs, | **COMPLAINT FOR:** |
| vs. | 1.  **FIFTH AMENDMENT** |
| | 2.  **FAIR HOUSING ACT** |
| UNITED STATES DEPARTMENT OF INTERIOR ("INTERIOR"), a federal agency; DOUG BURGUM, Secretary of the Interior; NATIONAL PARK SERVICE, a federal agency; JESSICA BOWRON, Acting Director of the National Park Service; DAVID SZYMANSKI, Regional Director, Pacific West Region; THE NATURE CONSERVANCY, a District of Columbia nonprofit corporation; BETTY NUNES, TIM NUNES, WILLIAM NUNES, and JACKIE NUNES-HEMELT (HISTORIC A RANCH AND E RANCH); JARROD MENDOZA, KAYLA MENDOZA, LINDA MENDOZA, and JOLYNN McCLELLAND (HISTORIC B RANCH); ROBERT J. McCLURE, and RUTH McCLURE (HISTORIC I RANCH); TOM KEHOE, MIKE KEHOE, EMILY | 3.  **DECLARATORY JUDGMENT ACT**<br>4.  **NATIONAL ENVIRONMENTAL POLICY ACT/ ADMINISTRATIVE PROCEDURES ACT**<br>5.  **ALL WRITS ACT**<br>6.  **CALIFORNIA TENANT PROTECTION ACT/ ADMINISTRATIVE PROCEDURES ACT** |

1  JEAN KEHOE, JANNELLE KEHOE,
   JUSTIN KEHOE, ANNE KEHOE,
2  TIMOTHY J. KEHOE JR., and TIM KEHOE
   (HISTORIC J RANCH) collectively
3  "DEPARTING RANCHERS"; and ROES 1 to
   30, inclusive,
4
5        Defendants.
6
7                    **INTRODUCTION**

8        1.      Beef cattle and dairy operations at Point Reyes have a long and rich history dating

9  back to the 1830s. When Point Reyes was established as a National Seashore, Congress explicitly

10 made multi-generational ranching a legislatively authorized use. In 1978, Congress added specific

11 leasing authority allowing agricultural lands to be leased back to prior owners or lessees. This is still

12 the policy and intent of Congress to this day.

13       2.      In response to the then Secretary of Interior Salazar's directive in 2012 that the

14 National Park Service pursue extending permits for the ranchers at Point Reyes to 20-year terms,

15 the National Park Service began a planning process to allow for the ongoing practice of permitting

16 commercial dairy and cattle ranching in the National Seashore. Three environmental groups,

17 Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project, sued

18 the National Park Service in 2016 objecting to the issuance of these permits. The parties settled their

19 lawsuit with the National Park Service agreeing to issue an amendment to the 1980 General

20 Management Plan that addressed and analyzed the environmental impacts of continuing to allow

21 livestock grazing at the Seashore. The National Park Service agreed to consider and evaluate the

22 following alternatives: a no ranching alternative, no dairy ranching alternative, and a reduced

23 ranching alternative. There was no requirement that the National Park Service exercise its discretion

24 in a particular way or select a non-ranching preferred alternative.

25       3.      After ten years of studies and analysis and a robust public process that considered

26 over 8,000 public comments, in 2021 the National Park Service decided to issue 20-year leases to

27 ranchers at the Point Reyes National Seashore. This was welcome news to the people who work and

28 live on these ranches. Their jobs and housing were safe and secure.

4.      Even though the three environmental groups agreed to this process, they nevertheless again sued the National Park Service, this time over the resulting decision (the "Environmentalists' Lawsuit"). The environmental groups sought a permanent injunction prohibiting the National Park Service from approving 20-years leases with the ranches, which would result in the discriminatory practice of evicting agricultural workers and their families ("Agricultural Workers" also referred to as Does 1-150) from their homes without due process and just cause.

5.      For almost three years the Environmentalists' Lawsuit never progressed. Instead, the environmental groups, the Nature Conservancy ("Conservancy") and National Park Service engaged in secret negotiations aimed at reversing the decision that emerged from the lengthy public process of allowing multi-generational ranching to continue – something that would not have been legally permitted absent the Environmentalists' Lawsuit. It is inconceivable that a few special interests can overturn the result of the public process. But that is what occurred. Instead of implementing its 2021 decision as it was legally required to do and issue the mandated 20-year leases to the ranchers, the National Park Service secretly sided with the plaintiff environmental groups and together with the Conservancy contrived a plan to avoid issuing the 20-year leases. The scheme involved creating uncertainty for the ranchers and a time crisis by issuing only very short term leases that expired in January 2025, as well as having the Conservancy pay the just compensation that the National Park Service owed the ranchers as a result of the federal government taking their private property for a public use. The ranchers were left with a Hobson's choice; agree to the "voluntary" payoffs, relinquish their rights, terminate their leases, and vacate their properties, or fight the taking, have their leases expire, and lose their existing multi-generational families eligibility required for renewed leases without any compensation.

6.      Eventually, the National Park Service, environmental groups, and the Conservancy required the ranchers "cooperation" in accepting the private payoffs. So, when the ranchers intervened in the Environmentalists' Lawsuit to protect their interests they were welcomed into the mediation. But, they were prevented from disclosing any information to the public because to participate they had to sign non-disclosure agreements. Keeping everything a secret until after the decisions were made was an essential element of the scheme. The National Park Service,

Case No.

environmental groups, and the Conservancy could not risk creating any public sympathy or support for the ranchers, outrage over the loss of ranching and affordable housing, or knowledge of the illegal private payment of just compensation. This lack of transparency, secret negotiating, and imposition of a gag order on matters of public importance is contrary to the public interest.

7.      The people who work and live on the ranches, the Agricultural Workers, who are at risk of becoming unhoused and joining the tens of thousands of people living on the streets, tried to intervene in the Environmentalists' Lawsuit to protect their interests like the ranchers did. But, unlike the ranchers, the environmental groups and National Park Service met the Agricultural Workers' attempts with considerable opposition. The environmental groups, Conservancy, and National Park Service did not want anything or anyone to derail their scheme to eradicate ranching from the Point Reyes National Seashore. This lawsuit is necessary for the Agricultural Workers to protect their interests.

**PARTIES**

1.      Plaintiffs, DOES 1 - 60 are individual persons that live in homes on ranches located in the Point Reyes National Seashore in West Marin County, California and some are also employed on the ranches.

2.      Plaintiffs anticipate that other persons will join this case as plaintiffs after this Complaint is filed and served. These persons will also be agricultural workers and their families that live and work on ranches located in the Point Reyes National Seashore, which is a part of the National Park system. Those plaintiffs are identified as DOES 61-150. Plaintiffs will seek leave to amend as these DOES become plaintiffs in this case.

3.      Defendant, the UNITED STATES DEPARTMENT OF INTERIOR ("Interior") is an agency of the United States. The National Park Service is a bureau of Interior.

4.      Defendant, DOUG BURGUM is the Secretary of the Interior ("Secretary"). The Secretary is authorized to acquire and pay for property for the Point Reyes National Seashore, may lease the land, and is responsible for managing the land and compliance with federal and state laws. 16 U.S.C. §§ 459c-2, 495c-5. The Secretary is sued in his official capacity only. Past Secretaries that held office during the pertinent time were David Bernhardt and Deb Haaland. The officer's

1  current successor has been substituted as the party. Any successor will automatically be substituted

2  as a party per Fed. R. Civ. P. 25.

3         5.      Defendant, NATIONAL PARK SERVICE, is an agency of the United States within

4  the U.S. Department of Interior. The National Seashore is managed by the National Park Service.

5  The National Park Service is a party to several agreements and made the decisions that are the

6  subject of this lawsuit.

7         6.      JESSICA BOWRON is the Acting Director of the National Park Service ("Acting

8  Director"). Under the direction of the Secretary, the Director shall have the supervision,

9  management, and control of the National Park System. 54 U.S.C.§ 100302. The Acting Director is

10  sued in her official capacity only. The past Director that held office during the pertinent time was

11  Charles F. Sams III. The current officer's successor has been substituted as the party. Any successor

12  will automatically be substituted as a party per Fed. R. Civ. P. 25.

13        7.      DAVID SZYMANSKI is the Regional Director, Pacific West Region, Interior

14  Regions 8, 9, 10 and 12 at the National Park Service ("Regional Director"). David Szymanski signed

15  the revised Record of Decision ("Revised ROD" or "2025 ROD") in January 2025. The Regional

16  Director is sued in his official capacity only. Any successor will automatically be substituted as a

17  party per Fed. R. Civ. P. 25. Interior, the National Park Service, the Secretary, the Acting Director,

18  and the Regional Director are collectively referred to as the "Federal Defendants."

19        8.      Defendant, THE NATURE CONSERVANCY is a District of Columbia non-profit

20  corporation and tax-exempt organization qualified as a public charity under Section 501(c)(3) of the

21  United States Internal Revenue Code. The Conservancy is a party to several agreements and

22  participated in the National Park Service's decision-making that are the subject of this lawsuit.

23        9.      Defendants, BETTY NUNES, TIM NUNES, WILLIAM NUNES, and JACKIE

24  NUNES-HEMELT own historic A Ranch and E Ranch that is located within the Point Reyes

25  National Seashore. Defendants have entered into agreements with the National Park Service and

26  Conservancy that are the subject of this lawsuit. Defendants are also real parties in interest.

27        10.     Defendants, JARROD MENDOZA, KAYLA MENDOZA, LINDA MENDOZA,

28  and JOLYNN McCLELLAND own historic B Ranch that is located within the Point Reyes National

Seashore. Defendants have entered into agreements with the National Park Service and Conservancy that are the subject of this lawsuit. Defendants are also real parties in interest.

11.    Defendants, ROBERT J. McCLURE, and RUTH McCLURE own historic I Ranch that is located within the Point Reyes National Seashore. Defendants have entered into agreements with the National Park Service and Conservancy that are the subject of this lawsuit. Defendants are also real parties in interest.

12.    Defendants, TOM KEHOE, MIKE KEHOE, EMILY JEAN KEHOE, JANELLE KEHOE, JUSTIN KEHOE, ANNE KEHOE, TIMOTHY J. KEHOE JR., and TIM KEHOE own historic J Ranch that is located within the Point Reyes National Seashore. Defendants have entered into agreements with the National Park Service and Conservancy that are the subject of this lawsuit. Defendants are also real parties in interest. All defendant ranch owners are collectively referred to as the "DEPARTING RANCHERS".

13.    ROES 1 through 25, inclusive, are sued under fictitious names. Plaintiffs are ignorant of the true names and capacities, whether individual, corporate, governmental, or otherwise, of the Defendants or Real Parties in Interest named in this Complaint as ROES 1 through 25, inclusive, and therefore sues these Defendants and Real Parties in Interest by these fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

## JURISDICTION

14.    The Federal Defendants, Conservancy, and Departing Ranchers have made final decisions that are the subject of this lawsuit. The Environmentalists' Lawsuit has settled and is over, and the agreements that are the subject of this lawsuit have been executed.

15.    This Court has subject matter jurisdiction under Article III, § 2 of the U.S. Constitution and 28 U.S.C. § 1331 because this Complaint arises out of the Fifth Amendment of the U.S. Constitution, and the laws of the United States including the Fair Housing Act (Title VIII of the Civil Rights Act of 1968) 42 U.S.C. §§ 3601 et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., and the All Writs Act, 28 U.S.C. § 1651.

16.     This Court has supplemental jurisdiction over the California State law cause of action and defendants to only State law claim. 28 U.S.C. §1367(a). The State law claim "form[s] part of the same case or controversy under Article III of the United States Constitution" and arise from a "common nucleus of operative facts." *Id*. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172-73 (9th Cir. 2002).

17.     An actual, justiciable controversy now exists between Agricultural Workers and Defendants. The National Park Service, Acting Director, and Regional Director made a final decision to enter into a settlement agreement with the environmental groups, Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project, the Point Reyes Seashore Ranchers Association, individual ranchers, and the Conservancy to settle the Environmentalists' Lawsuit. The settlement agreement results in the ranches ceasing to operate and vacating all of the structures, including the Agricultural Workers' homes, as well as the payment of just compensation by a private entity. The Defendants' decisions are sufficiently concrete so that legal consequences that will flow are particularized. The Agricultural Workers are informed and believe that they will be evicted from their homes without due process and just cause. The Agricultural Workers are, therefore, opposed to the settlement agreement and associated actions that requires their homes be vacated.

18.     The federal government waived sovereign immunity for the federal claims pursuant to 5 U.S.C. § 702, 42 U.S.C. § 3613, and 28 U.S.C. § 1343.

19.     The federal government waived sovereign immunity for the California law claim pursuant to the APA. *S. Delta Water Agency v. U.S., Dep't of Interior, Bureau of Reclamation*, 767 F.2d 531, 539 (9th Cir. 1985). The APA, 5 U.S.C. § 702, provides both a cause of action and a waiver of sovereign immunity for actions against federal agencies. *Buynak v. United States Dep't of the Interior*, No. CV227271MWFMAAX, 2023 WL 3549628, at *5 (C.D. Cal. Mar. 1, 2023). Plaintiffs may rely on 5 U.S.C. § 702 for wavier of sovereign immunity, even if they do not rely on the APA to provide the cause of action for their claim against the United States. *Id*.

20.     Agricultural Workers are not required to have exhausted any administrative remedies because the settlement agreement and associated actions have not been the subject of any

administrative hearing process. Rather, the negotiations and decisions occurred in secret without the Agricultural Workers' participation or knowledge. In fact, the Federal Defendants' failure to provide an administrative public hearing process forms the basis for a number of the causes of action. Further, Agricultural Workers' attempted to intervene in the Environmentalists' Lawsuit to prevent the settlement agreement from being executed. The Court denied the motion. Presentation of the claims administratively would be futile because Defendants' decisions and actions are final.

## VENUE

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the affected public lands and resources that are located in this judicial district.

## STANDING

22.    Agricultural Workers have established for each cause of action that they have: (1) an injury in fact; (2) that is fairly traceable to the challenged action of the defendants; and, (3) that can be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Therefore, Agricultural Workers meet the Article III standing requirements.

23.    Agricultural Workers have standing to assert their Fifth Amendment claims because each of them will suffer injury by losing the ability to live in their current housing. Given the severe shortage of housing the Agricultural Workers can afford in Marin County and the extremely long wait times for public assistance, it is very likely that they will end up unhoused or forced to move out of their community against their will. Such injury is directly traceable to the Federal Defendants' because they failed to implement the 2021 General Management Plan Amendment ("GMPA") and along with the Conservancy contrived a plan to pressure the ranchers into accepting payoffs and terminating the ranchers' rights to leases that allow for multi-generational ranching and the associated housing presently occupied by Agricultural Workers. The ranches owned by the Departing Ranchers will cease to operate, all ranch worker housing structures will be vacated, and the Agricultural Workers will be evicted. These actions and decisions will result in a loss of affordable housing for the Agricultural Workers without due process. Agricultural Workers contend the due process they are entitled to consists of the government providing fair notice of its actions,

holding a hearing before an impartial tribunal as part of the Writ cause of action, giving the affected persons the right to be heard and present their case, and truly considering the comments made. Agricultural Workers will continue to live on the ranches if permitted to do so by the Departing Ranchers and Federal Defendants. The National Park Service, Acting Director, and Regional Director's decision to proceed in secret causes the Agricultural Workers' liberty and property interests to be invaded by the government without an opportunity to challenge that invasion and prevent their eviction. If their actions are found unconstitutional, the Federal Defendants would be enjoined from evicting the Agricultural Workers in this manner, required to implement the 2021 Record of Decision ("2021 ROD"), and along with the Conservancy a declaration that they conspired to evict the ranchers and by extension the Agricultural Workers without due process. This relief would redress the Agricultural Workers' injuries.

24.    Standing under section 812 of the Fair Housing Act (42 U.S.C.A. § 3612) extends to the full limits of U.S. Constitution Article III. *Havens Realty* Corp*. v. Coleman*, 455 U.S. 363 (1982). The Fair Housing Act authorizes "an aggrieved person" to bring a cause of action for enforcement. 42 U.S.C. § 3613(a). An aggrieved person is defined to include "any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C.A. § 3602(i). An aggrieved person is not required to be a U.S. citizen and can be undocumented immigrants. *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86 (Title VII's prohibition of discrimination against "any individual" means that "aliens are protected from discrimination.").

25.    Agricultural Workers have standing to bring a claim under the Fair Housing Act because the Federal Defendants injured the Agricultural Workers through their discriminatory housing practice. *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972). Specifically, the National Park Service, Acting Director, and Regional Director's decision to settle the Environmentalists' Lawsuit by having the Departing Ranchers relinquish their leases and close down the ranches, including vacating worker housing that will significantly impact Agricultural Workers who are not able to locate affordable housing in Marin County. This Court's granting of the requested injunction will redress this injury.

26.     The Declaratory Judgment Act authorizes federal courts to grant relief in a "case of actual controversy." 28 USC § 2201(a). This statutory phrase refers to the type of "Cases" and "Controversies" that are justiciable under Article III; i.e., cases involving a substantial controversy between parties having adverse interests of sufficient immediacy and reality.

27.     There is an actual dispute relative to the legal rights of the Agricultural Workers, the obligations of the Federal Defendants and the actions of the Conservancy. The Agricultural Workers contend that the National Park Service, Acting Director, and Regional Director were required to implement the 2021 ROD, cannot reverse course on the GMPA without providing due process, and required to comply with the Fair Housing Act and NEPA. Further, Agricultural Workers contend that the National Park Service, Acting Director, and Regional Director conspired with the Conservancy to pay off the Departing Ranchers in exchange for the Ranchers relinquishing their rights to 20-year leases and instead leasing the Ranchers' property to the Conservancy. The Agricultural Workers are informed and believe that the National Park Service, Acting Director, and Regional Director contend that they were not required to implement the 2021 ROD, that they can reverse their decisions memorialized in the 2021 ROD and GMPA without providing due process and reopening public comment and the EIS, and that they complied with the Fifth Amendment, Fair Housing Act, and NEPA. The Agricultural Workers are informed and believe that the National Park Service, Acting Director, Regional Director, and the Conservancy contend that they did not conspire to pay off the Departing Ranchers in exchange for the ranchers and gain control of their property. Without the relief sought through this lawsuit, the Agricultural Workers face imminent eviction in the near future, the community will lose affordable housing, and the public will have lacked notice and an opportunity to participate in the decision-making. A judicial declaration that the National Park Service, Acting Director, Regional Director, and the Conservancy cannot proceed in this manner, would redress the Agricultural Workers' injuries by protecting their interests and retaining ranching and affordable housing.

28.     NEPA challenges proceed under the APA. The APA grants federal court standing to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 USC § 702. When a plaintiff alleges a

"procedural injury"—such as the failure to comply with NEPA—the " 'normal standards for ... [the] immediacy' of the injury are relaxed." *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 989 (9th Cir. 2023). Plaintiffs are not required to show that the agency would necessarily have reached a different decision had it complied with NEPA. *Id.*

29.    Agricultural Workers have standing under the APA to bring a NEPA claim because their interests are intertwined with the environment. Some of their environmental interests include the loss of safe and sanitary housing for low-income households during the California housing crisis, increasing the number of persons that will be exposed to outdoor air and noise pollution, and increasing food insecurity. The unhoused persons utilization of survival tactics, like waste disposal and burning materials for heat, affects both the health of the individual and the environment. Increased homelessness encampments can contribute to trash ending up in waterways, where it can harm aquatic life and increase bacteria levels. There will also be an increased need for California to provide public services to support displaced workers and their families and for public safety when the State is facing a serious budget deficit. The National Park Service, Acting Director, and Regional Director are also depriving the Agricultural Workers, and the public, of reviewing and providing input as required by NEPA on their decision to not renew the Departing Ranchers' leases, to end ranching and to evict the Agricultural Workers.

30.    Agricultural Workers have standing under the All Writs Act because the National Park Service, Acting Director, and Regional Director's failure to comply with NEPA and Executive Order 12898 of February 11, 1994, and implement the GMPA and 2021 ROD resulted in their decision to reverse course and require the Departing Ranchers to vacate their properties and relinquish their rights to leases for multi-generational housing, and to evict the Agricultural Workers without due process. A grant of mandamus relief can redress these injuries.

31.    Agricultural Workers have standing under the APA to bring the State law claims because they have suffered legal wrongs because of the Federal Defendants' actions, and are adversely affected and aggrievedwithin the meaning of the California Tenant Protection Act. The California Tenant Protection Act prohibits the eviction of the Agricultural Workers under the circumstances explained in this Complaint. As a result of the Federal Defendants' failures to comply

with the California Tenant Protection Act, the Agricultural Workers will be evicted in violation of the law. Because of California's housing crisis, it will be very difficult, if not impossible, for the Agricultural Workers to find affordable housing in the area.

32.     Agricultural Workers have prudential standing because as discussed above all of their claims relate to their own legal rights and interests, and are within the zones of interest protected by the Fifth Amendment, Fair Housing Act, Declaratory Judgment Act, NEPA, the APA, the All Writs Act, and the California Tenant Protection Act. A plaintiff can "satisfy NEPA's zone-of-interests requirement even 'if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'" *Solar Energy Indus. Ass'n*, 80 F.4th at 990–91. Further, Agricultural Workers have a right to enforce this State law.

## **BACKGROUND**

### *Agricultural Workers*

33.     Some of the Agricultural Workers are of Hispanic origin. Some are undocumented. Agricultural Workers live on the ranches, some for decades. The Agricultural Workers live on the ranches with the knowledge and acquiescence of the Federal Defendants and had the ROD been implemented the Agricultural Workers would have enjoyed housing for at least 20 years. The Conservancy was aware that the Agricultural Workers live on the ranches before it executed any of the agreements involved in this lawsuit.

34.     Agricultural Workers' households fall in the extremely low, very low, and low income categories, earning less than 80% of median income. The rent they pay is just within the limits of affordability for these households. They either pay the rent separately or the rent is subtracted from their paychecks.

### *Point Reyes National Seashore*

35.     President John F. Kennedy established the Point Reyes National Seashore located in West Marin County on September 13, 1962. Cattle ranching started in the 1830s and the dairy industry in the late 1850s. From the beginning, the enabling legislation (Public Law 87-657) recognized ranching as a permitted use. The National Park Service has a long history of authorizing

the issuance of lease/special use permits (lease/permits) for agricultural, ranching, or dairying purposes, and associated housing. Congress has continued to consistently express a desire that ranching activities continue within the National Seashore.

36.    When Congress amended the enabling legislation in 1970 by repealing the prohibition on condemning ranches, the National Park Service was authorized when it acquired the land to continue ranching through retained rights of use and occupancy (as authorized under Section 5 [formerly Section 6] of the National Park Service's enabling legislation), or by using the leasing provisions of the Land and Water Conservation Fund Act. S. Rep. 91-738, at 2, 7–8 (1970); 116 Cong. Rec. S7615 (March 17, 1970).

37.    When the enabling legislation was amended again in 1978, language was added to facilitate the National Park Service's ability to authorize ranching. In addition to expanding the types of use and occupancy rights that ranchers could retain, Congress included specific leasing authority allowing agricultural lands to be leased back to prior owners or lessees. Any land to be leased by the Secretary of Interior was to be offered first to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States. Act of Nov. 10, 1978, Pub. L. No. 95-625, Title III, § 318(b), 92 Stat. 3467, 3486–87; codified as amended at 16 U.S.C. § 459c-5.

38.    The enabling legislation also required "the Secretary shall pay to the owner the fair market value of the property on the date of acquisition minus the fair market value on that date of the right retained by the owner." 16 U.S.C. § 459c-5(a). No more than $62,500,000 shall be appropriated for the acquisition of land and waters and improvements thereon, and interests therein, and incidental costs relating thereto. 16 U.S.C.A. § 459c-7.

39.    As evidenced by some of the leases with the ranchers, the Federal Defendants were well aware that employees of the ranchers were living on-site.

### Ranch Comprehensive Management Plan

40.    On November 12, 2012, Congress's long-standing interest in ranching prompted former Secretary of the Interior Salazar to direct the National Park Service to pursue extending permits for the ranchers to 20-year terms. On January 13, 2013, the Director of the National Park

Service delegated authority to the Regional Director to enter into leases/permits for the purpose of grazing cattle and operating beef and dairy ranches, along with associated residential uses by the lessees and their immediate families and their employees, and their employees' immediate families. The long-term leases were intended to provide greater certainty for the ranches and to continue the presence of daily and beef ranching operations at the National Seashore. To the Agricultural Workers' knowledge, these directives remain in place.

41.    In order to carry out the Secretary's direction, in the spring of 2014, the National Park Service initiated the development of a Ranch Comprehensive Management Plan. The National Park Service proclaimed that: "Ranching has a storied history on the Point Reyes peninsula and surrounding lands and is an important part of the fabric of Point Reyes National Seashore." "These working ranches are a vibrant part of Point Reyes National Seashore and represent an important contribution to the superlative natural and cultural resources of these NPS lands. Protection of these diverse and unique resources is an important responsibility shared by the NPS and park ranchers within the agricultural lease/permit areas." The Plan had two objectives: (1) enable the National Park Service to issue 20-year ranch permits; and, (2) devise an effective management strategy for tule elk.

42.    In February 2016, three environmental groups, Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project, sued the National Park Service claiming that the National Park Service failed to timely revise its 1980 GMP and that it never analyzed the environmental impacts associated with authorizing continued ranching. A GMP is required for the preservation and use of each national park. 54 U.S.C.A. § 100502. Several ranchers and the County of Marin intervened. The environmental groups objected to ongoing practice of permitting commercial dairy and cattle ranching in the National Seashore. The environmental groups and the National Park Service, together with the ranchers and the County of Marin, entered into settlement negotiations in an effort to resolve the litigation. The multi-party Agreement was approved by the U.S. District Court on July 14, 2017. Per the multi-party Agreement, the National Park Service agreed that in lieu of the Ranch Comprehensive Management Plan, it would prepare a GMPA and EIS addressing the management of the lands currently leased for ranching within the National

Seashore and analyzing the environmental impacts of continuing to allow livestock grazing. The National Park Service agreed to consider and evaluate the following alternatives: a no ranching alternative, no dairy ranching alternative, and a reduced ranching alternative. There was no requirement that the National Park Service exercise its discretion in a particular manner to select the preferred alternative.

### 2021 General Management Plan Amendment, ROD, and EIS

43.    In 2019, Congress directly addressed the GMPA planning process in a Joint Explanatory Statement accompanying House Joint Resolution 31 (the Consolidated Appropriations Act, 2019). The Joint Statement noted that "multi-generational ranching and dairying is important both ecologically and economically" and is "fully consistent with Congress's intent for the management of Point Reyes National Seashore." The statement further expressed the conferees' "strong support" for the October 2017, GMPA Initial Proposal, which proposed continued ranching and dairying operations under lease/permits with 20-year terms. H. Rep. 116-9 at 720-21 (2019). The National Park Service's Management Policies 2006 (Section 1.4.3.1) direct park managers to consider Congressional interest, as expressed in enabling legislation, when deciding whether to allow a legislatively authorized use.

44.    The formal scoping process for the EIS was initiated on October 31, 2018. Over 1,340 pieces of correspondence were received during the 30-day scoping period. In response to the Notice of Availability for the draft EIS on August 9, 2019, more than 7,600 pieces of correspondence were received during the comment period. Even after the September 2020 release of the final EIS, the National Park Service continued to receive a number of letters from other agencies and the public regarding a variety of issues addressed in the GMPA. This demonstrates the tremendous public interest in the long-term management of the Point Reyes National Seashore. After considering all of these comments, the National Park Service, Acting Director, and Regional Director made their decisions, which were reflected in the GMPA and ROD dated September 13, 2021.

45.    The 2021 ROD was based on the EIS. The National Park Service adopted a modified Alternative B from the EIS. Alternative B is set forth in the GMPA.

46.    The GMPA addressed the management of approximately 28,000 acres of land leased

for ranching. The GMPA adopted a new zoning framework and new programmatic management direction for the planning area by establishing two new management zones, the Ranchland zone and the Scenic Landscape zone. Land in the Ranchland zone has been actively ranched before and after the property was acquired by Secretary of the Interior.

47.     Under the GMPA multi-generational ranching activities is considered an appropriate use in the Ranchland zone, and continued occupancy and use of lease/permit areas for multi-generational ranching will occur according to the management strategies specified in the 2021 ROD. The EIS alternative that the National Park Service selected authorized it to issue lease/permits with up to 20-year terms to existing families who agreed to undertake required actions to continue ranching operations on approximately 25,500 acres. The National Park Service, Acting Director, and Regional Director decided that the longer term leases (i.e., 20 years) will allow ranchers to amortize increased investment in the operational infrastructure required to maintain historic structures and meet expectations for implementation of Management Activities, which mitigate potential natural resource impacts. As a condition of the lease/permit, all ranch worker housing was required to be maintained in a safe and sanitary condition to ensure the health and well-being of occupants. The National Park Service also determined that in some cases, conversion of permanent pasture to seasonal grazing regimes in coordination with ranchers may achieve desired conditions for grassland habitat and fire protection while also reducing potential water quality impacts. This is what the public and the Agricultural Workers had every reason to believe would occur, and this is the only action that could legally proceed under the 2021 ROD.

48.     The National Park Service's 2021 decision to continue permitting ranching was expressly permitted by law, which provides that the "Secretary, under such regulations and on such terms as the Secretary may prescribe, may grant the privilege to graze livestock within a System unit when, in the Secretary's judgment, the use is not detrimental to the primary purpose for which the System unit was created." 54 U.S.C. § 102101(a)(2). The National Park Service made the requisite non-impairment determination for the selected alternative that continued ranching.

49.     The National Park Service determined that the "selected action considers ranching an appropriate use of park lands in the Ranchland zone and manages ranching through a number of

new approaches that will support desired conditions for the planning area. Only grazing will be allowed in the Range subzone which comprises more than 60% of the Ranchland zone. As documented in the EIS and USFWS [U.S. Fish and Wildlife Service] Biological Opinion, grazing is not only compatible with the resource conditions in this zone, it also helps support populations of some federally-listed plant species." 2021 ROD, p. 47.

50.    According to "the EIS analysis, NPS has determined that a continued grazing regime within the grasslands (representing approximately 60% of the planning area and over half of the Range subzone and 86% of the Pasture subzone) is important to maintain many natural and cultural resources including rare plants, native and naturalized grasslands, and the historic cultural landscape. In their 2021 Biological Opinion, USFWS concluded that "the general changes to ranching in Point Reyes National Seashore and the north district of Golden Gate National Recreation Area will not have noticeable negative effects on the populations (California red-legged frog, western snowy plover, Myrtle's silverspot butterfly, beach layia, Sonoma alopecurus and Sonoma spineflower) and in some cases may actually improve conditions. This is supported by the general positive trends since the 2002 biological opinion on Ranching Activities in Point Reyes (USFWS 2002) was issued." Grazing is also necessary to prevent further encroachment by shrubland and forest habitat, which are abundant elsewhere in the park outside of the planning area. Protecting the park's grasslands is consistent with the Seashore's legislative history which cited the large expanses of pastureland and their contribution to the scenic beauty of the area as a factor supporting the establishment of Point Reyes as a unit of the national park system. 2021 ROD, p. 47.

51.    GMPs are required to articulate measures for the preservation of an area's resources. Accordingly, the Biological Assessment for the GMPA prepared by the U.S. Fish and Wildlife Service identifies management strategies for the preservation of the area resources. These include targeted grazing to maintain rare and endangered habitat and species.

52.    At Tomales Point, the National Park Service committed in the GMPA that it would continue to maintain the elk fence that serves as the northern boundary to the planning area, and any elk that leave the reserve would be returned to the reserve. The elk at Tomales Point would continue to be managed as a fenced population in accordance with the 1998 Tule Elk Management

Case No.

Plan/Environmental Assessment ("EA").

53.     The National Park Service developed a template of the ranch leases that would greatly benefit Agricultural Workers. Among other things, the leases would have:

A.     provided housing security for at least twenty years;

B.     expressly recognized that housing on the ranches would be rented or otherwise offered to ranch workers (together with their families) who are employed on a ranch within Point Reyes National Seashore;

C.     ensured that worker housing is safe, sanitary, and decent and that the physical condition of such housing complies with all applicable laws, including building codes, and that the exterior areas around the housing units would remain clean and slightly;

D.     provided for ranch workers to have housing rental agreements with the ranchers that would comply with applicable laws, including landlord-tenant laws;

E.     provided that any rents charged for the housing would not exceed rental rates identified in the appraisal for the ranch;

F.     reserved the right of the National Park Service to inspect ranch worker housing and to review ranch worker rental agreements to ensure that housing conditions and rental rates comply with the lease terms;

G.     ensured cyclic maintenance for worker housing;

H.     ensured that all utilities on the ranch (e.g., water, electric, sewer/septic, propane) would be operational at all times;

I.     ensured all fire protection systems including alarms, sprinkler systems and extinguishers would be inspected on an annual basis, and maintained in full operating condition at all times; and,

J.     provided that at all times during the term of the lease that the ranchers would maintain in full force and effect Workers' Compensation and Employer's Liability Insurance.

54.     The Regional Director acknowledged in the 2021 ROD that multi-generational ranching is a legislatively authorized use for lands in Point Reyes and that "the legislative record reflects decades of Congressional support for beef and dairy ranching on lands in the planning area,

as well as a recognition of the linkage between ranching and maintenance of the park's scenic and pastoral qualities. This history together with the recent reaffirmation of Congressional support for ranching confirm that ranching remains an appropriate use of park lands today. In accordance with NPS [National Park Service] Management Policies Section 1.4.3.1, the NPS has determined that ranching may continue provided that it does not cause impairment or unacceptable impacts to park resources."

55.     On September 13, 2021, the National Park Service also adopted the Point Reyes National Seashore Standard Operating Procedure: PR-71, which was a Succession Policy for Ranch Operations within the Ranchland Zone for Point Reyes National Seashore ("2021 Succession Policy"). The 2021 Succession Policy established a process for authorizing continued multi-generational ranch operations or other adaptive uses within the Ranchland zone. The process provided that: (1) immediate family members are eligible to be named lessees; (2) immediate family members of the two remaining life estates would be offered new leases upon cessation of the life estates; (3) lessees who receive lease/permits under this policy will be eligible for subsequent lease/permits; (4) leases could transition to new operators under certain conditions; and, (5) existing ranchers could relocate to a vacant or closed ranch.

### *Environmental Groups Litigation Against the National Park Service*

56.     Even though the environmental groups had agreed to this process, on January 10, 2022, they filed the Environmentalists' Lawsuit in federal court challenging the National Park Service's approval of the GMPA. They alleged that allowing ranching to continue would cause water pollution, and impact fish and the tule elk, among other claims. Their intention was to shut down all ranching and prevent new ranches from being established.

57.     The 2017 multi-party Agreement did not preclude the National Park Service, Acting Director, and Regional Director from selecting a GMPA alternative that allowed long term leases with the ranchers. The environmental groups did not contend that the National Park Service, Acting Director, and Regional Director breached the 2017 multi-party Agreement. Rather, the environmental groups simply do not like the result. They want to control the content of the GMPA and 2021 ROD.

58.    Several ranchers and the Point Reyes Seashore Ranchers Association ("Ranchers Association") intervened to protect their rights. The ranchers held interim and long term, multi-generational leasehold interests, Rights of Use and Occupancy ("RUO's"). The environmental groups and National Park Service did not oppose the ranchers and Ranchers' Association from intervening in the Environmentalists' Lawsuit.

59.    Agricultural Workers have an interest in the ranchers' leasehold rights as they have long rented and occupied housing on the ranches, including as a part of their employment arrangement with the ranchers. They have an actual current and ongoing lawful possessory interest. Because the Departing Ranchers' leasehold interests are being terminated as a result of the National Park Service, Acting Director, Regional Director and the Conservancy's decisions that settled the Environmentalists' Lawsuit, the Agricultural Workers will lose not only their jobs, but also their housing.

60.    Agricultural Workers attempted to intervene in the Environmentalists' Lawsuit like the ranchers to protect their interests. But, unlike the ranchers their attempts were met with hostility and opposition from the environmental groups and National Park Service.

61.    Since almost the inception of the Environmentalists' Lawsuit the parties engaged in a secret negotiation process to reject the decisions made in the GMPA that was developed through a public process. The environmental groups and National Park Service invited a non-party, the Conservancy, to participate in the secret negotiations. The Conservancy's participation was an essential part of the environmental groups and National Park Service's scheme to eliminate ranching at the Point Reyes National Seashore. As a condition of participation in the secret negotiations, the ranchers were required to sign gag orders and agree not to publicly disparage the National Park Service or the outcome of the negotiations.

62.    Secretly negotiating public policy is directly contrary to the requirements of transparency in government decision-making. By cloaking the decision-making process within the confines of "confidential mediation," the National Park Service thwarted the public's right to know. Transparency is the foundation of democracy allowing citizens to scrutinize government actions and hold officials accountable. There was no public interest represented at the table, let alone the

1    Agricultural Workers' interests, that are directly affected by the decision to eliminate ranching at

2    Point Reyes.

3        63.    While the secret negotiations were occurring, the National Park Service, Acting

4    Director, and Regional Director deliberately did not implement the 2021 ROD, the GMPA, and EIS

5    mitigation measures even though they remained valid under the law and they were under a legal

6    obligation to implement the documents. Instead, the National Park Service, Acting Director, and

7    Regional Director would only issue very limited lease extensions contrary to its obligation and duty

8    to issue 20-year leases. Agricultural Workers are informed and believe that the National Park

9    Service purposely did not issue the 20-year leases so that it could pressure the ranchers into

10   agreeing to relinquishing their property rights.

11       64.    On December 2, 2024, the Regional Director reversed the decision in the 2021

12   GMPA regarding the management of the tule elk in the Tomales Point area. Under the new plan,

13   the existing tule elk enclosure fence will be removed from the Point Reyes peninsula. Upon removal

14   of the 2.2 miles of fencing, the Tomales Point tule elk will be a free-range population and elk that

15   have breached the fence or leave the planning area would be managed in a manner similar to the

16   Limantour herd. The fence was critical to protecting grazing areas from intrusions by the elk. The

17   elk damage pastures and property, access water sources intended for livestock, can spread diseases,

18   and cause highway collusions. Damage to the grazing areas and property affects the profitability of

19   the ranches. The Ranchers' Association informed the National Park Service that this change would

20   be "the functional equivalent of a permanent injunction against grazing by ranchers." This decision

21   sounded the "death knell" for ranching continuing in the National Seashore.

22                     ***Settlement Agreement and Revised ROD and GMPA***

23       65.    On January 8, 2025, the environmental groups and National Park Service filed a

24   notice of settlement and motion to stay the litigation until October 21, 2026; the estimated date that

25   the ranchers will have vacated Point Reyes. The timing of the notice and motion was no coincidence

26   as it came on the eve of the hearing on the Agricultural Workers' motion to intervene in the

27   Environmentalists' Lawsuit, which the Court subsequently denied.

28       66.    Under the settlement, the Conservancy will pay the Departing Ranchers with

charitable or private donations it has collected to terminate their lease interests with the National Park Service and vacate their properties within 15 months. According to news reports, the National Park Service may use the vacated houses and existing buildings for employee housing, park partner operations, and for housing conservation partners. The National Park Service is also looking to develop a new trail system, new camping opportunities, educational experiences and parking and shuttle areas – all public purposes. The Conservancy has no leases with the Departing Ranchers and there is nothing in the settlement agreement to suggest that the Departing Ranchers are conveying their interests to the Conservancy, or that the Conservancy is donating the Departing Ranchers' property interests to the federal government. The Departing Ranchers are entitled to be compensated for their lease interests by the Secretary of Interior. But, the Secretary of Interior is not paying just compensation to the Departing Ranchers; the Conservancy is paying the federal government's obligation.

67.    In exchange for paying the Secretary of Interior's obligation to compensate the Departing Ranchers for the taking of their lease interests, the National Park Service, Acting Director, and Regional Director are giving the Conservancy a lease option and cooperative agreement covering some or of all the properties to be vacated by the Departing Ranchers for purposes of providing conservation and public benefits, and in furtherance of the Conservancy's charitable purposes. The Conservancy's charitable purposes include converting land developed with legal commercial uses into natural habitat even if it means eliminating affordable housing for the most vulnerable members of the community.

68.    The Conservancy and the National Park Service will jointly enforce the agreement by having each Departing Rancher enter into a: Payment Agreement and Termination of Lessee Interests with the Conservancy for compensation in exchange for terminating the Rancher's lease agreement with the National Park Service; Wind Down Agreement with the Conservancy and National Park Service; and, Lease Amendment with National Park Service. If the rancher has not completed its obligations in the Wind Down Agreement, the National Park Service and/or Conservancy will issue a deficiency notice to the rancher and notify the environmental groups. If the deficiency is not rectified, then the parties to the settlement agreement have the right to initiate

new litigation. After all of the Departing Rancher's obligations are completed, the National Park Service and/or Conservancy will serve a notice of satisfaction to the parties to the settlement agreement. The Agricultural Workers are informed and believe that the agreements between the National Park Service, Conservancy, and Departing Ranchers provide financial benefits to the Departing Ranchers if they evict the Agricultural Workers from their homes and that the Departing Ranchers' obligations will not be completed until this occurs.

69.    The gag order remains in effect. The parties to the settlement agreement are required to maintain the confidentiality of all communications made during the mediation process in accordance with the mediation process agreement and all addendums thereto even after the settlement agreement was executed. In addition, Agricultural Workers are informed and believe that under the terms of the secret settlement agreements among the Departing Ranchers and the Conservancy, the Departing Ranchers are precluded from saying negative things about the Conservancy and instead must compliment the Conservancy for its role in destroying ranching in the Park.

70.    On January 6, 2025, the Regional Director issued the Revised ROD. The Revised ROD rescinded the 2021 ROD, and adopted a "new Selected Action for implementation that is composed of elements drawn from the alternatives analyzed in GMPA Final Environmental Impact Statement (FEIS)." The National Park Service also issued a new Succession Policy for multi-generational ranching, which was revised to exclude from the right to continue ranching any ranchers that have executed agreements with the Conservancy and to reconsider future extensions for the remaining leases with ranchers that have not agreed to terminate their leases. One of the factors that will be considered is the important role that ranching can play in maintaining the character of the Historic District in which it is located.

71.    Under the Revised ROD, 17,400 acres would be zoned Scenic Landscape, as compared to the 28,100 acres that were rezone and allocated to the Ranchland zone under Alternative B. The only type of grazing that will be authorized in the Scenic Landscape zone is Targeted Grazing. Multigenerational ranching (i.e., commercial ranching) will not be allowed in this zone. The National Park Service states that the Revised ROD is similar to Alternative F in the

1   2021 ROD.

2          72.     The cessation of ranching in Alternative F was expressly rejected by the National

3   Park Service in the 2021 ROD:

4                  These changes would likely diminish the integrity of the Point Reyes
                   Peninsula Dairy Ranches Historic District and the Olema Valley Dairy
5                  Ranches Historic District to the point that they would no longer retain
                   sufficient integrity to convey their historic significance and therefore
6                  would no longer be eligible for listing in the National Register of Historic
                   Places. This would result in significant, adverse impacts on the Point
7                  Reyes Peninsula Dairy Ranches and Olema Valley Dairy Ranches
                   Historic Districts which are considered FRVs for the park. Impacts of this
8                  magnitude are inconsistent with desired conditions for the planning area.
                   Similarly, these landscape level changes could also adversely affect
9                  wildlife and plant habitat (including some threatened and endangered
                   species) and increase fuel loading and thereby fire risk in the planning
10                 area.

           73.     The Agricultural Workers and the public are entitled to know the people's business.
11
    The secret negotiations and imposition of a gag order make this impossible. It is in the public's
12
    interest to know how and why the 2021 ROD and GMPA were not implemented and eventually
13
    reversed without public knowledge or input. Agricultural Workers are informed and believe that the
14
    secret mediation process suppressed legitimate disclosure of important information that could
15
    expose wrongdoing, harm to the public interest, issues that require public awareness and the
16
    silencing of individuals who might otherwise have raised concerns about the National Park Service,
17
    Acting Director, and Regional Director's failure to implement the 2021 ROD and GMPA,
18
    subsequently recission of the 2021 ROD, and the issuance of a new 2025 ROD. The National Park
19
    Service should be required to disclose to the public the substance of the negotiations and the
20
    confidentiality agreements, lift the gag order, and implement the 2021 ROD.
21
                                        *California's Housing Crisis*
22
           74.     California is at the epicenter of the nation's housing crisis. The high cost of housing
23
    is particularly devasting for people with the lowest incomes. There are not enough subsidized
24
    housing vouchers to meet the needs of all eligible households. The burdens of housing insecurity
25
    hits minorities and low income persons the hardest.
26
           75.     Pursuant to the 1948 Universal Declaration of Human Rights, there is a human right
27
    to adequate housing. Shelter is necessary for human existence. The right to adequate housing
28

                                                 23
                                                                                         Case No.

includes security of tenure, equal and non-discriminatory access to adequate housing, affordability, and participation in housing-related decision-making.

76.    Most recently, on November 23, 2024, California Governor Gavin Newsom, signed a legislative package to strengthen California's laws addressing the housing and homelessness crisis. The legislation mandated that locals plan for housing for extremely vulnerable residents and increase accountability. So, while California is attempting to address the housing shortage, the Federal Defendants and Conservancy are removing important low income housing from the marketplace, evicting the Agricultural Workers from their homes and adding to the homelessness problem in this State.

77.    The Agricultural Workers have been searching for affordable housing, but have not been able to find a place to live. This is because there is a severe lack of affordable housing in West Marin County, and a backlog of persons needing assistance finding interim housing, rental assistance, and permanent housing. Because there are insufficient County services to address the current housing shortage, Agricultural Workers and their families are at risk of becoming unhoused due to the decisions and actions of the Federal Defendants and Conservancy. The loss of affordable housing for the Agricultural Workers seriously affects the quality of their lives. If forced to relocate, they would leave behind familiar surrounds and support systems, experience isolation, and suffer from multiple stresses that affect mental well-being. Children may struggle to adapt to a new school system potentially impacting their academic performance.

## FIRST CAUSE OF ACTION

**Fifth Amendment – Procedural Due Process/Equal Protection/Just Compensation Clause (Against Defendants Department of Interior, Secretary, National Park Service, Acting Director, Regional Director, and the Conservancy)**

78.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

79.    The Fifth Amendment to the U.S. Constitution provides that no person shall be deprived of life, liberty, or property, without due process of law. Fair play is the essence of "due process."

80.    Agricultural Workers belong to a recognized minority group.

81.    Agricultural Workers have a liberty interest in their existing housing. The U.S.

COMPLAINT

Case No.

21479076.3

Supreme Court has recognized that the right to establish a home is part of the liberty guaranteed by the due process clause of the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (the liberties protected by the due process clause include the right to establish a home). *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (the Fifth Amendment provides protection against all governmental invasions "of the sanctity of a man's home and the privacies of life."). The federal government cannot unduly interfere with a person's ability to obtain and maintain housing.

82.    Agricultural Workers also have a legitimate claim of entitlement to their homes. The Federal Defendants and Conservancy know that they live on the ranches and the Federal Defendants acquiesced to their physical possession for years. The protections of the due process clause extend to any significant property interest. *Fuentes v. Shevin*, 407 U.S. 67 (1972). Property interests protected by the Fifth Amendment include possessory interests. *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 760 (4th Cir. 1990). Agricultural Workers' possessory property interests are established by the federal Fair Housing Act (42 U.S.C. §§ 3601 et seq.) that prohibits discriminatory disparate impacts, the California Fair Employment and Housing Act (Gov. Code, §§ 12955 et seq.) that protects tenants from discrimination, and the California Tenant Protection Act (Civil Code, § 1946.2) that prohibits evicting tenants without "just cause". By closing down the ranches, the Federal Defendants are evicting the Agricultural Workers. Tenants cannot be evicted without due process. *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992). Further, as long as there was some dispute as to the right of continued possession, a possessor is entitled to due process. *Dunbar Corp.*, 905 F.2d at 760.

83.    Agricultural Workers' liberty and property interests detailed above have been invaded by the Federal Defendants without due process. The Federal Defendants failed to provide sufficient due process, such as disclosing to the public the substance of the negotiations, lifting the gag order, holding public workshops, providing a formal comment period, producing a revised EIS, and issuing another ROD before a judgment is entered in the environmentalists' lawsuit.

84.    The Federal Defendants' purported justification for the invasion, to settle a lawsuit with terms that are contrary to results from the public process, is not compelling or rationally related

1    to a legitimate government interest, goal, objective or purpose.

2          85.    The procedures the National Park Service, Acting Director, and Regional Director

3    followed to settle the Environmentalists' Lawsuit are constitutionally inadequate to evict the

4    Agricultural Workers from their homes. The entire purpose of the 2021 ROD was to decide whether

5    multi-generational ranching would continue. The 2021 ROD informed the public and Agricultural

6    Workers that the National Park Service would allow the ranches to operate for at least another twenty

7    years. There has been no public process that would permit the National Park Service, Acting

8    Director or Regional Director to reverse course on its decisions articulated in the 2021 ROD. Rather,

9    the negotiations were conducted in secret. The National Park Service did not provide any due

10   process to the Agricultural Workers before making the decisions articulated in the Revised ROD

11   that will lead the elimination of ranching and vacating of all structures at the National Seashore.

12         86.    Because the Federal Defendants' actions deprive the Agricultural Workers of their

13   property interests and the basic human right to housing, the Agricultural Workers are entitled to pre-

14   deprivation due process consisting of the government providing fair notice of its actions, holding a

15   hearing before an impartial tribunal, and giving the affected persons the right to be heard and present

16   their case. The Federal Defendants violated the Agricultural Workers' rights by failing to provide

17   pre-deprivation due process.

18         87.    The Fifth Amendment also prohibits denying to any person the equal protection of

19   the law. *United States v. Windsor*, 570 U.S. 744, 774 (2013). In other words, all persons similarly

20   situated should be treated alike. The U.S. Supreme Court's "decisions have established that

21   classifications based on alienage, like those based on nationality or race, are inherently suspect and

22   subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular'

23   minority." *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971)(footnotes omitted).

24         88.    The Departing Ranchers and the Agricultural Workers are both losing their

25   livelihood and homes as a direct result of the National Park Service, Acting Director, and Regional

26   Director's decisions. Despite the fact that they are similarly situated, the Federal Defendants are

27   intentionally treating the Agricultural Workers differently from the Departing Ranchers and doing

28   so without a rational basis or compelling reason. The National Park Service opposed the Agricultural

Workers' request to intervene in its case with the environmental groups so that they could protect their interests, but did not oppose the ranchers' similar request. The National Park Service excluded the Agricultural Workers from the negotiations that will affect their livelihoods and housing, while the ranchers were allowed to represent their interests. The Federal Defendants facilitated a compensation plan for the Departing Ranchers, but not the Agricultural Workers. This is a race based classification that qualifies as discriminatory conduct, which is injurious and not justified.

89.     The Government has a categorical duty under the Fifth Amendment to pay just compensation when it takes private property for a public use. *Horne v. Dep't of Agric.*, 576 U.S. 350, 352 (2015). The Secretary of Interior is specifically required to pay to the owner the fair market value of the property. 16 U.S.C. § 459c-5(a). There is a limit of $62,500,000 to the compensation that may be paid. 16 U.S.C. § 459c-7.

90.     The National Park Service is entering into new lease amendments and Wind Down Agreements with the Departing Ranchers to terminate their rights to continue ranching under the provisions permitting the continuation of multi-generational ranching, and to vacate the premises within 15 months. Once these ranches are vacated, the National Park Service intends to use the properties for public uses. However, the Secretary of Interior is not paying the required just compensation, the Conservancy is, and it is unknown whether the compensation that the Conservancy is paying exceeds the maximum amount allowed under 16 U.S.C. § 459c-7.

91.     Private parties, like the Conservancy, are not permitted to pay compensation the Secretary owes the Departing Ranchers for taking their property under the Fifth Amendment. Further, the Secretary has not paid the Agricultural Workers, who have valid possessory property interests, any just compensation.

92.     The Conservancy and Federal Defendants also conspired to create the circumstances that compelled the Departing Ranchers to accept the pay offs and terminate their leases with the National Park Service. If the Conservancy had not paid off the Departing Ranchers, it is highly unlikely that the Departing Ranchers would have terminated their leases and rights. As a result of the Conservancy and Federal Defendants' actions the Agricultural Workers will be evicted. The Agricultural Workers have suffered damages and injuries as a result, including the loss of affordable

housing and the protections identified in the lease template.

93.    The Conservancy took the following overt actions in furtherance of the conspiracy:

A.    The Conservancy, who does not have any leases with the Departing Ranchers, nevertheless paid the them to terminate their lease interests with the National Park Service and vacate their properties and evict the Agricultural Workers from their homes within 15 months.

B.    In order for the Conservancy to control the vacated properties and provide affordable housing for their employees, the National Park Service gave the Conservancy, without a competitive bid process, a lease option and cooperative agreement in exchange for paying the Departing Ranchers off.

C.    The Conservancy reserved for itself in the agreements the right to enforce the Departing Ranchers' obligations to timely vacate the properties and leave them in a suitable condition for the Conservancy's future use.

D.    The Conservancy is paying the Departing Ranchers to evict the Agricultural Workers from their homes. If the Departing Ranchers do not evict them, the Agricultural Workers are informed and believe that the Conservancy or Federal Defendants will.

E.    The Conservancy agreed with the National Park Service to conduct the people's business in secrecy and with a gag order.

94.    The National Park Service took the following overt actions in furtherance of the conspiracy:

A.    Reversed its commitment in the 2021 GMPA to maintain the elk fence that serves as the northern boundary to the planning area. By removing the fence, the National Park Service knew that the ranchers' grazing activities would be severely impeded.

B.    Agreed that the Conservancy should pay off the Departing Ranchers to leave instead of the Secretary.

C.    Deliberately failed to implement the 2021 ROD the GMPA, and EIS mitigation measures even though they remained valid under the law and the National Park Service was under a legal obligation to implement the documents and timely execute 20-year leases.

D.    Provided only short lease extensions to the ranchers instead of the 20-year

1  leases authorized and promised by the 2021 ROD.

2          E.      Rescinded the 2021 ROD and adopted a rejected alternative in the Revised

3  ROD that prohibits most multi-generational ranching without public process.

4          F.      Agreed with the Conservancy to conduct the people's business in secrecy and

5  with a gag order.

6          G.      Facilitated the Conservancy's takeover of prior ranch areas of the Point Reyes

7  National Seashore by, without a competitive bid process, entering into a lease option and

8  cooperative agreement and reserving in the 2025 GMPA the right to use the vacated houses and

9  existing buildings for "park partner operations" and housing for the Conservancy's employees.

10         H.      Changed the 2021 Succession Policy so that it could reconsider future

11 extensions for the remaining leases with ranchers that have not agreed to terminate their leases. One

12 of the factors that will be considered is the important role that ranching can play in maintaining the

13 character of the Historic District in which it is located. However, the National Park Service is well

14 aware that the termination of the other ranch leases will diminish the integrity of the historic districts

15 to the point that they would no longer retain sufficient integrity to be eligible for listing in the

16 National Register of Historic Places.

17         I.      The National Park Service may enforce the Departing Ranchers' obligations

18 to timely vacate the property and leave it in a suitable condition for the Conservancy's future use.

19     95.    The conspiracy is memorialized in a series of written agreements, including the

20 settlement agreement, the Revised ROD, the 2025 Succession Policy, the Payment Agreement and

21 Termination of Lessee Interests, the Wind Down Agreement, and the Lease Amendment.

22                          **SECOND CAUSE OF ACTION**

23              **Fair Housing Act (Title VIII of the Civil Rights Act of 1968)**
                                **42 U.S.C. §§ 3601 et seq.**
24     **(Against Defendants Department of Interior, Secretary, National Park Service, Acting**
                          **Director, and Regional Director)**
25

26     96.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

27     97.    One or more of the following agencies, Department of Interior, Secretary, and

28 National Park Service, are the Departing Ranchers' landlords. The Agricultural Workers are

1    sublessees.

2        98.    The Fair Housing Act (Title VIII of the Civil Rights Act of 1968), 42 U.S.C.A. §§

3    3601 et seq., is the federal statute that protects homebuyers and renters from discrimination on the

4    basis of race, color, religion, sex, national origin, familial status, and disability.

5        99.    "A disparate impact analysis examines a facially-neutral policy or practice ... for its

6    differential impact or effect on a particular group." *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp.

7    2d 133, 142 (E.D.N.Y. 2011). A party may establish a disparate impact by showing that the

8    challenged action had the effect of discriminating on the basis of race or one of the other criteria

9    barred by the Act. *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement*

10   *District*, 17 F.4th 950 (9th Cir. 2021). *Id*. A party is not required to show that the party responsible

11   for those policies or practices had intended to discriminate on such grounds. 42 U.S.C. § 3604.

12       100.    The Federal Defendants' decision to treat similarly situated lessees differently causes

13   a significantly adverse or disproportionate impact on a protected group of individuals. The Federal

14   Defendants have made sure that the Departing Ranchers will be compensated so that they can locate

15   comparable housing. The Federal Defendants have not offered any compensation or affordable

16   housing options for the Agricultural Workers. The Federal Defendants are permitting the

17   Conservancy to reuse the ranch buildings as affordable housing for the Conservancy's employees.

18   There is a serious shortage of affordable housing and extremely long waiting lists for public

19   assistance in West Marin County. Because the Agricultural Workers have an overall proportionally

20   greater need for affordable housing than the Departing Ranchers or the Conservancy's employees,

21   the Federal Defendants' decision deprives Hispanics of affordable housing with a disproportionate

22   impact.

23       101.    The Federal Defendants' decision is not bona fide and legitimate. To appease the

24   environmental groups, the National Park Service, Acting Director, and Regional Director are

25   discarding a decade of studies and analysis demonstrating that the continuation of the multi-

26   generational ranching is preferred; a decision that was also the outcome of an open, legitimate public

27   process.

28       102.    There are less discriminatory alternatives that can achieve the National Park

1    Service's objectives of eliminating ranching at the National Seashore, such as adaptive reuse of the

2    existing housing on the ranches that would allow the Agriculture Workers to remain permanently at

3    affordable rent levels, or replenishment housing. In fact, the EIS recognizes the benefits of adaptive

4    reuse of the existing structures for the Conservancy's employees, but not the Agricultural Workers.

5         103.    The Fair Housing Act provides that a permanent or temporary injunction, temporary

6    restraining order, or other order (including an order enjoining the defendant from engaging in such

7    practice or ordering such affirmative action as may be appropriate) may be granted as relief. 42

8    U.S.C.A. § 3613(c)(1).

9                              **THIRD CAUSE OF ACTION**

10                   **Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.**
      **(Against Defendants Department of Interior, Secretary, National Park Service, Acting**
11    **Director, Regional Director, the Conservancy, and the Departing Ranchers)**

12        104.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

13        105.    Under the Declaratory Judgment Act, in a case of actual controversy in its

14   jurisdiction, a court may declare the rights and other legal relations of any interested party seeking

15   such declaration, whether or not further relief is or could be sought. Any such declaration shall have

16   the force and effect of a final judgment or decree. 28 U.S.C. § 2201(a).

17        106.    An actual controversy exists as to whether the Federal Defendants have violated the

18   Agricultural Worker's Fifth Amendment rights, the Fair Housing Act, and NEPA, all of which

19   provide for a private right of action.

20        107.    There is an actual dispute relative to whether the National Park Service, Acting

21   Director, and Regional Director were required to implement the 2021 ROD, and could not reverse

22   course on the GMPA without providing due process or compliance with NEPA. There is also an

23   actual dispute as to whether the Federal Defendants conspired with the Conservancy to pay off the

24   Departing Ranchers in exchange for the ranchers relinquishing their rights to 20-year leases and to

25   instead lease the ranchers' property to the Conservancy, and whether considering the amount of the

26   Conservancy's payoff the total compensation for property interests at the National Seashore will

27   exceed $62,500,000.

28        108.    The Agricultural Workers are informed and believe that the Federal Defendants and

Conservancy contend their actions were legal. The parties dispute is definite and concrete, touches upon the legal relations of parties having adverse legal interests, and is real and substantial.

109.    There is a substantial likelihood that the Agricultural Workers will suffer injuries as a result of the Federal Defendants and Conservancy's decisions and actions. The Agricultural Workers will lose their homes and could become unhoused.

110.    There is a need for the Court to declare the Federal Defendants' duties under the Fifth Amendment, Fair Housing Act, and NEPA, the Agricultural Worker's rights under these laws, and whether there was a conspiracy.

111.    It is in the public's interest for the Federal Defendants to treat all persons equally regardless of national origin, and to comply with the law.

112.    An actual controversy also exists as to whether the Departing Ranchers can evict or constructively evict the Agricultural Workers from their homes as set forth in the agreements Departing Ranchers have with the Conservancy. The Agricultural Workers contend that the Departing Ranchers cannot do the bidding of the Federal Defendants and Conservancy.

113.    The Agricultural Workers are informed and believe that the Departing Ranchers contend their actions were legal. The parties dispute is definite and concrete, touches upon the legal relations of parties having adverse legal interests, and is real and substantial.

114.    There is a substantial likelihood that the Agricultural Workers will suffer injuries as a result of the Departing Ranchers' actions. The Agricultural Workers will lose their homes and could become unhoused.

115.    There is a need for the Court to declare the parties rights under the law and whether the agreements Departing Ranchers have with the Conservancy are legal.

116.    The Court may order further necessary or proper relief based on a declaratory judgment or decree may be granted against any adverse party whose rights have been determined by such judgment. 28 U.S.C. § 2202.

### **FOURTH CAUSE OF ACTION**

**National Environmental Policy Act 42 U.S.C. §§ 4321 et seq.,**
**Administrative Procedures Act, 5 U.S.C. §§ 551 et seq.**
**(Against Defendants Department of Interior, Secretary, National Park Service, Acting**

1    **Director, and Regional Director**)

2    117.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

3    118.    The Federal Defendants violated NEPA by: (1) failing to implement the 2021 ROD;

4    (2) failing to provide for public input and proceeding; and, (3) not preparing an EIS for the Revised

5    ROD.

6    119.    Section 706(1) of the APA states that "The reviewing court shall...compel agency

7    action unlawfully withheld or unreasonably delayed."

8    120.    The National Park Service is under a mandatory statutory duty to timely amend the

9    1980 GMP. 54 U.S.C. § 100502. On September 13, 2021, the Acting Regional Director fulfilled the

10   National Park Service's mandatory statutory obligation by selecting Alternative B and issuing the

11   2021 ROD and GMPA/EIS.

12   121.    The National Park Service is required to implement Alternative B as modified by the

13   2021 ROD. The ROD is an official record of the agency's decision on a project after completing the

14   environmental review process, and is a legally binding instrument. NPS has no legal authority to

15   deviate from its decision in the 2021 ROD. *Alliance for Wild Rockies v. Cooley*, 661 F. Supp. 3d

16   1025 (D. Mont. 2023).

17   122.    The GMPA made the non-discretionary commitment to offer ranchers who agree to

18   undertake required actions lease/permits with terms up to 20-years. The National Park Service has

19   no discretion left to exercise in issuing the leases. The decision to issue the leases has already been

20   made. The National Park Service created a 48-page detailed ROA template that "would allow

21   ranching activities to continue in a manner consistent with the preferred alternative." The only

22   remaining discrete action left for National Park Service to complete the leases was to fill in the ranch

23   specific information on the lease template. The National Park Service also made the decision that it

24   would not remove fencing to prevent the tule elk from encroaching on grazing lands.

25   123.    Since 2021, the National Park Service, Acting Director, and Regional Director made

26   a deliberate decision not to implement the 2021 ROD and would not issue the ranchers the 20-year

27   leases. The National Park Service, Acting Director, and Regional Director also made a deliberate

28   decision to remove fencing that prevented the tule elk from encroaching on grazing lands. Their

1  recalcitrance in the face of a clear statutory duty amounts to an abdication of statutory responsibility.

2  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 312 F. Supp. 2d 1337, 1343 (D. Or. 2004). The APA

3  requires the National Park Service, Acting Director, and Regional Director's compliance with the

4  2021 ROD be compelled.

5        124.   NEPA expressly requires that a federal agency, like the National Park Service,

6  engage the public before it makes a decision and that engagement is required "to inform the public

7  of an agency's proposed action, allow for meaningful engagement during the NEPA process, and

8  ensure decision makers are informed by the views of the public." 42 U.S.C. § 4332. The National

9  Park Service failed to solicit public input on the Revised ROD. Instead, it proceeded via a secret

10  mediation process that did not include the public or all stakeholders.

11       125.   The National Park Service cannot under the guise of secret settlement discussions

12  arrive at a decision in the absence of NEPA review and that circumvents its consideration of public

13  input. The purpose of NEPA is to inform decision-making; it is not an ad hoc rationalization of a

14  decision already made. NEPA certainly does not sanction the secret process that the National Park

15  Service utilized. The Agricultural Workers were deprived of their procedural rights.

16       126.   NEPA also imposes procedural requirements designed to force agencies to take a

17  "hard look" at environmental consequences. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291,

18  1299 (9th Cir. 2003).

19       127.   The National Park Service cannot rely on the EIS to support the Revised ROD.

20  Federal agencies are required to prepare a supplemental EIS if there is a major Federal action and

21  either substantial changes or significant new circumstances are present. 42 U.S.C. § 4332(C).

22  Supplementation is necessary when the remaining governmental action would be environmentally

23  significant. Major federal actions include the adoption of plans, official policies, etc. 40 C.F.R. §

24  1508.1(w).

25       128.   An agency is required to supplement an existing EIS when "[t]he agency makes

26  substantial changes to the proposed action that are relevant to environmental concerns" or when

27  "[t]here are significant new circumstances or information relevant to environmental concerns and

28  bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1).

129.    NEPA also "requires agencies to prepare a detailed EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The threshold for NEPA analysis "is relatively low: 'It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment.'" *Earth Island Inst.*, 351 F.3d at 1299.

130.    The National Park Service's Revised ROD constitutes a major Federal action. The Revised ROD is substantially different than Alternative B that is relevant to environmental concerns, and there is significant new circumstances and information that has a bearing the Revised ROD and its impacts. Further, the National Park Service's decision to cease multi-generational ranching and evict the Agricultural Workers from their housing constitutes a major Federal action significantly affecting the quality of the human environment for which an EIS is required, but has not been prepared.

131.    The National Park Service alleges that the Revised ROD is not a major federal action under NEPA because it is not a party to the agreements between the Conservancy and the Departing Ranchers and no federal funding is involved in the payments to the Departing Ranchers. The facts show that the National Park Service was not a mere uninterested bystander to an organic decision by the Departing Ranchers to terminate their lease interests. Rather, the Agricultural Workers are informed and believe that the National Park Service took actions to force the Departing Ranchers into the agreements with the Conservancy and that it had the Conservancy pay the just compensation the Secretary of Interior owned the Departing Ranchers for the purpose of avoiding a supplemental EIS and the associated public process and scrutiny, and possibly the monetary limit on property acquisitions.

132.    The National Park Service required, and continues to require, secrecy and gag orders that exclude public input and prevent the ranchers from conferring with interests other than environmental. The National Park Service, Acting Director, and Regional Director deliberately did not implement the 2021 ROD and issue the 20-year leases even though they were under a legal obligation to do so. This decision was essential to an agreement terminating the ranchers' rights and to create uncertainty that makes it difficult for the ranchers to make informed business decision that

can impact profitability and growth. The very short term leases that the National Park Service executed instead meant that if the ranchers fought the taking of their property, they risked having their leases expire and lose their existing multi-generational families eligibility required for renewed leases without any compensation. To add to the pressure on the ranchers, the National Park Service reversed its decision on the tule elk management plan and decided to remove the 2.2 miles of fencing that was "the functional equivalent of a permanent injunction against grazing by ranchers." The fencing was not supposed to be removed until ranching operations ceased. The National Park Service agreed that the Conservancy would pay the just compensation it owed the ranchers for taking their lease interests, and in exchange gave the Conservancy an exclusive lease option and cooperative agreement. The National Park Service will jointly enforce the ranchers-Conservancy payment agreements and the termination of rancher's lease interests. The ranchers are required to enter into Wind Down Agreements and a Lease Amendment with National Park Service to ensure that the Departing Ranchers terminate their interests and vacate the properties as provided for in the payment agreements. The National Park Service retained the right to sue any Departing Rancher that does not complete its obligations in the Wind Down Agreement. The National Park Service revoked the 2021 ROD and GMPA, and issued the Revised ROD and a new management plan to implement the payment agreements. The new management plan was based in part on an alternative the National Park Service had rejected in the EIS. Under the new management plan, zone changes occurs when the property is vacated as required by the payment agreements and Wind Down Agreements. The National Park Service is deeply engaged in the scheme to circumvent NEPA and force the ranchers out of Point Reyes.

133.    Further, the National Park Service is making a conscious decision to cease ranching; it is not executing a "do nothing" alternative. Under Alternative A, the no action alternative, "NPS would issue new lease/permits to the existing ranch families to continue beef and dairy operations on approximately 27,000 acres with terms of 5 or 10 years."

134.    The new alternative adopted by the Revised ROD (that was expressly rejected in the 2021 ROD) will result in "significantly different environmental effects" than those already considered in EIS, and these new effects cannot be easily predicted from the existing analysis. For

1    example, because almost all ranching will cease and the fencing will be removed at round the

2    same time there will be a greater than expected:

3    •    restoration activities (i.e., such as removal of fencing, water developments,

4        roads/crossings, and wildlife barriers/attractants, and habitat restoration in wetlands)

5        because of the increased number of abandoned ranches;

6    •    targeted grazing required to maintain habitat for native plant and animal

7        communities, including rare and endangered species;

8    •    disturbance regimes that may need to be maintained by the National Park Service;

9    •    management, early detection, and adaption of integrated pest management strategies

10        for areas where ranching is no longer occurring;

11    •    mitigate necessary for ongoing water quality impacts;

12    •    maintenance requirements for stock ponds documented as California red-legged frog

13        habitat;

14    •    maintenance requirements for resource protection;

15    •    new fencing in areas where targeted grazing is prescribed;

16    •    adaptive reuse of vacant, historic ranch complexes to support their long-term

17        preservation;

18    •    mowing and use of prescribed burns to maintain the integrity of the historic

19        pasturelands;

20    •    road upgrades, decommissioning, and infrastructure improvements to prevent

21        erosion and protect water quality; and,

22    •    waterway vegetation and plantings where added water conveyance capacity and

23        vegetative protection are needed to prevent erosion and improve runoff water quality.

24        There also will be in increase in the elk population and associated damage and impacts. All

25    these needs will be triggered within 15 months and not the five year phase out analyzed in

26    Alternative F. The EIS does not address the impacts of these events occurring at the same time.

27    The EIS also did not evaluate the Conservancy's plans for the property it is leasing.

28        135.    None of the alternatives studied in the EIS address impacts associated with the

37

Case No.

1   eviction of the Agricultural Workers or the cumulative impacts caused by the combination of the

2   elimination of both ranching and Agricultural Worker housing within an area that does not have a

3   sufficient supply of affordable housing.

4          136.   The unanalyzed, conclusory assertion that the Revised ROD would have the same

5   type of effects as previously analyzed alternatives does not allow the impacts to be considered

6   "qualitatively within the spectrum of alternatives" discussed in the EIS. The National Park Service

7   failed to conduct any further analysis because it takes the absurd position that it has nothing to do

8   with the ranchers deciding to terminate their leases.

9          137.   The National Park Service failed to take the requisite "hard look" at the

10  environmental consequences caused by its decisions, specifically:

11          A.     Loss of safe and sanitary housing for low income households within the

12  context of California's housing crisis.

13          B.     Loss of long term housing security and displacement.

14          C.     Increased number of unhoused individuals and households that will be

15  exposed to more: outdoor air pollution that leads to higher incidence of cardiovascular and

16  respiratory mortality rates; noise pollution; interactions with police; crime and violence;

17  criminalization by anti-camping ordinances; food insecurity; difficulties with evacuations during

18  emergencies; extreme heat and cold temperatures; and infectious diseases. The unhoused persons

19  lack access to clean water and sanitary services. Their utilization of survival tactics, like waste

20  disposal and burning materials for heat, affects both the health of the individual and the environment.

21  They are also separated from community identity.

22          D.     Increased homelessness encampments that can contribute to trash ending up

23  in waterways, where it can harm aquatic life and increase bacteria levels.

24          E.     Increased need for California to provide public services to support displaced

25  workers and their families and for public safety when the State is facing a serious budget deficit.

26          F.     Air quality impacts from conducting restoration activities, adaptive reuse of

27  historic ranch complexes, road upgrades, and the mowing and use of prescribed burns.

28          Among other things, the National Park Service's decision to evict the Agricultural Workers

38

is not the result of an extensive analysis of various alternatives. There is no explanation of how National Park Service reached its decisions. The National Park Service's failure to analyze and disclose these impacts violates NEPA.

138.    An EIS should include a reasonably complete discussion of possible mitigation measures, and its omission undermines NEPA's "action-forcing" function. The mitigation measures discussed in Appendix F are for Alternative B. Mitigation measures are not discussed for the selected alternative in the Revised ROD. While adaptive reuse of structures in the ranch complexes is specifically recognized in the Final EIS as a strategy for maintaining structures and historical preservation, it should be implemented as a mitigation measure to provide affordable housing for the Agricultural Workers. This mitigation measure would have long-term, beneficial effects for the community. The Secretary is authorized to enter into leases for buildings and associated property. 54 U.S.C. § 102102.

139.    The National Park Service is also failing to comply with Executive Order 12898 of February 11, 1994. Under this Order federal agencies are required to consider alternatives that will avoid or minimize "disproportionately high and adverse" impacts on low-income communities or communities of color. There has been no environmental justice analysis of National Park Service's decision to eliminate housing.

140.    The Executive Order also requires a federal agency to "conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin." But, this is exactly what the National Park Service by preventing the Agricultural Workers from participating in the litigation to protect their interests and providing pre-deprivation due process. The National Park Service sidelined minority and low-income populations from the decision-making process.

141.    A court may set aside a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", contrary to a constitutional right, in excess of

1   its statutory jurisdiction, authority, or limitations, or short of statutory right, or "without observance

2   of procedure required by law." 5 U.S.C. § 706(2). The National Park Service's decisions and actions

3   described above are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

4   law, in excess of its statutory jurisdiction, authority, or limitations, or short of statutory right, and

5   without observance of procedure required by law.

6          142.    When an agency violates NEPA, the presumptive remedy is vacatur of the deficient

7   action. *Solar Energy Indus. Ass'n*, 80 F.4th at 997. Vacatur of the National Park Service's decisions

8   is appropriate because under the Ninth Circuit's test, the seriousness of the agency's errors out

9   weight the disruptive consequences of an interim change that may itself be changed. The National

10  Park Service will not seek public review and input, and it has ignored serious environmental impacts

11  caused by its decisions. If the National Park Service's decision is allowed to remain in place while

12  it complies with NEPA, the Agricultural Workers will lose their homes, which would make any

13  injunctive or declaratory relief meaningless.

14                              **FIFTH CAUSE OF ACTION**

15          **Writ of Mandate/Mandamus (All Writs Act), 28 U.S.C. § 1651**
    **(Against Defendants Department of Interior, Secretary, National Park Service, Acting**
16                  **Director, and Regional Director)**

17         143.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

18         144.    Mandamus will lie to compel an administrative agency to perform a mandatory,

19  ministerial duty or non-discriminatory act, to take action upon a matter, or exceeded its authority,

20  to follow the applicable requirements of agency regulations, or to act in the public interest. 28 U.S.C.

21  § 1651. *City of Rochester v. U.S. Env't Prot. Agency*, 496 F. Supp. 751, 765 (D. Minn. 1980)

22         145.    The National Park Service, Acting Director, and Regional Director have a

23  mandatory, ministerial duty to implement the 2021 ROD and issue 20-year leases.

24         146.    The National Park Service also has a mandatory, ministerial duty under NEPA to

25  engage the public before it makes a decision, take a "hard look" at environmental consequences of

26  its decisions, consider possible mitigation measures, and comply with Executive Order 12898 of

27  February 11, 1994. The National Park Service has not complied with any of these requirements

28  relative to its decisions to cease multi-generational ranching and evict the Agricultural Workers

1   from their homes. In the absence of compliance with these requirements, the National Park Service

2   lacks legal authority to implement decisions that are contrary to Alternative B as expressed in the

3   2021 ROD, and is not acting in the public interest.

4        147.    The National Park Service is required to provide the Agricultural Workers with due

5   process that consists of providing fair notice of its actions, holding a hearing before an impartial

6   tribunal as part of the Writ cause of action, and giving the affected persons the right to be heard and

7   present their case.

8        148.    There is no adequate alternative remedy to mandamus relief to require the National

9   Park Service to comply with the law.

10                              **SIXTH CAUSE OF ACTION**

11              **California Tenant Protection Act, Civil Code, § 1946.2**
                **Administrative Procedures Act, 5 U.S.C. §§ 551 et seq.**
12        **(Against Defendants Department of Interior, Secretary, National Park Service, Acting
           Director, Regional Director, the Conservancy, and the Departing Ranchers)**
13

14       149.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

15       150.    Agricultural Workers have continuously and lawfully occupied residential real

16   properties located at the Point Reyes National Seashore for at least 12 months.

17       151.    The owner of residential real property shall not terminate a tenancy without just cause

18   or no-fault just cause under the California Tenant Protection Act (Civil Code, § 1946.2). The

19   residential real property (including leasehold rights) that the Agricultural Workers occupy was

20   purchased by the Secretary of Interior and the Conservancy, and is managed by the National Park

21   Service.

22       152.    There is no "just cause" as that term is defined in California Civil Code, section

23   1946.2, subdivision (b)(1) or "no-fault just cause" as that term is defined in subdivision (b)(2)

24   allowing for any of the Federal Defendants, the Conservancy, or the Departing Ranchers to evict,

25   or conspire to evict, the Agricultural Workers. However, the agreements among the National Park

26   Service, Conservancy and Departing Ranches will result in the actual or constructive eviction of the

27   Agricultural Workers in violation of the California Tenant Protection Act.

28       153.    The Supremacy Clause does not bar enforcement of the California Tenant Protection

Case No.

1   Act against the Federal Defendants. California has a strong interest in tenant protections particularly

2   in light of the State's housing crisis. The presumption against preemption applies because there is

3   no conflict between the California Tenant Protection Act and the statutes that govern the Federal

4   Defendants. *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1209 (9th Cir. 2009).

5                                    **PRAYER**

6           WHEREFORE, Agricultural Workers respectfully prays for relief as follows:

7           1.      Preliminary and permanent injunctive relief.

8           2.      Declaratory relief as set forth in the Complaint.

9           3.      A writ of mandate.

10          4.      For such further and other relief as the Court deems just and proper.

11  DATED: February 3, 2025                HANSON BRIDGETT LLP

12

13                                  By: _____

14                                      ANDREW G. GIACOMINI
                                        PATRICK BURNS
15                                      ALENE M. TABER
                                        BIANCA A. VELEZ
16                                      Attorneys for Plaintiffs
                                        DOES 1-150, Individual Persons

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Case No.

21479076.3