HANSON BRIDGETT LLP
ANDREW G. GIACOMINI, CA SBN 154377
agiacomini@hansonbridgett.com
PATRICK T. BURNS, CA SBN 300219
pburns@hansonbridgett.com
ALENE M. TABER, CA SBN 218554
ataber@hansonbridgett.com
BIANCA A. VELEZ, CA SBN 339795
Bvelez@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366

Attorneys for Plaintiffs
DOES 1-150, Individual Persons

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| DOES 1-150, Individual Persons,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR ("INTERIOR"), a federal agency; DOUG BURGUM, Secretary of the Interior; NATIONAL PARK SERVICE, a federal agency; JESSICA BOWRON, Acting Director of the National Park Service; DAVID SZYMANSKI, Regional Director, Pacific West Region; THE NATURE CONSERVANCY, a District of Columbia nonprofit corporation; BETTY NUNES, TIM NUNES, WILLIAM NUNES, and JACKIE NUNES-HEMELT (HISTORIC A RANCH AND E RANCH); JARROD MENDOZA, KAYLA MENDOZA, LINDA MENDOZA, and JOLYNN McCLELLAND (HISTORIC B RANCH); ROBERT J. McCLURE, and RUTH McCLURE (HISTORIC I RANCH); TOM KEHOE, MIKE KEHOE, EMILY JEAN KEHOE, JANNELLE KEHOE, JUSTIN KEHOE, ANNE KEHOE, TIMOTHY J. KEHOE JR., and TIM KEHOE (HISTORIC J RANCH) collectively "DEPARTING RANCHERS"; and ROES 1 to 30, inclusive,<br>Defendants. | Case No. 3:25-cv-01115<br>Judge: Hon. Lisa J. Cisneros<br><br>Also Filed in Dismissed Case 3:24-cv-09009<br>Judge: Hon. Maxine M. Chesney<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT NATIONAL PARK SERVICE'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES 3:24-CV-09009 AND 3:25-CV-01115 SHOULD BE RELATED (Civil L.R. 3-12)** |

21511647.1

# REQUEST FOR JUDICIAL NOTICE

Plaintiffs hereby requests that the Court take judicial notice of the following pursuant to Federal Rule of Evidence 201 of **Exhibits A-J** to Plaintiffs' Opposition to Defendant National Park Service's Administrative Motion to Consider Whether Cases 3:24-CV-09009 and 3:25-CV-01115 Should Be Related (Civil L.R. 3-12):

**Exhibit A** is the Complaint filed by Plaintiffs Resource Renewal Institute, Center for Biological Diversity, and Western Watersheds Project against Defendant National Park Service on January 10, 2022 in Case No. 3:22-cv-00145 [Dkt. 1].

**Exhibit B** is the Notice of Motion and Motion to Intervene and Memorandum of Points and Authorities in Support Thereof filed by Plaintiffs Resource Renewal Institute, Center for Biological Diversity, and Western Watersheds Project on April 20, 2022 in Case No. 3:22-cv-00145 [Dkt. 30].

**Exhibit C** is the Notice of Motion and Motion to Intervene on Behalf of: Dan and Dolores Evans and Julie Evans Rossotti (PRNS Historic H Ranch and K Ranch); Robert J. and Ruth McClure (PRNS Historic I Ranch); Tim, Tom, Mike, Emily, Janelle, Justin, Anne, and Tim Jr. Kehoe (PRNS Historic J Ranch); Betty, Tim, and Jackie Nunes-Hemelt (PRNS Historic A Ranch, D Ranch, and E Ranch) (collectively, the "Individual Ranchers") and Memorandum of Points and Authorities and Proposed Order in Support Thereof filed on June 8, 2022 in Case No. 3:22-cv-00145 [Dkt. 47].

**Exhibit D** is the Notice of Motion and Motion to Intervene and Memorandum of Points and Authorities filed by Intervenors DOES 18 (the "Agricultural Workers") on October 15, 2024 in Case No. 3:22-cv-00145 [Dkt. 108].

**Exhibit E** is Defendant National Park Service's Response to Motions to Intervene and To File Under Pseudonym filed on November 4, 2024 in Case No. 3:22-cv-00145 [Dkt. 117].

**Exhibit F** is the Civil Minutes of the Office of the Clerk of the United States District Court Northern District of California of the hearing on January 10, 2025 in Case No. 3:22-cv-00145 before Judge Maxine M. Chesney [Dkt. 170].

**Exhibit G** is an excerpt (p. 32) of the transcript of proceedings from the January 10, 2025

2

Case No. 3:25-cv-01115-LJC

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT
NATIONAL PARK SERVICE'S MOTION TO RELATE CASES

21511647.1

1  hearing in Case No. 3:22-cv-00145 before Judge Maxine M. Chesney.

2       **Exhibit H** is an excerpt (p. 45) of the transcript of proceedings from the January 10, 2025

3  hearing in Case No. 3:22-cv-00145 before Judge Maxine M. Chesney.

4       **Exhibit I** is an excerpt (p. 56) of the transcript of proceedings from the January 10, 2025

5  hearing in Case No. 3:22-cv-00145 before Judge Maxine M. Chesney.

6       **Exhibit J** is the Order Closing Case for Statistical Purposes Only issued by Judge Maxine

7  M. Chesney on January 10, 2025 in Case No. 3:22-cv-00145 [Dkt. 168].

8       A Court may take judicial notice of its own records in other cases. *MGIC Indem. Corp. v.*

9  *Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

10

11  DATED:  February 10, 2025          HANSON BRIDGETT LLP

12

13            By: _____

14            ANDREW G. GIACOMINI

          ALENE M. TABER

15            BIANCA A. VELEZ

16            Attorneys for Proposed Intervenors Agricultural

          Workers Appearing as DOES 1-8

17

18

19

20

21

22

23

24

25

26

27

28

3          Case No. 3:25-cv-01115-LJC

21511647.1     REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT
NATIONAL PARK SERVICE'S MOTION TO RELATE CASES

# EXHIBIT A

Laurence ("Laird") J. Lucas (CA Bar No. 124854)
llucas@advocateswest.org
Elizabeth H. Potter (*pro hac vice* application to be filed)
epotter@advocateswest.org
Andrew R. Missel (*pro hac vice* application to be filed)
amissel@advocateswest.org
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
Telephone: (208) 342-7024

Michael R. Lozeau (CA Bar No. 142893)
michael@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland CA 94612
Telephone: (510) 836-4200

Attorneys for Plaintiffs
RESOURCE RENEWAL INSTITUTE,
CENTER FOR BIOLOGICAL DIVERSITY,
and WESTERN WATERSHEDS PROJECT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL PARK SERVICE, a federal agency, <br><br> Defendant. | Case No. 3:22-cv-145 <br><br> **COMPLAINT** <br><br> (Administrative Procedure Act Case) |

**INTRODUCTION**

1.    Plaintiffs Resource Renewal Institute, Center for Biological Diversity, and Western Watersheds Project challenge Defendant National Park Service's (NPS or the "Park Service") decision to expand beef and dairy ranching on public lands within Point Reyes National Seashore and Golden Gate National Recreation Area (GGNRA). In so doing, NPS prioritized the commercial needs of ranchers instead of providing maximum protection to the natural environment and supporting the public's use and enjoyment of these majestic lands along the California coast.

2.    In the 1970s and 1980s, Congress spent well over $100 million (in 2021 dollars) buying private ranches to establish Point Reyes National Seashore for "purposes of public recreation, benefit, and inspiration," 16 U.S.C.§ 459c (the "Point Reyes Act"), and to establish GGNRA "for public use and enjoyment…." 16 U.S.C. § 460bb (the "GGNRA Act"). These Acts did not make ranching a purpose of these public lands and did not encourage NPS to allow ranching there. Instead, the Point Reyes Act required NPS to ensure the "maximum protection, restoration and preservation of the natural environment" of the Seashore, thereby prioritizing this duty above all other uses of these public lands, including ranching. 16 U.S.C. § 459c-6(a).

3.    Nevertheless, for decades, NPS has devoted roughly 28,000 acres of these public lands—including almost one third of the lands managed by Point Reyes National Seashore—to commercial beef and dairy ranching despite the significant harm that it causes to environmental, scenic, and recreational values. NPS has long been aware that ranching contributes to violations of state water quality standards, consumes large amounts of surface water and groundwater, promotes invasive and nonnative vegetation, and causes conflicts with wildlife and public recreation. But NPS neglected its duty to carefully consider these effects until Plaintiffs sued in 2016 and forced the agency to decide the future of ranching through an Environmental Impact Statement (EIS) and an amendment to its 1980 General Management Plan (GMP).

4.    During the subsequent public process, more than 100 groups representing millions of members and supporters, along with other individuals, demanded NPS adhere to its statutory mandates to protect these lands by phasing out ranching at the National Seashore and GGNRA.

Plaintiffs, other members of the public, scientists, and other agencies raised a wide range of concerns about the impacts of ranching on the environment and public enjoyment. NPS largely ignored these comments, along with overwhelming public opposition, and prioritized ranchers' commercial interests over public needs. In September 2021, NPS issued a Record of Decision (ROD) adopting a GMP amendment (GMPA) that expanded the lands open to ranching; quadrupled the potential length of leases to 20 years; allowed ranchers to expand their operations with new commercial activities; required killing native tule elk to protect ranchers' profits; and allowed ranching to continue in perpetuity through an unreasonably permissive succession plan.

5.      NPS justified its decision by wrongly claiming that it must allow modern, commercial ranching to protect natural and cultural resources and by misinterpreting its legal duties. In so doing, NPS improperly rejected a "no ranching" alternative that would provide maximum protection for the natural environment—as required under the Point Reyes Act—along with no-dairying and reduced-ranching alternatives that would provide greater protection than the selected GMPA. NPS also ignored substantial evidence that expanding ranching is inconsistent with the agency's duties under the 1916 Organic Act to conserve and leave unimpaired dwindling water resources, native coastal prairie, tule elk, and other important resources for future generations.

6.      In making this decision, NPS also failed to take a hard look at the impacts of expanded ranching on these and other resources as required by the National Environmental Policy Act (NEPA). The EIS purported to include a site-specific analysis for certain ranching activities so that NPS can issue 20-year leases and allow ranchers to expand their commercial operations without further study or public scrutiny. But the EIS failed to disclose baseline information about individual ranches and resource conditions, making it impossible for the public to discern the likely impacts of each lease. Without such key information, NPS also failed to ensure that ranching would cease contributing to violations of state water quality standards.

7.      For these and other reasons, NPS's ROD, GMPA, and EIS are inconsistent with the agency's duties under the Point Reyes Act, the National Park Service's Organic Act, NEPA,

and the Clean Water Act (CWA). Thus, the Court should find that these decisions are arbitrary, capricious, and contrary to law, and set them aside as unlawful.

## JURISDICTION

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Park Service's Organic Act, 54 U.S.C. § 100101 *et seq.*; the Point Reyes Act, 16 U.S.C. § 459c *et seq.*; NEPA, 42 U.S.C. § 4321 *et seq.*; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*

9.      The federal government waived sovereign immunity pursuant to 5 U.S.C. § 702.

10.     An actual, justiciable controversy now exists between Plaintiffs and Defendant. The requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

## DIVISIONAL ASSIGNMENT

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. Under Civil Local Rule 3-2(c) and (d), this civil action should be assigned to the San Francisco Division or the Oakland Division of this Court, because a substantial part of the events or omissions which give rise to the claims herein occurred in Marin County.

## PARTIES

12.     Plaintiff RESOURCE RENEWAL INSTITUTE (RRI) is a nonprofit corporation based in Fairfax, California, in the County of Marin. RRI was founded in 1985 by the late Huey D. Johnson, a former California Secretary of Resources who helped NPS acquire lands for Point Reyes as the co-founder and Executive Director of the Trust for Public Land. RRI fosters innovative and practical natural solutions to increasingly complex environmental problems, and unites diverse stakeholders to test and share these ideas for the benefit of all.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit organization with offices and more than 189,000 members and supporters in California— including over 3,700 members in Marin County—and more than 1.7 million members and

COMPLAINT – Page 4

supporters throughout the world. The Center works to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and law.

14.    Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a nonprofit organization dedicated to protecting and restoring watersheds and wildlife in the American West through education, public policy initiatives, and legal advocacy. WWP has over 12,000 members and supporters, including many in the San Francisco Bay Area. WWP, as an organization and on behalf of its members, is concerned with and seeks to protect and improve the public lands, wildlife, other natural resources, and ecological values of western watersheds.

15.    Plaintiffs and their members, staff, and supporters have spent years working to protect natural resources, wildlife, and public uses from ranching at the Seashore and GGNRA.

16.    Plaintiffs have members, staff, and supporters who live or work near, and who use and enjoy the public lands and waters of, Point Reyes National Seashore and GGNRA for recreational, conservation, educational, and/or other purposes such as hiking, wildlife viewing, photography, scientific study, swimming, and spiritual renewal. They will continue to visit the Seashore and GGNRA in the future for such purposes and to use and enjoy the natural and scenic beauty of the area. Plaintiffs, as organizations and on behalf of their staff, members, and/or supporters, have an interest in protecting and preserving the resources and public uses of these public lands, and are directly harmed by Defendant's decisions challenged herein.

17.    Defendant's violations of law have injured and will continue to injure the aesthetic, conservation, scientific, recreational, educational, procedural, and/or other interests of Plaintiffs and their staff, members, and/or supporters. Defendant's decision to continue and expand commercial livestock ranching harms Plaintiffs' and their members' use and enjoyment of Point Reyes and GGNRA. Ranching prevents them and other members of the public from accessing and enjoying parts of these public lands, and impacts adversely their activities where they do occur. These are actual, concrete injuries caused by Defendant's violations of law, and the judicial relief sought would remedy, in whole or in part, these injuries. Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

COMPLAINT – Page 5

18.     Plaintiffs exhausted their administrative remedies by submitting comments, letters, and other information to NPS during the GMPA planning processes.

19.     Defendant NATIONAL PARK SERVICE is an agency or instrumentality of the United States, within the U.S. Department of the Interior. NPS is vested with the authority and duty to manage and protect Point Reyes National Seashore and GGNRA.

## LEGAL BACKGROUND

### National Park Service Organic Act

20.     Congress created NPS through the Organic Act in 1916 and has since required the agency to promote and regulate the use of the National Park System:

> by means and measures that conform to the *fundamental purpose* of the System units, which purpose is *to conserve the scenery, natural and historic objects, and wild life in the System units* and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and *by such means as will leave them unimpaired for the enjoyment of future generations*.

54 U.S.C. § 100101(a) (previous version at 16 U.S.C. § 1) (emphasis added). The italicized language is often referred to as the Organic Act's "nonimpairment mandate."

21.     NPS defines "impairment" as any authorized activity that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." 2006 NPS Management Policies § 1.4.5.

22.     Where NPS has discretionary authority to authorize a use, such as ranching, that discretion may only be exercised if "the use will not cause impairment or unacceptable impacts." 2006 NPS Management Policies § 1.4.3.1.

23.     The Organic Act also requires NPS to prepare and timely revise general management plans (GMPs) for the preservation and use of all national parks and other lands within its jurisdiction. 54 U.S.C. § 100502. GMPs must address, "measures for the preservation of the area's resources" along with "types and general intensities of development … associated with public enjoyment and use of the area," among other elements. *Id.*

### Point Reyes National Seashore Act

24.     In 1962, Congress enacted the Point Reyes Act to establish the Point Reyes National Seashore as part of the National Park System in order "to save and preserve, for

1    purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of

2    the United States that remains undeveloped….” 16 U.S.C. § 459c.

3    25.    The Point Reyes Act authorized the Secretary of the Interior (Secretary) to acquire

4    the lands, waters, and other property within the bounds of Point Reyes peninsula. 16 U.S.C.

5    § 459c-2, 459c-4. The original enabling act prohibited the taking of agricultural lands by eminent

6    domain, so long as they remained agricultural. Pub. L. No. 87-657, § 4, 76 Stat. 538, 540 (1962).

7    But in 1970, completion of the National Seashore was in jeopardy, so Congress amended the

8    Point Reyes Act to repeal the provision prohibiting the condemnation of agricultural lands. Pub.

9    L. No. 91-223, §2(b), 84 Stat. 90 (1970) (now codified at 16 U.S.C. § 459c-7).

10    26.    At that time, NPS was required to manage the Seashore in accordance with laws

11    of general applicability for the National Park System, including the Organic Act. 16 U.S.C.

12    § 459c-6(a) (1970).

13    27.    In 1976, Congress amended the enabling statute to provide additional and more

14    specific direction for the management of the Seashore. As amended, the Point Reyes Act requires

15    that the Seashore shall be administered “*without impairment of its natural values*, in a manner

16    which provides for such recreational, educational, historical preservation, interpretation, and

17    scientific research opportunities as are consistent with, based upon, and supportive of the

18    *maximum protection, restoration, and preservation of the natural environment within the*

19    *area*….” Pub. L. No. 94-567, § 7(a), 90 Stat. 2692, 2695 (1976) (emphasis added) (codified at 16

20    U.S.C. § 459c-6(a)). The Park Service unsuccessfully opposed this amendment, claiming it

21    would be inconsistent with existing ranching operations at the Seashore.

22    28.    In 1978, Congress again amended the Point Reyes Act to allow owners of

23    agricultural property not yet acquired by NPS to elect, at the time of acquisition, a right of use

24    and occupancy (RUO) for 25 years, or for the life of the owner or their spouse. Pub. L. No. 95-

25    625, § 318(b), 92 Stat. 3467, 3487 (1978) (codified at 16 U.S.C. § 459c-5(a)). Congress also

26    provided the Secretary with the option to lease out formerly agricultural land, provided that such

27    leases “shall be subject to such restrictive covenants as may be necessary to carry out the

28    purposes of” the Point Reyes Act. *Id.* When passing this amendment, Congress did not alter the

Act's public purposes, did not make ranching a purpose of the Act, and did not repeal the Act's mandates that NPS ensure the non-impairment and maximum protection of natural resources.

**The GGNRA Act**

29.    Congress established GGNRA in 1972 "[i]n order to preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic, and recreational values, and in order to provide for the maintenance of needed recreational open space necessary to urban environment and planning…." Pub. L. No. 92-589, § 1, 86 Stat. 1299, 1299 (codified at 16 U.S.C. § 460bb).

30.    The GGNRA Act provides that the Secretary "shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management … and shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C.§ 460bb.

31.    In 1978, the GGNRA Act was amended with the Point Reyes Act to similarly authorize NPS's acquisition and leasing of agricultural property. Pub. L. No. 95-625, § 317(c), 92 Stat. 3467, 3485 (1978) (codified at 16 U.S.C. § 460bb-2(j)).

**FACTUAL BACKGROUND**

**History of Point Reyes National Seashore and Northern District of GGNRA**

32.    Point Reyes National Seashore is located on a coastal peninsula in western Marin County, California, and encompasses more than 71,000 acres, 80 miles of undeveloped coastline, and the tide and submerged lands to a quarter mile offshore. It contains stunning and diverse natural landscapes such as breathtaking headlands, coastal cliffs, sandy and rocky beaches, rolling grasslands, coastal forests, meandering streams, and bays and inlets. Approximately 32,000 acres is wilderness, which encompasses forests, grasslands, beaches, and coastline, and includes over 100 miles of trails. Point Reyes is the only National Seashore on the West Coast and its natural resources are among the most diverse in the National Park System.

33.    Point Reyes National Seashore has a rich cultural heritage that began with the indigenous Coast Miwok, who inhabited the peninsula since time immemorial. In the 1800s,

settlers largely displaced these native people from their ancestral territory, and subsequently established cattle ranching throughout the area.

34.     After the Point Reyes Act established the National Seashore, NPS purchased more than a dozen privately-owned ranches within its boundaries during the 1970s for at least $14,000,000, which equates to more than $100,000,000 in 2021 dollars. NPS similarly purchased private ranches in the 1970s to create GGNRA. Given the overlap with ranch management issues between these two parks, the Park Service administers approximately 15,000 acres of the Northern District of GGNRA together with Point Reyes National Seashore.

35.     In 1980, NPS issued the first GMP for Point Reyes National Seashore and the Northern District of GGNRA. The 1980 GMP delineated a 19,854 acre "Pastoral Zone" within the Seashore where livestock ranching could continue "where feasible" and "within the limits of carefully monitored range capacities." Nevertheless, the 1980 GMP recognized that "natural resource management considerations will not support grazing in all areas where it has occurred historically" and that operations were restricted to "the use of the lands to traditional ranching only." It also determined that "the primary objectives for the park must continue to relate to the natural integrity of the seashore, upon which the quality of a Point Reyes experience totally depends."

36.     NPS has since authorized approximately 24 ranching operations on approximately 18 allotments across approximately 18,000 acres within the Seashore, which include six dairy operations that occupy approximately 6,300 acres, and on approximately 13 allotments across 10,000 acres within the northern GGNRA, which solely include beef ranches.

37.     NPS has also allowed some ranchers to expand their commercial operations to include thousands of chickens and horse boarding. And in some cases, when ranchers left the Seashore, their leased acres were transferred to other ranching operations, enlarging them, rather than returning those lands to nature. NPS has also allowed ranchers to pursue other operations for personal use, resulting in an unknown number of other livestock and pets on public lands.

38.     The following map depicts the 31 ranching allotments spread across 28,000 acres of these public lands where NPS has allowed private, commercial ranching to continue:

COMPLAINT – Page 9



| Allotment | Ranch | Permit Acres |
|---|---|---|
| 1 | A Ranch (Dairy) | 838 |
| 2 | B Ranch (Dairy) | 1,257 |
| 3 | C Ranch/D Ranch (Dairy) | 850 |
| 4 | D Ranch Pasture B & C | 581 |
| 5 | E Ranch | 1,372 |
| 6 | F Ranch | 1,510 |
| 7 | ATT | 481 |
| 8 | G Ranch | 1,151 |
| 9 | D. Rogers Ranch | 382 |
| 10 | M Ranch | 1,178 |
| 11 | H Ranch | 1,099 |
| 12 | I Ranch (Dairy) | 1,076 |
| 13 | L Ranch (Dairy) | 1,126 |
| 14 | K Ranch | 566 |
| 15 | J Ranch/K Ranch (Dairy) | 1,134 |
| 16 | N Ranch | 924 |
| 17 | Home Ranch Developed Complex | 20 |
| 18 | Home Ranch | 2,660 |
| 19 | Martinelli Ranch | 259 |
| 20 | Genazzi Ranch | 436 |
| 21 | E. Gallagher Ranch | 320 |
| 22 | McFadden Ranch | 335 |
| 23 | C. Rogers Ranch | 229 |
| 24 | Zanardi Ranch | 404 |
| 25 | McIsaac Ranch | 1,403 |
| 26 | Cheda Ranch | 808 |
| 27 | Percy Ranch/Percy ROP* | 687 |
| 28 | Stewart Ranch/Lupton/Truttman | 2,166 |
| 29 | Stewart Ranch Developed Complex | 19 |
| 30 | R. Giacomini Ranch | 1,858 |
| 31 | Commonwealth/Niman ROP** | 781 |

### Legend

- Point Reyes Administered Land
- GMP Amendment Planning Area
- NPS Lands Outside Planning Area
- County Boundary
- Major Road
- Reserved Life Estate
- Beef Cattle Operations *
- Dairy Operations *

Sources:
NPS 2016-2018, ESRI 2017

North

0   4 Kilometers
0   2.5 Miles

### Natural Resources and Public Uses of the National Seashore and GGNRA

39.     More than 2 million people visit the Seashore each year to enjoy its inspiring scenery and natural resources, to view wildlife, and to engage in recreational or educational activities. Tourism's economic contributions to the local economy dwarf those of ranching, with tourism generating nearly $100 million more than ranching within gateway communities and

creating nearly 10 times more jobs than ranching.

40.    The Seashore's freshwater resources include wetlands, lakes, small rivers, and streams. The Seashore's coastal and marine resources include Tomales Bay, a "Wetland of International Importance" under the Ramsar Convention in 2002; Drakes Estero, the only West Coast marine wilderness south of Alaska, and its several bays and inlets; and Bolinas Lagoon and Bay. Point Reyes also supports four California Areas of Special Biological Significance (ASBS), including Duxbury Reef and Point Reyes Headlands.

41.    The Seashore provides habitat for a rich array of wildlife, including dozens of species of mammals, reptiles, and amphibians, and about 490 species of birds. Around 50 species there are listed as threatened, endangered, or rare under the Endangered Species Act (ESA) and other laws, including coho and Chinook salmon, steelhead, and snowy plovers.

42.    The Seashore is the only place within the National Park System where visitors can observe tule elk, which roamed freely for millennia until being extirpated from the Seashore by the 1860s through hunting and cattle ranching. In 1976, Congress required the Department of the Interior to reintroduce tule elk to areas of California with suitable habitat, including the Seashore. *See* Pub. L. No. 94-389, 90 Stat. 1189 (1976). Congress recognized that "the protection and maintenance of . . . Tule elk in a free and wild state is of educational, scientific, and esthetic value." *Id.* Pursuant to that law, tule elk were reintroduced to the Seashore in 1978.

43.    Three herds of tule elk currently exist in the park: the Drakes Beach herd that roams between the Point Reyes Highlands, Drakes Beach Road, and ranches; the Limantour herd that inhabits the wilderness areas and adjacent lands; and the Tomales herd that is confined to 2,600 acres behind a ten-foot-high, three-mile-long fence at Tomales Point in order to prevent elk from inhabiting public lands used by ranchers.

44.    The Northern District of GGNRA is approximately 15,000 acres nestled between Point Reyes Station and Bolinas in Marin County along the Bolinas Ridge. Lagunitas and Olema Creeks are two major waterways there that drain into Tomales Bay at the northern edge.

**The Harmful Impacts of Ranching on Natural Resources on these Public Lands**

45.    Beef and dairy ranching have harmed and continue to harm the natural resources,

COMPLAINT – Page 11

wildlife, scenery, and public use and enjoyment of the Seashore and GGNRA in many ways.

46.     Unlike livestock grazing on other federal public lands that typically occurs seasonally, NPS has allowed ranchers to graze and confine approximately 6,000 cattle year-round at Point Reyes and GGNRA. But grasslands there cannot support such intense use, so cattle typically require supplemental feed during fall and winter when forage growth is limited.

47.     Cattle grazing and other ranching activities impair water quality, alter stream channels and hydrology, compact riparian soils, reduce riparian and upland vegetation, and increase runoff, erosion, and sediment loads into water bodies. Water quality problems include excessive concentrations of fecal coliform and other bacteria—which can pose health and disease risks to humans and wildlife—along with turbidity, suspended solids, oxygen-depleting compounds, and nutrients. NPS has opined that bacterial and nutrient pollution associated with ranches are among the principal threats to the Seashore's water quality. In addition, ranching can consume more than 100 million gallons of water each year, which is largely extracted from sensitive and limited groundwater and surface water sources at the Seashore and GGNRA.

48.     Such impacts to water quality and quantity impair or eliminate important fish habitat components and adversely affect salmonids and other fish species. The Seashore and GGNRA contain threatened and endangered coho and Chinook salmon and steelhead trout as well as designated critical habitat for coho and steelhead. According to the National Marine Fisheries Service (NMFS), the population of Central California Coast coho salmon that spawns in the Lagunitas Creek watershed is the southernmost wild, independent population of coho salmon along the Pacific Coast and is critical to the survival and recovery of the species. Ranching has led to "degraded" habitat conditions for these species that threatens their survival.

49.     Grazing negatively impacts other wildlife species as well. Some ranchers seed non-native grasses and other plants to produce silage and forage, which displaces native species, and mow fields to increase forage for livestock, which kills, injures, and displaces small mammals and ground-nesting birds. Livestock operations support unnaturally dense populations of ravens, which are major nest predators for the endangered snowy plover.

50.     Grazing erodes soil and increases the abundance of invasive and non-native plant

species and decreases the abundance of native species, including those found in sensitive areas like coastal prairies, coastal dunes, wetlands, and riparian areas. After decades of grazing these lands, non-native species dominate grasslands at the Seashore. On numerous occasions, cattle have been found grazing in sensitive habitat areas, including Abbott's Lagoon.

51.     Ranchers rely on industrial equipment and infrastructure that harm the environment, natural resources, wildlife, scenic values, and public use. Ranchers use hundreds of miles of barbed wire and electric fencing that impede and harm wildlife, including tule elk, and prevent the public from accessing and enjoying large portions of public lands. Ranchers drive off-road vehicles to traverse grasslands and other sensitive terrain, which can compact and erode soils, trample vegetation, harm wildlife, and generate pollution.

52.     Dairy ranches include extensive infrastructure, including milking, loafing, and hospital barns; structures for milk storage and processing; drainage systems and lagoons that can impound more than 10 million gallons of manure and wastewater; and trucks and irrigation systems to dispose of manure and wastewater on fields. Notably, NPS has allowed ranchers to decide where to dispose of manure and wastewater at the Seashore and does not track how much manure and wastewater is disposed of each year. Dairies generally have higher densities of cows and produce much greater quantities of concentrated manure and water pollution and consume several times more water than beef operations.

53.     Most ranch allotments include "ranch complexes" with multiple residential buildings and trailers to house nearly 200 ranchers, employees, and their families. Residences rely on septic systems with tanks and leach lines for sewage disposal, and obtain water from springs or wells, although some ranchers receive water from NPS or a local utility.

54.     Ranches generate substantial traffic on Sir Francis Drake Boulevard, the Seashore's main public thoroughfare. Heavy trucks visit dairies daily to collect milk. Tanker trucks travel across roads and fields to dispose of manure on fields. Large hay trucks bring in supplemental feed when forage in fields is inadequate to sustain cattle. These vehicles degrade public roads, cause traffic jams, and pose safety concerns for visitors.

55.     Ranching operations impede and impair recreational opportunities for the public.

COMPLAINT – Page 13

The public is technically allowed to recreate on ranching pastures where cattle graze, but misleading or erroneous signs, harassment and intimidation, fencing, a lack of public education, cattle, and unpleasant sights and sounds often prevent such access. Moreover, cattle grazing drives away other wildlife, reducing visitors' ability to enjoy viewing such wildlife.

56.    Although many impacts are caused by authorized activities, some impacts have been caused by negligent or potentially intentional violations of ranching leases. Plaintiffs and other members of the public have informed NPS that ranchers have allowed litter and debris to accumulate on public lands, including one ranch that maintained a significant trash dump full of rusted vehicles and equipment for years or possibly decades; that one rancher bulldozed several hundred feet of native vegetation and soil into a creek that drains into Drakes Estero; that some ranchers may maintain unauthorized livestock and crops for commercial purposes; and that many ranchers have left cow carcasses to rot, which attracts ravens and pests.

**NPS's Failure to Timely Revise its 1980 General Management Plan**

57.    When the original RUOs and life estates expired—which mostly occurred in the 1990s and 2000s—NPS quietly began issuing leases that allowed ranching to continue without first assessing the environmental impacts of doing so.

58.    By 2000, NPS had launched a public process to revise the GMP due to changed conditions, and almost a decade later it announced that a draft GMP was ready for release. On information and belief, NPS had completed internal policy reviews on a draft GMP and was ready to release it to the public, but ranching and political influence sidelined this publication.

59.    Around 2014, rather than finishing its work to update the GMP, NPS began a Ranch Comprehensive Management Plan/Environmental Assessment to meet ranchers' demands for longer leases and an expansion of permitted activities to support their economic needs.

60.    On February 10, 2016, Plaintiffs filed a lawsuit against NPS, challenging the agency's longstanding failure to timely revise its 1980 GMP and its decisions to authorize ranching without ever analyzing its impacts. *RRI v. NPS*, No. 3:16-cv-00688-SBA, ECF No. 1 (N.D. Cal. Feb. 10, 2016). After the district court denied NPS's motion to dismiss, Plaintiffs, NPS, and intervenors—two groups of ranchers and Marin County—reached a settlement in 2017

1    that required NPS to prepare a GMP amendment (GMPA) covering the lands leased for ranching

2    along with an environmental impact statement. *Id.*, ECF No. 143. NPS committed to studying no

3    ranching, reduced ranching, and no dairying alternatives in the EIS, and the settlement allowed

4    NPS to issue interim 5-year ranch leases while the planning process was taking place. *Id.* at 6–7.

5              **The Listing of the Historic Dairy Districts**

6              61.    In July 2017, the Acting Superintendent of the Seashore nominated two historic

7    districts for inclusion on the National Register of Historic Places: the Point Reyes Dairy Ranches

8    Historic District and the Olema Valley Dairy Ranches Historic District.

9              62.    The Point Reyes Dairy Ranches Historic District is comprised of 17 ranch areas

10   and covers most of the Point Reyes Peninsula. The Olema Valley Dairy Ranches Historic

11   District is comprised of 19 historic ranch areas located in the eastern portion of the Seashore and

12   the northern end of GGNRA. The Olema Valley Dairy Ranches Historic District was added to

13   the National Register in April 2018, and the Point Reyes Dairy Ranches Historic District was

14   added in October 2018.

15             63.    With the exception of the Percy, Niman, and Martinelli ranches, all of the ranches

16   remaining at the Seashore and Northern District of GGNRA are located within either the Point

17   Reyes or Olema Valley Dairy Ranches Historic District.

18             64.    The two districts are listed as historically significant because of their association

19   with the history of dairy ranching in Marin County from the mid-1800s through the 1950s and

20   because they contain buildings and structures that reflect that history.

21             65.    The approved nominations for both districts discuss how most of the dairies at the

22   Seashore and GGNRA were relatively small dairies that milked between 100 and 250 cows at the

23   end of the period of significance in the 1950s. In recent years, the dairies remaining at the

24   Seashore have milked approximately 200 to 400 cows, but are authorized for even more.

25             66.    The approved nominations for both districts discuss how the "death knell" for

26   most of the dairies in the districts was the advent of strict water quality laws in the 1970s. The

27   dairies that remained in business—including the dairies that are still operating at the Seashore—

28   had to install new structures and make other capital improvements in order to comply with the

COMPLAINT – Page 15

new water quality laws. Those structures and improvements do not contribute to the historic character of the districts.

**NPS's Planning Process and Proposed GMPA**

67.     Prior to preparing its EIS for the new GMPA, NPS sought public comment about significant issues and potential alternatives to consider and received thousands of public comments in response.

68.     NPS published a draft EIS in August 2019, and a final EIS in September 2020 that studied six alternatives for managing approximately 28,000 acres in the Seashore and GGNRA. Each alternative included strategies to preserve natural and cultural resources and to manage infrastructure, visitor use, ranching, and tule elk. The EIS also included proposed desired conditions for natural resources that would be part of the GMPA.

69.     Alternative A was the "no action" alternative that would continue existing management under the 1980 GMP. Under this alternative, NPS would issue new five- or ten-year leases/permits for existing beef and dairy ranches on approximately 27,000 acres. The EIS revealed that 7,600 acres of this area were not zoned for such use under the 1980 GMP, thus admitting that nearly a quarter of the ranching that NPS had authorized for decades violated the 1980 GMP.

70.     Alternative B—NPS's "preferred alternative" and "proposed action"—would expand lands zoned for ranching under the 1980 GMP by about 7,000 acres for a total of 28,100 acres under the GMPA: a 33% increase. Within this so-called ranchland zone, NPS would create subzones: 16,900 acres for range, where only cattle grazing could occur unless NPS decided to allow other activities in that zone; 9,000 acres for pasture, where a suite of vegetation management activities such as seeding, mowing, manure dumping, and forage and silage production[1] could occur, along with some new commercial activities; 220 acres for the ranch core, where 18 residentially-occupied ranch complexes and most new commercial activities and

---

[1] Forage and silage production are intensive activities that include seedbed preparation, manure spreading, seeding—typically of non-native plants—and harvest mowing to provide feed for livestock. Silage is cut earlier in the season than forage and is wetter.

COMPLAINT – Page 16

new infrastructure would occur; and 2,000 acres for resource protection, where ranching

activities would supposedly be prohibited unless NPS decided to allow an undefined amount of

targeted grazing and other management activities. The GMPA would devote 600 acres, or only

3% of the planning area, to other purposes within a scenic landscape zone.

71.     Alternative B included almost everything that ranchers demanded: 20-year leases,

quadruple the length of existing leases; expansion possibilities for poultry farming and other

livestock, crops, processing facilities, and other commercial activities; lethal control of the

Drakes Beach tule elk herd, based on a population cap of 120 animals that would likely require

killing 12–18 elk each year; lethal control for the Limantour tule elk herd if elk traveled beyond

their core area and established new herds or concentrated on ranchlands; and a generous

succession policy that would offer the current leaseholders—many of whom are descendants of

prior landowners—new leases at the expiration of old ones, paving the way for ranching to

continue in perpetuity. NPS would also allow current, intensive livestock levels: 2,400 AUs[2] of

beef cattle and 3,115 dairy animals.

72.     Alternative C was identical to Alternative B with one exception: NPS would

lethally remove the *entire* Drakes Beach tule elk herd.

73.     Under Plaintiffs' settlement with NPS, NPS was required to study different

alternatives to reduce ranching, eliminate dairying, and phase out ranching. For the reduced

ranching alternative in the EIS, Alternative D, NPS did not choose to reduce ranching based on

maximizing the protection of the environment or natural resources. Instead, NPS proposed to

reduce ranching by eliminating grazing-only leases that lack a ranch complex or substantial

infrastructure on approximately 7,500 acres while otherwise allowing existing operations to

continue. For the no-dairying alternative, Alternative E, NPS proposed to give dairy operations

five years to close or convert to beef ranching. Alternative F, the restoration alternative, would

---

[2] NPS defines an "animal unit" (AU) as one mature (1,000 pound) cow with or without a calf up
to 1 year old or the equivalent based on the average daily forage consumption of 26 pounds of
dry matter per day. NPS uses AUs to authorize beef ranches but employs a per-head limit for
most dairy operations.

discontinue all ranching operations within five years, increase opportunities for visitors to use and enjoy these public lands, and remove the elk fence from Tomales Point.

74. For Alternatives B through E, ranchers would be required to sign a generic lease with standard terms and conditions. Ranch-specific details, including AU or cattle limits, any new commercial activities, maps delineating subzones, maintenance requirements, and mitigation measures, would be included in a separate ranch operating agreement (ROA). NPS would negotiate these details with ranchers but would not conduct any environmental analysis or accept public comment for ROAs, with the exception of a few types of potential commercial activities, before doing so. NPS would revisit the ROAs and allow for changes annually.

75. For each of the action alternatives, the EIS provided little detail about activities that would support public uses. NPS explained that public use projects would occur "over time" and "subject to available funding" but did not provide any certainty that NPS would complete projects, maintenance, or other work to benefit public use and enjoyment.

76. In contrast, the EIS assumed that NPS would undertake a substantial amount of new work to facilitate projects that would benefit ranchers, including lethal control and hazing of tule elk herds, new commercial activities, new infrastructure projects, and more. NPS did not question its ability to handle this additional workload, even though the agency has failed to effectively monitor and manage ranch leases in past years.

77. During the planning process, NPS received thousands of public comments. Of the commenters who supported a specific alternative, approximately 91.4% of commenters opposed ranching on various grounds, while only 2.3% of commenters supported NPS's preferred alternative to continue ranching operations.

78. Plaintiffs and their members, supporters, and allies submitted detailed comments at every opportunity during the planning process. Plaintiffs flagged substantial deficiencies in the agency's analysis, provided documentation of on-the-ground problems and impacts associated with ranching, asked numerous questions about potential impacts and NPS's plans, and called on NPS to phase out ranching and restore former ranchlands for public use and inspiration.

79. Other federal and state agencies also provided critical comments to NPS on the

EIS. The U.S. Environmental Protection Agency (EPA) urged NPS to analyze the water usage of proposed activities and consider the impact of climate change on future water supply. The San Francisco Regional Water Quality Control Board (Water Board) was also critical of the agency's water quality analysis, urged NPS to consider the technical and financial feasibility of the proposed mitigation measures, and revealed that implementation of best management practices at ranches have been inadequate to stop exceedances of state water quality standards.

80.     NPS did not fully address or respond to many of the comments submitted by Plaintiffs, other members of the public, and other agencies. The final EIS made limited changes to the DEIS and the proposed action despite overwhelming demand for NPS to choose a different alternative and to better disclose and evaluate impacts of ranching.

**The EIS's Incomplete Baseline Discussion and Impact Analysis**

81.     The EIS for the GMPA purported to analyze the impacts of the six alternatives on water resources, tule elk, vegetation, cultural resources, socioeconomics, and other resources. But the EIS was incomplete or inaccurate in several overarching ways, particularly related to the analysis of the impacts from Alternative B, the proposed GMPA.

82.     First, the EIS did not fully describe the environmental baseline of the planning area. The EIS included broad and general information about resources across the planning area. It largely excluded site-specific information about natural and cultural resources, existing ranch infrastructure and operations, and past monitoring and compliance issues for each ranch.

83.     For example, for cultural resources, NPS focused almost exclusively on the history of ranching, nearly ignoring cultural resources and history related to the Coast Miwok's presence at the Seashore since time immemorial. NPS used a lack of baseline information to decline a detailed analysis of effects on archaeological resources, stating in an appendix to the EIS that the small number of known resources located in the planning area did not warrant such an analysis. But the EIS did not disclose that the 72 Native American archaeological sites which comprise the Indigenous Archaeological District likely constitute only a small fraction of the sites at the Seashore (and in the planning area), because only 6% of the Seashore has been intensively surveyed for archaeological resources.

84.     The EIS also included little baseline information about water resources, particularly for the Pacific Drainages, the ASBS areas, and Drakes Bay watershed and wilderness area. It included less than a page about baseline conditions for water quantity issues, and included conflicting information about the amount of water that ranches consume. Although it admitted ranchers may use more than 100 million gallons per year, the EIS did not identify the specific surface water and groundwater sources that supply such large quantities of water.

85.     Second, the EIS did not analyze or disclose the impacts of proposed ranching operations at a site-specific level for each of the 31 ranching allotments. The EIS did not include specific details about the operations, infrastructure, or natural resources at each ranch. But the EIS nonetheless asserted that additional NEPA analysis would not be required prior to issuance of 20-year leases or implementation of most ranching activities.

86.     This lack of site-specific analysis for ranching alternatives stemmed, in part, from deferring critical decisions about the scope and details of each ranch's operations—including the actual number of cattle and other livestock allowed, which new commercial operations and management activities could occur, and what maintenance and mitigation measures would be required—until NPS negotiates ROAs with each rancher. The environmental impacts of many of those key decisions will not be disclosed to the public or analyzed in another NEPA analysis.

87.     Third, the EIS assumed that a new subzoning framework—which would allow different ranching activities in pasture, ranchland, and ranch core subzones—along with mitigation measures and management activities would reduce impacts from the baseline. But NPS has yet to formally determine where all subzones are located through on-the-ground verification of ranches and resources. The EIS did not explain how and when NPS would delineate all boundaries for subzones or other exclusion areas *on the ground* to ensure that cattle or other livestock and activities are contained in the proper subzone. The EIS also did not evaluate whether subzoning would be effective, which is a particular concern given that existing barriers have not prevented cattle from grazing in off-limit areas.

88.     The EIS also failed to evaluate the generic mitigation measures included in its attached appendices, or consider their effectiveness or feasibility. Many have yet to be developed

or defined, making it uncertain what measures will ultimately be required, whether they will be effective for site-specific conditions at each ranch, and whether they will provide the maximum protection for the natural environment as a whole. The EIS also failed to address other measures that would provide greater protection to natural resources, such as prohibiting silage mowing during bird nesting season and prohibiting cattle from entering all surface waters and wetlands.

89.     The EIS simply asserted that mitigation measures would be implemented and effective, even though full implementation may take years and is dependent on funding and priorities. It is uncertain how much funding ranching leases will generate, since NPS has yet to conduct a new appraisal process that will purportedly establish fair market value of the leases after decades of collecting below-market lease payments. And it is unknown whether NPS will secure the additional funding that is needed from internal and external sources.

90.     Fourth, the EIS provided little information about the expected impacts of climate change and largely ignored how ranching will exacerbate these effects, even though NPS has recognized that climate change poses one of the greatest threats in the Seashore's history. Most notably, the EIS largely ignored that climate change is expected to exacerbate water quality and quantity problems, assuming instead that tens of millions of gallons of water would continue to be available for ranching consumption each year.

91.     Finally, the EIS focused on many benefits of ranching and the proposed GMPA while downplaying or ignoring adverse impacts for numerous resources, including the following:

92.     For water resources, although NPS has completed little monitoring of water quality over the past decade and none in the past few years, the EIS claimed improvements in water quality had occurred and would continue to occur while ignoring that the data has revealed chronic violations of state water quality standards. Neither did the EIS evaluate whether or how ranches would comply with state water quality standards. Instead, the EIS claimed that the GMPA would reduce pollution compared to the baseline without specifying by how much or how long such reductions would take.

93.     For tule elk, NPS touted the benefits of its 120-elk population cap for the Drakes Beach herd, which was purportedly chosen to keep the Drakes Beach herd viable while ensuring

COMPLAINT – Page 21

adequate forage for cattle on nearby ranches. But in choosing that population threshold and analyzing the issue of forage competition between tule elk and cattle, the EIS used a numerical model that relied on several baseless or incorrect assumptions, including that the animals are evenly distributed throughout the study area. The EIS also discussed the issue of Johne's disease[3] very briefly and without analyzing whether additional mitigation measures related to manure management might protect tule elk from its spread.

94.     For grasslands, the EIS admitted that livestock grazing would perpetuate existing, significant problems with invasive species while ignoring that this would fail to achieve the GMPA's desired condition to limit invasive species. The EIS also focused on specious claims that livestock grazing is needed to maintain grasslands, while brushing aside the substantial benefits to wetlands, coastal dunes, and coastal prairie if ranching is reduced or removed.

95.     For public use and enjoyment, the EIS provided only a cursory analysis of the impacts of ranching, largely ignoring important issues such as potential safety risks from cattle, industrial traffic, and manure disposal. The EIS also unreasonably assumed that public visitation levels would remain flat if NPS restored public use to the 28,000 acres that are currently devoted to private, commercial uses.

96.     As a result of these and other issues, the EIS did not fully or accurately analyze the impacts of the proposed alternatives upon many resources and recreational uses of the Seashore and GGNRA.

**Water Quality Issues and Developments**

97.     During and after NPS's preparation of the EIS, several significant developments related to water quality issues at the Seashore and GGNRA arose.

*Regional Water Board Regulation and Compliance*

98.     Throughout the EIS and planning process, NPS relied heavily on the Water Board's regulation of ranches to address water quality impacts and concerns.

---

[3] Johne's disease is a diarrheal wasting disease of livestock and wild ungulates caused by the bacteria *Mycobacterium paratuberculosis*.

COMPLAINT – Page 22

99.     The Water Board has adopted a Water Quality Control Plan for the San Francisco
Basin (Basin Plan) that designates beneficial uses—including groundwater recharge, water
contact and noncontact recreation, cold and warm freshwater habitat, and wildlife habitat—along
with water quality objectives for surface water and groundwater in the planning area. Water
quality objectives include narrative and numeric standards for bacteria, temperature, turbidity,
dissolved oxygen, nitrates, and other parameters.

100.     Beef ranches on lands that drain to Tomales Bay are subject to a Conditional
Waiver of Waste Discharge Requirements for Grazing Operations in the Tomales Bay
Watershed, Order No. R2-2018-0046 ("the Conditional Waiver"). The Water Board issued the
Conditional Waiver in 2018 as part of its efforts to address water quality impairments for
pathogens and sediment in Tomales Bay and its major tributaries, including Lagunitas Creek,
through Total Maximum Daily Loads (TMDL)[4] under the CWA. The Conditional Waiver
requires covered dischargers to, *inter alia*, comply with water quality objectives in the Basin
Plan and not cause or contribute to exceedances of any water quality standards, and to submit
annual certifications that provide information about inspections completed, water quality
problems, and other actions required.

101.     In November 2020, NPS's range manager signed and submitted annual
certifications for the beef ranches but did not report that all of the required inspections were
conducted during the dry and wet seasons. The certifications also revealed that additional
management practices are needed to improve water quality for the grazing operations but lacked
the required detail about the problems and remedies taken to correct those problems.

102.     The Water Board regulates discharges of waste from confined animal facilities,
including dairies, under the General Waste Discharge Requirements for Confined Animal
Facilities Within the San Francisco Bay Region, Order No. R2-2016-0031 ("CAF Order"). This
CAF Order prohibits, *inter alia*, dairies from causing or contributing to an exceedance of any
applicable water quality objective in the Basin Plan. To obtain coverage, the CAF Order required

---

[4] Section 303(d) of the CWA requires a TMDL, which establishes the maximum amount of a
pollutant allowed in a waterbody, for waterbodies that do not meet water quality standards.

dairies that had been covered under the Water Board's Conditional Waiver of Waste Discharge Requirements for Existing Dairies—which expired in June 2020—to enroll by submitting a notice of intent form by September 1, 2020.

103.    On information and belief, the dairies at Point Reyes were covered under the Conditional Waiver of Waste Discharge Requirements for Existing Dairies, but multiple dairies submitted notices of intent to be covered after the September 2020 deadline in the CAF Order. In those notices of intent, some dairies reported that they confine dozens more cattle and have access to thousands of additional acres for manure disposal than the EIS disclosed.

*California Coastal Commission*

104.    In October 2020, NPS prepared a Coastal Consistency Determination (CD) for the California Coastal Commission (CCC) that purported to explain why the proposed GMPA was consistent to the maximum extent practicable with the California Coastal Act of 1976, as required under the Coastal Zone Management Act.

105.    The CCC's staff disagreed with NPS and found that the GMPA was inconsistent with state coastal laws and policies for marine resources and water quality. They found the lack of water quality monitoring was "concerning" and that available data showed violations of water quality standards, particularly for streams that drain to Drakes Estero and the Pacific Ocean. Staff faulted NPS for not proposing adequate measures to address these issues and for lacking a plan to ensure that promised actions result in compliance with water quality standards.

106.    After receiving nearly 45,000 comments nearly all of which urged the CCC to find the GMPA inconsistent with state coastal laws and policies, the CCC narrowly issued a conditional concurrence with NPS's CD on April 22, 2021. The CCC required NPS to develop a new water quality plan that includes a new strategy for improving and monitoring water quality on a set timeline *before* NPS issues new ranching leases, along with a climate action plan that addresses greenhouse gas emissions from ranching.

*Water quality monitoring*

107.    In January 2021, Plaintiff WWP hired a third-party expert engineer to conduct water quality monitoring of drainages at the Seashore's dairy and beef cattle ranches—including

COMPLAINT – Page 24

those that have implemented best management practices to reduce water pollution. The expert concluded that "[b]acteria contamination of surface water significantly exceeds applicable water quality criteria despite the reported implementation of cattle waste management actions." These exceedances pose "[i]mminent human health risks," particularly in places where people are likely to have direct water contact.

108.    In response, the April 2021 Water Board's Executive Officer Report found that WWP's sampling appeared to be of "good quality," concurred that water quality "is poor despite existing pollution prevention ranch practices," and concluded that "additional progress is needed to meet water quality standards during every season and in all sample locations."

*Drought*

109.    In December 2020, Marin County passed a resolution declaring an agricultural emergency drought that was retroactive to January 2020. The resolution declared that the drought was "very dire and is becoming even more grim as holding ponds across the county reach critically low levels."

110.    That fall, NPS prepared an "emergency" water use application to pump water from Kehoe Creek because J Ranch had run out of water to clean its milking facilities and support its dairy cows. Notably, a similar "emergency" occurred just a few years before, with NPS allowing pumping of Kehoe Creek during the 2013–2015 drought.

111.    In May 2021, Marin County issued a county-wide drought emergency after experiencing the lowest rainfall in a 16-month period since 1880.

112.    That spring, the operator of the oldest and largest dairy on the Seashore—Robert McClure—announced that he had sold his dairy cattle and closed his dairy at I Ranch due to dwindling surface water and a groundwater aquifer that stopped recharging. At that point, the ongoing drought in Marin County was worse than any other since 1977. Nevertheless, he announced plans to retain his lease to raise heifers at the Seashore to support his Petaluma ranch.

113.    On information and belief, these drought conditions have prompted ranchers to truck in unknown amounts of water along with hay to support their operations. This increases traffic, greenhouse gas emissions, and other air emissions at the Seashore. Yet the NPS has not

considered these impacts, nor required ranchers to curtail water usage to protect water resources—which include salmon-bearing streams, wetlands, and groundwater—during drought.

**Endangered Species Act Consultation**

114. On March 18, 2021, NMFS issued a Biological Opinion (BiOp) that found the proposed GMPA is likely to adversely affect Central California Coast coho salmon, steelhead trout, and Chinook salmon—species listed under the ESA. NMFS concluded that the recovery of these populations at the Seashore and GGNRA "depend upon programs that protect and restore aquatic habitats in watersheds and the continued reduction of impacts from land use and water withdrawal." NMFS ultimately found that the GMPA will not jeopardize the continued existence of the fish populations. However, NMFS included certain mandatory actions—"reasonable and prudent measures" and associated "terms and conditions"—in the BiOp to ensure that NPS minimizes the amount of harm caused by the GMPA to ESA-listed fish. These required actions include ensuring that riparian fences—in the limited areas they exist—are maintained and repaired in a timely fashion to prevent cattle from accessing streams where salmonids are found.

115. On June 4, 2021, the U.S. Fish and Wildlife Service (FWS) issued a BiOp that found the proposed GMPA is likely to adversely affect California red-legged frog, western snowy plover, Myrtle's silverspot butterfly, beach layia, Sonoma Alopecurus, and the Sonoma spineflower, all species listed under the ESA. The FWS BiOp included mandatory reasonable and prudent measures and associated terms and conditions to reduce the impacts of the GMPA on ESA-listed species. Notably, these required NPS to develop a "raven management program" to help reduce raven predation and thereby protect snowy plovers and include raven control measures in ROAs/leases.

**NPS's Record of Decision**

116. On September 13, 2021—exactly 59 years after President Kennedy signed the Point Reyes Act into law—NPS issued the ROD adopting the GMPA based on Alternative B, the proposed action in the EIS, with minor modifications. The ROD included a nonimpairment determination under the Organic Act, revealing for the first time why NPS believes continuing ranching at the Seashore and GGNRA is consistent with the agency's legal duties.

117.    The same day, the Point Reyes National Seashore Superintendent signed a Succession Policy outlining NPS's procedures for making leasing decisions at the Seashore and GGNRA, which the ROD referenced extensively.

*Modified Alternative B*

118.    Under the modified Alternative B adopted in the ROD, and due to the recent closure of I Ranch, NPS will allow five dairies with approximately 2,425 dairy cattle to operate at the Seashore. This would modestly reduce the acreage devoted to manure management and forage production and add the 580-acre Allotment 4 to the scenic landscape zone. But the ROD did not address whether NPS had accepted the McClure's plans to maintain a lease at I Ranch for raising heifers.

119.    The ROD also announced that NPS will require the remaining dairies, through their initial ROAs, either to modernize manure management practices and infrastructure, convert to beef operations, or cease dairy operations. But the ROD provided no detail about the dairy modernization requirement, and the EIS did not disclose that any dairy practices or infrastructure are outdated, making the scope and effect of this new requirement unclear.

120.    For beef operations, the ROD required NPS to convert a 259-acre grazing pasture in GGNRA to seasonal grazing and discontinue 280 acres of forage production on beef ranches.

121.    The ROD announced that the GMPA would allow ranchers to add, as part of their initial ROAs, dozens of sheep or goats to their livestock operations, and begin farm stays or ranch tours without additional analysis under NEPA. Ranchers could also propose a suite of new commercial activities—including chickens, irrigated row crops, processing facilities for dairies, and mobile slaughterhouses—for NPS to consider and analyze further.

122.    For tule elk, NPS increased the population threshold for the Drakes Beach herd from 120 to 140 without explanation. NPS also promised to coordinate its elk management with the Federal Indians of the Graton Rancheria (FIGR), the federally-recognized tribe in the area.

123.    NPS added and modified some mitigation measures that must be included in the initial ROAs to address, among other things, terms and conditions of the BiOps and additional requirements from other agencies. NPS would also adopt a new water quality strategy along with

1    a climate action strategy as required by the CCC. But NPS did not develop or adopt these

2    plans—including the raven management program required by FWS—prior to the ROD, making

3    their scope, effectiveness, and environmental impacts unclear.

4            *Primary justifications for the GMPA*

5        124.    The ROD provided a few key reasons for adopting modified Alternative B.

6        125.    First, the ROD claimed that the chosen scheme will improve natural resource

7    conditions compared to current conditions due, in part, to the new zoning framework, even

8    though only 3,200 acres are protected from ranching's impacts in the resource protection or

9    scenic landscape zones while the remaining 25,500 acres are zoned for ranching uses. NPS

10   claimed that the 2,000-acre resource protection zone includes "known sensitive resources such as

11   listed species and riparian areas" and that intensive activities would be limited to pasture and

12   ranch core subzones, which supposedly lack sensitive resources.

13       126.    But the EIS admitted that sensitive resources *are* located in the range zone, which

14   includes 81% of the planning area's wetlands and 65% of the riparian forests/shrublands that

15   support sensitive resources, and in the pasture zone, which includes 27% of the planning area's

16   coastal prairie and 3% of coastal dunes that support a diversity of sensitive species. Other

17   uncertainties about when, where, and how NPS would implement subzones and exclude cattle in

18   areas make any potential benefits unknown and questionable. Further, the ROD ignored that

19   activities in the ranch core can have an outsized impact on sensitive resources *outside* of that

20   subzone, particularly related to water pollution and consumption.

21       127.    Second, the ROD stated that the chosen alternative's continuation of ranching

22   would support cultural resources and the Olema Valley Dairy Ranches and Point Reyes

23   Peninsula Dairy Ranches Historic Districts. The ROD concluded that continuing ranching is the

24   preferred preservation treatment and explained that NPS's agreement with FIGR to help manage

25   elk and ranchlands would support preservation of cultural resources.

26       128.    Neither the ROD nor the EIS grappled with the fact that modern ranching—

27   particularly modern dairying—is fundamentally different than ranching as it was practiced

28   during the Historic Districts' period of significance. The chief reason why most of the prior

1    dairies closed in the 1970s was the imposition of strict water quality standards; dairies that

2    remained were forced to make changes to comply with those standards that made their operations

3    look very different than they had looked during the period of significance. NPS did not

4    acknowledge this, nor did it explain how the new modernization requirements that will be

5    imposed on dairies—which will include the installation of even more infrastructure for manure

6    and nutrient management—are compatible with the desire to evoke a bucolic past on the ranches.

7        129.    The ROD's conclusion that discontinuing or reducing ranching at the Seashore

8    and GGNRA would result in adverse impacts to the Historic Districts echoed the conclusions of

9    the EIS. But the EIS did not justify those conclusions; it simply *assumed* that reducing or

10   eliminating ranching would lead to adverse effects to the Districts, including a change in the

11   characteristic vegetation of the pasturelands, without considering viable alternative methods of

12   preservation. NPS neither considered other potential uses for ranch buildings and infrastructure

13   nor addressed evidence indicating that an expanded tule elk population could preserve the

14   character of the ranches by grazing pastures currently grazed by cattle.

15       130.    Finally, the ROD argued that ranching remains an "appropriate use of park

16   lands"; that the proposed action "furthers Congress's interest in seeing ranching continue in the

17   planning area"; and that multi-generational ranching is consistent with Congressional intent. The

18   agency based its conclusion about Congressional intent largely on a selective reading of the

19   legislative history of the Point Reyes Act along with "recent reaffirmation of Congressional

20   support for ranching." But these isolated pieces of legislative history do not overcome the plain

21   language of the Act, which does not endorse continued ranching in perpetuity.

22       **NPS's Nonimpairment Determination**

23       131.    Pursuant to its duties under the PRNS and Organic Acts, NPS analyzed whether

24   the GMPA would impair the resources of the Seashore and GGNRA. The ROD determined that

25   NPS's adoption of modified Alternative B as the new GMPA would not impair water quality and

26   quantity, vegetation, elk, cultural resources, and other resources that NPS analyzed.

27       132.    The ROD reasoned that the GMPA would improve conditions and reduce impacts

28   to these resources compared to current conditions. But this comparative analysis did not address

whether or how these purported changes will be enough to prevent impairment and comply with desired conditions or other resource standards.

133. The ROD also repeated many of the EIS's specious conclusions and relied on key parts of its incomplete and inadequate analysis, and largely ignored or brushed aside new evidence that arose after the completion of the EIS.

134. For example, for water resources, the ROD restated the EIS's finding that water quality has improved in recent years, brushing aside the agency's own (limited) monitoring and expectation that adverse impacts to surface and groundwater quality from nutrients, pathogens, sediment, and other pollutants will occur and potentially be long-lasting. It also failed to address reports from the CCC and the Water Board that limited improvements and best management practices have not stopped violations of applicable water quality standards. Despite such evidence, neither the ROD nor the EIS addressed whether the new GMPA and its mitigation measures would ensure ranching comes into compliance with state water quality standards.

135. And for water quantity, the ROD concluded that water would be available to support ranching in the future because it *has been* available in the past, ignoring climate change and that increasing drought and dwindling water supplies were inadequate to support existing ranching levels just before the ROD was signed.

136. For tule elk, the ROD did not explain why keeping the Drakes Beach herd at 140 individuals rather than some higher population level will better prevent impairment of other resources, nor did the ROD offer any meaningful analysis of how changed conditions since the issuance of the EIS might affect the need for lethal removal of tule elk.

137. The ROD also claimed that NPS need not consider, as part of its nonimpairment determination, impacts to visitor use, experience, and access, even though its own policies require the opposite.

**ROD Implementation**

138. Interim leases issued to ranchers under the *RRI v. NPS* settlement will expire in mid-July 2022. On information and belief, NPS intends to commit substantial resources and time in order to issue new 20-year leases for ranchers under the ROD before those leases expire.

139.    Before issuing new leases for ranchers, NPS must also negotiate individual ROAs for approximately 24 different ranchers, which will entail: 1) conducting on-the-ground surveys to delineate the boundaries of the subzones for each of the 30 ranching allotments; 2) identifying infrastructure and investment commitments for practices that support natural and cultural resource protection, including deferred maintenance and upkeep of more than 100 historic structures and determining which management activities, practice standards, and mitigation measures apply to each rancher's operations; 3) determining how many cattle or other livestock may be confined within each ranch; 4) identifying necessary measures to modernize manure management infrastructure and practices; 5) analyzing ranchers' proposals to expand their commercial activities; 6) considering whether proposed farm stays have sufficient water to avoid unacceptable impacts; and 7) identifying operational adjustments to support tule elk where conflicts with ranches occur. NPS must also conduct or commission up-to-date appraisals to bring leasing rates for ranches up to market rates.

140.    One of the major reasons for NPS's decision to issue 20-year leases as opposed to shorter leases was to give the Point Reyes ranchers greater security, allowing them to more easily obtain loans to make capital investments. On information and belief, Point Reyes ranchers intend to, and will, rely upon the new 20-year leases to secure loans and make investments in new facilities for diversification activities or expanded ranching operations.

141.    On information and belief, NPS may undertake lethal tule elk control actions under the unlawful ROD and EIS during the pendency of this case.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF POINT REYES ACT AND APA**

142.    Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs.

143.    This first claim for relief challenges NPS's ROD and GMPA for violating the Point Reyes Act, 16 U.S.C. § 459c *et seq*. This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

144.    Congress established Point Reyes National Seashore "for purposes of public recreation, benefit, and inspiration…." 16 U.S.C. § 459c. The Point Reyes Act requires NPS to

administer the National Seashore "*without impairment of its natural values*, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are *consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area*," unless otherwise provided. *Id.* § 459c-6(a) (emphasis added). Although the Point Reyes Act allows NPS to lease property that was agricultural prior to acquisition, those leases must be "subject to such restrictive covenants as may be necessary to carry out the purposes of" the Act. *Id.* § 459c-5(a).

145.   The ROD and GMPA are inconsistent with the Act in several ways.

146.   First, NPS unlawfully placed protection of historic dairying districts on par with or above protection of the natural environment and recreational uses of the National Seashore. The ROD and GMPA allow NPS to authorize and expand ranching operations despite evidence that ranching has harmed and will continue to harm water quality and quantity, native grasslands and other sensitive vegetation types, tule elk restoration, other wildlife, and recreational uses. In so doing, NPS rejected mitigation measures and alternatives that would provide stronger protections for the environment and public uses of the Seashore—most notably, Alternative F, the restoration alternative. In reaching this decision, NPS incorrectly interpreted the Point Reyes Act by equating that law's duty to provide for the "maximum protection, restoration, and preservation of the natural environment" with the Organic Act's nonimpairment mandate.

147.   Second, NPS unlawfully prioritized private, commercial needs above "public recreation, benefit, and inspiration"—the overarching purposes of the Act, 16 U.S.C § 459c. NPS did so by, *inter alia*, requiring lethal control of tule elk instead of curtailing ranching operations, allowing ranching to impede and displace public uses of public lands across a large swath of the Seashore, and fast-tracking measures—including expanded commercial operations—to benefit ranches while sidelining projects that would benefit public recreation and inspiration.

148.   Finally, the ROD determined that ranching remains an appropriate use of the Seashore based on an erroneous interpretation of the Point Reyes Act. The ROD stated that Congress has, for decades, intended multi-generational ranching at the Seashore to continue. But this assertion is inconsistent with the plain language of the statute, which did not establish

ranching as a purpose of the Seashore and did not even encourage NPS to issue leases for ranching. Instead, the Act allowed NPS to offer initial leases to prior landowners. But it did not provide a similar preference for subsequent leases to the descendants of those original landowners in perpetuity. Thus, the ROD's determination that ranching should continue under its adopted Succession Policy that gives preference to current leaseholders and their descendants was arbitrary and capricious and contrary to the Point Reyes Act.

149.    For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Point Reyes Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF ORGANIC ACT & REGULATIONS

150.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

151.    This second claim for relief challenges the ROD and GMPA for failing to comply with the Organic Act, 54 U.S.C. § 100101 *et seq.*, and its implementing regulations, 36 C.F.R. § 1.1 *et seq.* This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

152.    The Organic Act requires NPS to regulate use of the Seashore and GGNRA to conserve and provide for the public's enjoyment of scenery, natural and historic objects, and wildlife, and to leave such resources "unimpaired for the enjoyment of future generations", 54 U.S.C. § 100101(a), by, *inter alia*, prohibiting uses that cause "unacceptable impacts." 2006 NPS Management Policies, §§ 1.4.3.1, 1.4.4, 1.4.7.1.

153.    NPS may authorize livestock grazing when such "use is not detrimental to the primary purpose for which" the Seashore and GGNRA were created. 54 U.S.C. § 102101(a)(2). But NPS's policies declare that the agency "will phase out the commercial grazing of livestock whenever possible…." 2006 NPS Management Policies § 4.4.4.1.

154.    The Organic Act allows NPS to destroy animals, provided they are "detrimental to the use of" the Seashore or GGNRA. 54 U.S.C. § 100752.

155.    Consistent with these obligations, the Park Service's regulation that governs its issuance of permits for uses such as livestock grazing requires that such permits be consistent with other federal laws, and "based upon a determination that public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted." 36 C.F.R. § 1.6(a). NPS's regulations also prohibit the introduction of plants into System units. 36 C.F.R.§ 2.1(a)(2).

156.    The ROD and the GMPA violated the Organic Act and its regulations in numerous respects, including but not limited to the following:

    A.    Relying on an inadequate analysis and irrational explanations to support the nonimpairment determination—particularly for water quality and quantity, vegetation, tule elk, wildlife, and cultural resources—which was inconsistent with evidence that shows that ranching impairs or threatens to impair resources and public uses at Point Reyes National Seashore and GGNRA;

    B.    Failing to consider whether the GMPA would impair visitor use, experience, and access based on an erroneous interpretation of NPS's own policies;

    C.    Arbitrarily determining that continued and expanded beef and dairy ranching is necessary to protect the historic dairying districts at Point Reyes National Seashore and GGNRA without fully and adequately considering alternative options to maintain the districts, without considering how modern ranching practices and infrastructure actually detract from the character of and public access to the historic dairying districts, and without considering the fact that some ranches are not located within the historic districts;

    D.    Setting an arbitrary population level for the Drakes Beach herd of tule elk and electing to employ lethal control of tule elk based on a flawed analysis of how tule elk impact other park resources; and

    E.    Allowing livestock grazing that is detrimental to the primary purposes of the

COMPLAINT – Page 34

Seashore, which are public benefit, inspiration, and recreation, and GGNRA, which are public use and enjoyment, that will cause adverse impacts to public health and safety, environmental or scenic values, and natural or cultural resources, and that will introduce and perpetuate non-native and invasive plants.

157.    For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Organic Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

158.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

159.    This third claim for relief challenges NPS's ROD, GMPA, and EIS for failing to comply with NEPA. This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

160.    NEPA's goals are to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c).[5]

161.    To that end, NEPA requires federal agencies to prepare an EIS before taking action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332. An EIS must include, *inter alia*, a detailed statement of: (1) the environmental effects—including direct, indirect, and cumulative effects—of the proposed action; (2) any adverse effects that cannot be avoided if the proposed action is implemented; (3) reasonable alternatives to the

---

[5] Recent revisions to NEPA's regulations, 85 Fed. Reg. 43304, 43339 (July 16, 2020), do not apply because the EIS was prepared while the prior version of the regulations were in effect and cited those regulations. This complaint similarly cites the 1978 regulations that the EIS applied.

1    proposed action; and (4) mitigation measures to minimize any significant effects identified. 42

2    U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14, 1502.16.

3        162.    Agencies must gather and disclose "high quality" information. 40 C.F.R.

4    § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are

5    essential to implementing NEPA." *Id.* The agency must disclose if information is incomplete or

6    unavailable, and explain "the relevance of the incomplete or unavailable information to

7    evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1).

8        163.    Through an EIS, an agency must take a "hard look" at the impacts of its

9    proposed action and alternatives thereto in order to "foster both informed decision-making and

10   informed public participation." *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d

11   1092, 1120, 1122 (9th Cir. 2010)

12       164.    In its EIS, NPS failed to take a hard look at the effects of allowing and expanding

13   commercial beef and dairy ranching within the Seashore and GGNRA under the GMPA. The

14   agency failed to do so in many ways, including but not limited to the following:

15           A.    Failing to provide accurate and complete baseline information about, *inter alia*,

16       existing ranch operations and residential uses, water quality and quantity, native plants and

17       sensitive vegetation areas, other natural resources, tule elk and other wildlife, cultural and

18       archaeological resources, and public health and safety risks;

19           B.    Failing to fully analyze and disclose the direct, indirect, and cumulative impacts

20       of the GMPA and ROD related to, *inter alia*, authorizing site-specific ranching operations

21       on approximately 30 different public land allotments, deferring key decisions about

22       individual ranch operations and mitigation measures until the lease/ROA process, allowing

23       ranchers to propose new commercial activities like mobile slaughterhouses and dairy

24       processing facilities, maintaining the Tomales Point elk fence under Alternatives A–E or

25       removing the fence under Alternative F, killing tule elk within the Drakes Beach and

26       Limnatour herds, failing to consider mitigation measures that address the transmission of

27       Johne's disease from domesticated ungulates to tule elk, and proposing an undefined

28       amount of targeted grazing throughout all subzones;

COMPLAINT – Page 36

C.  Unreasonably assuming that management activities, mitigation measures and other plans—some of which have yet to be developed—and a new zoning framework will prevent or reduce adverse effects to the environment without analyzing and disclosing their potential effectiveness, feasibility, or full costs; and

D.  Failing to adequately respond to comments submitted by Plaintiffs, other agencies, and other members of the public.

165.   For these reasons, NPS's EIS, ROD, and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to NEPA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE CLEAN WATER ACT

166.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

167.   This fourth claim for relief challenges NPS's ROD and GMPA for violating section 313 of the Clean Water Act (CWA), 33 U.S.C § 1323(a). This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

168.   Section 313 of the CWA requires all federal agencies with jurisdiction over property or engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants to comply with all state water quality standards. 33 U.S.C. § 1323(a).

169.   Applicable California state water quality standards, as established in the San Francisco Bay Basin Water Control Plan, establish beneficial uses and water quality objectives for concentrations of pathogens, nutrients, turbidity, and other pollutants in surface waters within groundwater and adjacent to the Seashore and GGNRA. Through the Basin Plan, the CAF Order, the Conditional Waiver and/or other requirements, the Water Board requires beef and dairy operations to comply with these standards.

COMPLAINT – Page 37

170.    Data and other evidence from NPS and other sources show that water quality standards have not been met in surface waters within and adjacent to Point Reyes National Seashore and GGNRA. On information and belief, beef and dairy ranches cause or contribute to these violations through discharges and/or runoff of manure, wastewater, sediment, stormwater, and other pollutants into surface water and/or groundwater. Ranching activities that generate pollutants or facilitate discharges and/or runoff include, but are not limited to, manure and wastewater collection, storage, and disposal; cattle grazing within or adjacent to surface waters; infrastructure that contributes pollutants to runoff; and cattle confinement and feeding in buildings and other structures at ranch complexes.

171.    The ROD and GMPA allow beef and dairy ranching and related activities to continue causing or contributing to violations of these water quality standards. These violations are likely to continue because the ROD and GMPA rely on undefined, ineffective, and/or incomplete mitigation measures, management activities, and plans to reduce water pollution. Moreover, the ROD and GMPA allow ranchers to expand their operations, which—according to the Water Board—risks increasing the discharge of pollutants above existing baseline levels and harming beneficial uses, which would violate the state's Anti-degradation Policy, State Water Resources Control Resolution No. 68-16.[6]

172.    Through the EIS and ROD, and supporting documents, NPS did not fully or accurately analyze the potential for ranching to cause or contribute to violations of water quality standards. NPS claimed that the GMPA and new leases/ROAs will result in improvements to water quality but did not analyze or claim that such improvements would bring ranching activities into compliance with water quality standards. Accordingly, NPS failed to ensure that beef and dairy ranching allowed through the ROD and GMPA will comply with all state water quality standards.

173.    To address water quality concerns, the ROD and the GMPA rely on the Water

_____

[6] Resolution No. 68-16 requires the maintenance of the highest water quality achieved in California's waters since 1968 except where any reduction in such highest water quality would be consistent with the maximum benefit to the people of the State and would not result in any violation of an applicable water quality standard.

Quality Board's regulation of beef and dairy operations under the Conditional Waiver, CAF Order, and/or other state water quality requirements or regulations. But NPS did not consider or disclose whether beef and dairy ranches were in compliance with such requirements or regulations, despite its data showing ongoing violations of water quality standards, evidence that all dairies may not be covered by the CAF Order, and its own certifications that show all beef operations may not be fulfilling all requirements of the Conditional Waiver.

174. For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Clean Water Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A. Order, declare, and adjudge that NPS violated the Point Reyes Act, the Organic Act, the National Environmental Policy Act, the Clean Water Act, and/or the Administrative Procedure Act in adopting the Record of Decision, the General Management Plan Amendment, and the Final Environmental Impact Statement for Point Reyes National Seashore and the Northern District of Golden Gate National Recreation Area;

B. Set aside and vacate the Record of Decision, the General Management Plan Amendment, and the Final Environmental Impact Statement, and remand these matters to NPS;

C. Enter temporary, preliminary and/or permanent injunctive relief, as may be sought by Plaintiffs, including enjoining NPS from approving 20-year leases, new commercial activities, expanded ranching operations, and/or from undertaking new or expanded lethal tule elk control;

C. Enter such other declaratory relief and/or injunctive relief as hereafter prayed for by Plaintiffs;

D. Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et*

*seq.*, and all other applicable authorities; and/or

E.     Grant such further relief as the Court deems necessary or appropriate to redress NPS's legal violations and protect the Point Reyes National Seashore and GGNRA and the natural resources and public lands within.

Dated: January 10, 2022                    Respectfully submitted,

                                           */s/ Laurence ("Laird") J. Lucas*
                                           Laurence ("Laird") J. Lucas (CA Bar No. 124854)
                                           llucas@advocateswest.org
                                           Elizabeth H. Potter (*pro hac vice* to be submitted)
                                           epotter@advocateswest.org
                                           Andrew R. Missel (*pro hac vice* to be submitted)
                                           amissel@advocateswest.org
                                           ADVOCATES FOR THE WEST
                                           PO Box 1612
                                           Boise ID 83701
                                           Telephone: (208) 342-7024

                                           Michael R. Lozeau (CA Bar No. 142893)
                                           michael@lozeaudrury.com
                                           LOZEAU DRURY L.L.P.
                                           1939 Harrison St., Suite 150
                                           Oakland CA 94612
                                           Telephone: (510) 836-4200

                                           *Attorneys for Plaintiffs*

# EXHIBIT B

Tony Francois, Cal. Bar #184100
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, California, 94104
Telephone:    (415) 402-2700
Facsimile:    (415) 398-5630
Email:        tfrancois@briscoelaw.net

Caroline Lobdell, Ore. Bar #021236, *pro hac vice forthcoming*
Aaron Bruner, Ore. Bar #133113, *pro hac vice forthcoming*
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119 #327
Portland, Oregon 97219
Telephone:    (503) 768-8500
Facsimile:    (503) 222-3255
Email:        clobdell@wrlegal.org
              abruner@wrlegal.org

Attorneys for Proposed Defendant-Intervenor
POINT REYES SEASHORE RANCHERS ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, a federal agency,<br><br>        Defendant,<br><br>POINT REYES SEASHORE RANCHERS ASSOCIATION,<br><br>        Proposed Defendant-Intervenor. | Case Number: 3:22-cv-00145-MMC<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    Friday, May 27, 2022<br>Time:    9:00am<br>Room:    Courtroom 7, 19th Floor<br>Judge:   Maxine M. Chesney |

NOTICE OF MOTION AND MOTION TO INTERVENE                    3:22-cv-00145-MMC

# NOTICE OF MOTION

TO THIS HONORABLE COURT AND COUNSEL FOR THE PARTIES:

PLEASE TAKE NOTICE, that on Friday, May 27, 2022, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of Senior District Judge Maxine M. Chesney, at the San Francisco Courthouse, Courtroom 7 – 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, that the POINT REYES SEASHORE RANCHERS ASSOCIATION hereby moves for leave to intervene as a defendant in the above-entitled action.

# MOTION

Pursuant to Fed. R. Civ. P. 24, the Point Reyes Seashore Ranchers Association ("PRSRA" or "Proposed Intervenor") moves to intervene in this case as a matter of right.  In conferring on this motion, counsel for Federal Defendant National Park Service ("NPS") indicated the agency was unable to state its position until after review of the motion.  Counsel for Plaintiffs have likewise indicated they reserve their position on the motion until counsel review the final filing.[1]

PRSRA is an association consisting of individuals and members of ranching families that have been stewards of the rangelands and waters on the Point Reyes National Seashore ("Seashore") for many generations.  PRSRA's members currently hold active leases/permits for ranch properties on the Seashore that will be impacted by this litigation.  These ranches, and the surrounding area, were designated as the Point Reyes National Seashore in 1962, serving as a testament to the many decades of superior ranch management on the Point Reyes peninsula that has contributed to the cultural, historic, scenic, and environmental quality of the Seashore.  Since

---

[1] Counsel for the PRSRA initially emailed counsel for Plaintiffs via email on March 18, 2022, seeking Plaintiffs' position on the forthcoming motion.  At the request of Plaintiffs' counsel, Elizabeth Potter, we agreed to confer regarding the PRSRA's motion to intervene via a Zoom meeting scheduled for Friday, April 1, 2022, during which Plaintiffs' counsel was advised of the PRSRA's current membership, and Plaintiffs' counsel advised that they would not take a position on the motion prior to reviewing the final filing.  On April 5, Plaintiffs' counsel Elizabeth Potter emailed seeking additional clarification regarding PRSRA's membership.  In response to that request, the nature of the PRSRA organization and the current PRSRA membership are set forth in the Declaration of Ernest Spaletta, filed herewith in support of this motion.

-2-

then, ranching has continued, the land remains productive, wildlife is still abundant, and the scenery is still spectacular.

The subject of Plaintiffs' lawsuit directly implicates PRSRA members' leases/permits and other longstanding interests in the Seashore. In particular, Plaintiffs seek to overturn several significant elements of the National Park Service's recent Record of Decision ("ROD") on the General Management Plan Amendment ("GMPA") and corresponding National Environmental Policy Act ("NEPA") analysis that evaluates the issuance of long-term leases/permits to ranchers on the Seashore, the management of tule elk, and addresses the best management practices to promote protection of resources on the Seashore. As such, this lawsuit poses a serious threat to the stability of these longstanding family ranches on the Seashore by undermining a process that would provide long-term certainty for the families who live and work there.

As set forth more fully below, Proposed Intervenor the PRSRA, on behalf of its members, satisfies the criteria for intervention as of right under Fed. R. Civ. P. 24(a). As cattle and dairy ranchers who have lived and grazed the Seashore for decades and, in many cases, multiple generations, PRSRA members have numerous protectable interests at issue in this litigation. *See e.g.*, Spaletta Dec. ¶¶ 18-20, 23-28; Lunny Dec. ¶¶ 2-4, 7-9; McIsaac Dec. ¶¶ 2, 5, 6-7, 9; Grossi Dec. ¶¶ 3-9; Lucchesi Dec. ¶¶ 2-9; McClelland Dec. ¶¶ 2-4, 8-9. In addition to the ongoing interest in their ranch leases/permits, PRSRA members have economic, environmental, aesthetic, and recreational interests in the administration of the National Seashore. An adverse decision affecting the GMPA will impair these interests, as well as PRSRA members' ability to reside (as they have for generations) on the Seashore.

Plaintiffs allege NPS violated the Administrative Procedure Act ("APA"), NEPA, the National Park Service Act and Point Reyes Act (collectively "Park Acts"), and the Clean Water Act ("CWA") by authorizing grazing permits in the Point Reyes National Seashore. Plaintiffs claim that such authorized grazing is harmful to the National Seashore's natural resources, including riparian areas and fish habitat. Dkt. No. 1 ¶¶ 45-56. Put simply, Plaintiffs allege that the NPS must phase out livestock grazing and that such grazing authorizations violate key federal environmental laws. *See, e.g.*, Dkt. No. 1 ¶¶ 78, 153 and at 39-40 (Prayer for Relief).

NOTICE OF MOTION AND MOTION TO INTERVENE                    3:22-cv-00145-MMC

Effectively, what Plaintiffs seek will undermine the PRSRA's (and its members') rights and ability to use and reside on the Seashore, potentially stripping PRSRA members of their livelihoods and ways of life, and for many who reside on the Seashore, their homes.

Additionally, this motion is timely and the existing parties do not adequately represent the PRSRA's unique interests. The Defendant, NPS, has only recently appeared in the case and filed its Answer, and no discovery or substantive briefing has occurred. NPS cannot adequately represent Proposed Intervenor, given the agency's duty to represent a broader array of public interests than those specific to Proposed Intervenor. Indeed, PRSRA members were negatively impacted by several decisions made during the GMPA process, including, among other things, the agency's decision to deny the ranches' ability to diversify into various types of additional agricultural activities on the Seashore. PRSRA members also have first-hand knowledge of the decades-long history since the Seashore's inception that may be helpful to the Court in resolving this dispute, including the specific ranching authorizations, lease/permit terms and conditions, and long-running history of the right of use and residence for each of the affected ranches.

This motion is supported by the Memorandum below, the pleadings on file with the Court, the Declarations of Richard Grossi, Gino Lucchesi, Kevin Lunny, Jolynn McClelland, Ted McIsaac, Paulette Percy, and Ernest Spaletta, and a proposed Answer in Intervention.

Proposed Intervenor respectfully requests that this Court enter an order granting the PRSRA leave to intervene in this action as a party defendant in order to fully participate in the resolution of this case, and to order the filing of the accompanying proposed Answer in Intervention (attached as Attachment 1 to this Motion to Intervene).

NOTICE OF MOTION AND MOTION TO INTERVENE            3:22-cv-00145-MMC

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**

Pursuant to Local Rule 7-4(a)(3), the issue to be decided is whether proposed defendant intervenors have a right to intervene in this case under Fed. R. Civ. P. 24(a).

A party may intervene as a matter of right, under Fed. R. Civ. P. 24(a), where: (1) the applicant's motion is timely; (2) the applicant asserts an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that without intervention, the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest is not adequately represented by the existing parties. *Cty. of Orange v. Air California*, 799 F.2d 535, 537 (9th Cir. 1986), *cert. denied*, 480 U.S. 946 (1987) (citations omitted); *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002); *Wilderness Soc'y. v. Forest Serv.*, 630 F.3d 1173, 1177-78 (9th Cir. 2011) (eliminating the "none but the federal defendant rule" in a NEPA case). Furthermore, the non-conclusory allegations of a Motion to Intervene are accepted as true. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819-820 (9th Cir. 2001).

## I.  Proposed Intervenor's Motion to Intervene is Timely.

In determining whether a motion to intervene is timely, the Court must consider three factors: (1) the stage of the proceeding; (2) any prejudice to the other parties; and (3) the reason for and length of any delay. *Cty. of Orange*, 799 F.2d at 537; *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (noting appraisal of the timeliness of a motion to intervene requires a "nuanced, pragmatic" approach). Here, the stage of the proceeding is such that no substantive proceedings have occurred. The complaint was only filed in January 2022. Dkt. No. 1. Federal Defendants filed their Answer on March 21, 2022. Dkt. No. 20. No administrative record has been filed and no discovery has occurred. Given that the procedural posture of this case remains at its most initial stages, there is no indication of any prejudice to the parties or undue delay by the Proposed Intervenor. Thus, intervention is timely.

## II.  Proposed Intervenor's Members Have Protectable Interests in this Action.

The interest prong of the intervention test is a threshold criterion, not a determinative one. *Berg*, 268 F.3d at 818 (citations omitted). The Ninth Circuit liberally construes intervention of

-5-

right, *see Greene v. United States*, 996 F.2d 973, 979 (9th Cir. 1993), and "reject[s] the notion that Rule 24(a)(2) requires a specific legal or equitable interest." *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (citations omitted). Rather, the interest test is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). It suffices that the interest is "protectable under some law" and there is "a relationship between the legally protected interest and the claims at issue." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (en banc).

Plaintiffs generally challenge the GMPA/ROD that will serve as the basis for the upcoming renewal of ranching authorizations on the Point Reyes National Seashore and the northern district of the Golden Gate National Recreation Area ("GGNRA"). Dkt. No. 1. Plaintiffs challenge the adequacy of the environmental analysis for the GMPA/ROD as a basis for issuing 20-year leases/permits to Proposed Intervenor's members, as well as the approval of ranching operations and tule elk management authorized by the ROD, additionally asserting a Clean Water Act claim tied to ranching operations on the Seashore. *Id.*; *id.* at ¶¶ 166-74. As such, not only does Proposed Intervenor have protectable interests in the subject of this case, Proposed Intervenor's members are, indeed, the very target of Plaintiffs' Complaint. Moreover, Proposed Intervenor's members have their own uniquely situated economic, aesthetic, environmental, recreational, and other interests related to the subject of this litigation.

A.   **Proposed Intervenor's members have economic interests in their lease-permits and residential use of the Seashore and north district of the GGNRA.**

There is no dispute that Proposed Intervenor's members live on the National Seashore and within the northern district of the GGNRA, where they have authorizations to graze livestock.[2] Proposed Intervenor's members each have grazing authorizations contemplated by this litigation and subject to the GMPA/ROD process Plaintiffs seek to disrupt. Indeed, the

---

[2] Copies of all Point Reyes and north district GGNRA leases/permits are publicly available on the NPS website. *See* Nat'l Park Serv., *Ranching and Dairying Lease/Permits*, https://www.nps.gov/pore/getinvolved/planning_ranch_cmp_leases_permits.htm (last visited Apr. 6, 2022).

NOTICE OF MOTION AND MOTION TO INTERVENE                          3:22-cv-00145-MMC

1  ranchers currently have short-term, interim leases/permits that were the result of a settlement in a

2  prior case brought by these very same Plaintiffs, *Resource Renewal Institute, et al. v. National*

3  *Park Serv.*, Case No. 4:16-cv-00688-SBA (N.D. Cal.), and in which PRSRA members

4  successfully intervened (and participated in settlement negotiations).  According to the

5  settlement, those leases/permits are set to expire on July 14, 2022, making the upcoming

6  lease/permit renewal and Ranch Operating Agreement development process of paramount

7  importance to Proposed Intervenor's members.  *See id.*, Dkt. No. 143; *infra* n.4 (discussing

8  settlement terms in more detail).

9          PRSRA members are dependent on such leases/permits and corresponding grazing

10  authorizations for their families' livelihoods, homes, economic, and personal well-being.  *See*

11  Spaletta Dec. ¶ 26; Lunny Dec. ¶ 4; Grossi Dec. ¶ 7; McIsaac Dec. ¶ 4; Lucchesi Dec. ¶ 6;

12  McClelland Dec. ¶ 3.  Without authorization to graze, PRSRA members' ranching operations

13  would be devastated, destroying their long-established family businesses, some of which include

14  families that homesteaded on the seashore.  *See, e.g.*, McIsaac Dec. ¶ 6.  Further, Plaintiffs also

15  directly challenge the continued validity of Federal Defendant's GMPA/ROD for the Seashore

16  and GGNRA, which acknowledges and contemplates continued dairying and cattle ranching as

17  consistent with the Park Acts.  *See, e.g.*, Dkt. No. 1 ¶¶ 81-96.

18          Proposed Intervenor's members have economic interests in the current and future

19  authorizations permitting their livestock ranching as an integral part of the scenic, cultural, and

20  ecological foundation of the Seashore and which supports their livelihoods.  Spaletta Dec. ¶¶ 18-

21  20, 23-28; Lunny Dec. ¶ 4, 7, 9; Grossi Dec. ¶¶ 7, 8-9; McIsaac Dec. ¶¶ 4, 8, 9; Lucchesi Dec. ¶¶

22  6, 8-11; McClelland Dec. ¶¶ 2-4, 8-9.  In fact, PRSRA members' families have lived and been

23  raised on the Seashore and cared for its grasslands for decades and generations.  *Id.*  PRSRA

24  members' authorizations include the right to live in the homes their families built on the seashore

25  and work the land they acquired when they first arrived in this Country.  *See, e.g.*, Grossi Dec.

26  ¶¶ 3-5.  Plaintiffs not only challenge the long-term leases/permits and authorizations of grazing

27  pursuant to the GMPA/ROD, but also seek long-term "phase out" of ranching in general.  Dkt.

28  No. 1 ¶¶ 78, 153.  Proposed Intervenor's members are dependent upon such grazing

NOTICE OF MOTION AND MOTION TO INTERVENE        3:22-cv-00145-MMC

authorizations for their livelihoods and economic well-being and a permanent phase out of ranching directly threatens their livelihood and the future of their family ranching operations. Spaletta Dec. ¶ 26; Lunny Dec. ¶ 4; Grossi Dec. ¶ 7; McIsaac Dec. ¶ 4; Lucchesi Dec. ¶ 6; McClelland Dec. ¶ 3.

A contract or lease interest at issue in the litigation constitutes a protectable interest warranting intervention, even in a case asserting claims under NEPA or the Endangered Species Act. *See Berg*, 268 F.3d at 820 ("Contract rights are traditionally protectable interests."). Without the 20-year leases/permits authorized by the GMPA/ROD, Proposed Intervenor's members lack the ability to engage in meaningful, long-term planning on whether their multi-generational family businesses will continue to exist. Spaletta Dec. ¶¶ 26-28; Lunny Dec. ¶ 5, 7; Grossi Dec. ¶ 6; McIsaac Dec. ¶¶ 6-7; Lucchesi Dec. ¶ 7; McClelland Dec. ¶¶ 4, 6, 8.

Elimination of grazing would not only harm PRSRA members economically, but would also displace many from their current homes – requiring PRSRA members to find alternative places to live – while simultaneously devastating the very livelihood needed to financially support such alternative housing. *See e.g.*, Lunny Dec. ¶ 2-3, 5.

**B.    Proposed Intervenor's members have protectable aesthetic, environmental, and recreational interests.**

Proposed Intervenor's members also have an interest in the agricultural nature of the Point Reyes National Seashore and GGNRA given the fact that their multi-generational ranching operations have long contributed to the pastoral scenery and working landscape of the Point Reyes area. Spaletta Dec. ¶¶ 9; Lunny Dec. ¶ 14; Grossi Dec. ¶ 8; McIsaac Dec. ¶ 8; Lucchesi Dec. ¶ 8; Percy Dec. ¶ 3; McClelland Dec. ¶¶ 9. The pastoral landscape on the Seashore, upon which Plaintiffs claim aesthetic and recreational standing, in part, exists due to the stewardship from generations of PRSRA members' ranching, dairying, and agricultural use. *Id.* Maintaining the health and productivity of the land is an environmental interest shared by all PRSRA members because good soil and water is the foundation for the growth of nutritious forage, which feeds the livestock that supports the livelihood of those ranchers. Furthermore, Proposed Intervenor's members actively engage in environmental stewardship, such as building fences

-8-

NOTICE OF MOTION AND MOTION TO INTERVENE                    3:22-cv-00145-MMC

along creeks and wetlands to help protect plants and wildlife, using erosion control measures, and rotating and deferring cattle use among pastures to keep the grassland healthy. *See, e.g.*, Grossi Dec. ¶ 8; Lunny Dec. ¶ 8; Lucchesi Dec. ¶ 8.

Finally, Proposed Intervenor's members experience the Point Reyes Seashore daily given that they live, work, and recreate on the Seashore. Spaletta Dec. ¶ 26; Lunny Dec. ¶¶ 15-16; Grossi Dec. ¶¶ 4, 9; McIsaac Dec. ¶¶ 2-3; Lucchesi Dec. ¶¶ 9-11; McClelland ¶ 9. PRSRA members recreate, hike, observe wildlife and scenery, photograph, reside in, and enjoy the cultural and educational roles that ranching and agricultural use contributed historically and continue to provide to the pastoral setting of the Point Reyes National Seashore. *Id.* Accordingly, PRSRA members also have aesthetic and recreational interests in the Point Reyes National Seashore. Additionally, PRSRA members' ranching practices have helped provide many environmental benefits to the landscape, such as helping prevent the spread of invasive brush that shades out desirable grasses and forbs and keeps the vegetative fuel load from building to dangerous levels. Spaletta Dec. ¶ 13-20; Lunny Dec. ¶¶ 13-14; Grossi Dec. ¶ 8; McIsaac Dec. ¶ 8; Lucchesi Dec. ¶ 8; Percy Dec. ¶ 3; McClelland Dec. ¶ 5. Thus, Proposed Intervenor has demonstrated protectable aesthetic, environmental, and recreational interests on behalf of its members supporting intervention of right, just as plaintiff asserts these interests support their standing. *Wilderness Soc'y*, 630 F.3d at 1176-80 (groups with interest in motorized recreation could intervene in NEPA suit challenging agency's travel management plan).

## III.    Resolution of this Case May Impair the Interests of Proposed Intervenor.

An applicant for intervention under Rule 24(a) must be "so situated that the disposing of the action may as a practical matter impair or impede the movant's ability to protect that interest." Fed. R. Civ. P. 24(a) (emphasis added). This inquiry "is not limited to consequences of a strictly legal nature." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995) (citation omitted). The PRSRA's and its members' interests depend on being able to continue to live and graze livestock in the Point Reyes National Seashore and the north district of the GGNRA. Plaintiffs seek permanent injunctive relief that may preclude NPS from pursuing 20-year leases/permits under the GMPA/ROD. Dkt. No. 1 at 39-40.

NOTICE OF MOTION AND MOTION TO INTERVENE                3:22-cv-00145-MMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Should the Court grant Plaintiffs' requested relief, in whole or in part, PRSRA members may be deprived of their ability to continue to graze and live on the Seashore. Even if this Court grants only the declaratory relief sought by Plaintiffs, it will deprive PRSRA members of long-term certainty provided by the forthcoming 20-year leases/permits. Such a result would significantly impair the PRSRA's and its members' interests in their homes, ranching businesses, livelihoods, and way of life.

Plaintiffs additionally seek to invalidate many of NPS's elk management determinations, including but not limited to the population level determination for the Drakes Beach herd of tule elk and various fencing approvals, in order to increase elk numbers on the Seashore. *See, e.g.*, Dkt. No. 1 at 29, 30, 34, 36. Given that ranchers already face considerable economic and other impacts from tule elk on their ranches, such relief would likely exacerbate such issues and, in some cases, make ranching unworkable. *See, e.g.*, Spaletta Dec. ¶¶ 22-25.

Given these likely impairments of PRSRA members' interests, Proposed Intervenor meets the practical impairment factor supporting intervention of right on behalf of its members.

**IV.     Existing Parties do not Adequately Represent the Interests of the PRSRA.**

In the Ninth Circuit "[t]he applicant-intervenor's burden in showing inadequate representation is minimal: it is sufficient to show that representation may be inadequate." *Forest Conservation Council*, 66 F.3d at 1498; *see also Trobovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *see also Arakakai v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). When deciding whether representation by existing parties will be adequate, the court must consider: (1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present parties are capable and willing to make such arguments; and (3) whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect. *Forest Conservation Council*, 66 F.3d at 1498-99. Finally, if existing parties have the same "ultimate objective" as the proposed intervenor, then any presumption of adequate representation will be rebutted by a showing that the proposed intervenor's objective is of a different scope than the existing party. *Berg*, 268 F.3d at 823.

-10-

NOTICE OF MOTION AND MOTION TO INTERVENE                     3:22-cv-00145-MMC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.    Existing parties will not "undoubtedly" make "all" the same arguments as Proposed Intervenor.**

Plaintiffs cannot be expected to make the same arguments as Proposed Intervenor because Plaintiffs' interests are clearly adverse to those of Proposed Intervenor.  The NPS will not undoubtedly make all the arguments in support of the continuation of PRSRA members' ranching, agricultural, and residential uses on the Seashore because the NPS is charged with advocating on behalf of the public interest and addressing multiple environmental interests and does not share the same private interests as Proposed Intervenor.  In fact, Plaintiffs claim that the NPS is required by its governing statutes, regulations, and polices to eliminate or significantly restrict grazing whenever possible.  Dkt. 1 ¶¶ 153.

No existing party is capable of making the same arguments as Proposed Intervenor because no existing party shares Proposed Intervenor's unique perspective and interests relating to Plaintiffs' claims.  The Point Reyes Act provided that the ranchers and families, which include PRSRA members, had a right to use and occupy the pastoral zone when the NPS acquired their land.  16 U.S.C. § 459c-5(a).  Since then, PRSRA members have consistently, and without interruption, continued to graze and reside in the pastoral zone by way of the retained rights and other authorizations.  *See e.g.*, Spaletta Dec. ¶¶ 9-11; McIsaac Dec. ¶¶ 6-7; Lunny Dec. ¶¶ 3-6; Grossi Dec. ¶¶ 3-6; Lucchesi Dec. ¶¶ 2-5, 7; McClelland Dec. ¶¶ 2-4.

The PRSRA members' ability to continue grazing and living on the Seashore provides economic opportunities for PRSRA members' small, multigenerational family businesses; these businesses may cease to exist because of this litigation.  The NPS controls the fate of PRSRA members' ability to graze and reside on the Seashore.  Yet, as a public agency, NPS must also balance the competing interests of Plaintiffs and answer to the public at large.

Therefore, NPS is not equally capable of making the same arguments as the Proposed Intervenor, whose members' livelihoods and current existence is subject to the NPS's policies.  No other party in the lawsuit shares that position or is able to make all the same arguments.

NOTICE OF MOTION AND MOTION TO INTERVENE                3:22-cv-00145-MMC

**B.** **Proposed Intervenor would bring necessary elements to the proceedings that existing parties would neglect.**

Unlike the NPS employees that move from park to park throughout their careers, Proposed Intervenor represents ranchers who bring vast local and historical knowledge about the Point Reyes National Seashore, and the measures that have been taken to sustain and improve ranching and the environmental quality of the National Seashore. *See, e.g.*, Spaletta Dec. ¶ 13-20; Lunny Dec. ¶¶ 13-14; Grossi Dec. ¶ 8; McIsaac Dec. ¶ 8; Lucchesi Dec. ¶ 8; Percy Dec. ¶ 3; McClelland Dec. ¶ 5.

For example, as mentioned in the complaint, in 1979 the NPS reintroduced tule elk, despite opposition from Point Reyes ranchers, resulting in the permanent eviction of a multigenerational ranching family. Lucchesi Dec. ¶ 4. Since then, the NPS has been unable to effectively manage the tule elk population as the population has vastly exceeded its carrying capacity. By failing to manage the tule elk population in a sustainable way, the tule elk have expanded outside of their designated reserve area and onto the historic ranch properties, thereby hindering PRSRA members' grazing. The Lucchesi family is a prime example of diverging interests over tule elk management, which Plaintiffs raise in their Complaint. Lucchesi Dec. ¶ 4. Gino Lucchesi's father-in-law was ultimately forced by NPS to permanently move from Pierce Point Ranch so that the agency could repurpose his ranch for the currently existing tule elk reserve. *Id.* Given these types of direct conflicts of interest, the NPS cannot adequately represent the PRSRA and its members' unique personal interests.

Also, Plaintiffs claim that grazing has a negative impact on the Point Reyes National Seashore. Dkt. 1 at ¶¶ 45-56. According to the Plaintiffs, the grazing authorizations have also contributed to water quality violations. Dkt. No. 1 at ¶¶ 166-74. PRSRA members maintain to the contrary that there are environmental benefits of grazing, such as reducing the risk of catastrophic wildfire and minimizing the spread of invasive species. Lunny Dec. ¶ 14; Grossi Dec. ¶ 8; McIsaac Dec. ¶ 8; Lucchesi Dec. ¶ 8. Proposed Intervenor is in the unique position to advance the arguments for continued grazing on their particular ranches and the economic, cultural, environmental, and scenic value they provide. Proposed Intervenor represents a truly unique and unrepresented voice in the present action.

NOTICE OF MOTION AND MOTION TO INTERVENE                3:22-cv-00145-MMC

### C. The presumption of adequate representation by the federal government is rebutted.

If an existing party and the proposed intervenor have the same "ultimate objective," then the presumption of adequate representation arises. *Berg*, 268 F.3d at 823. A presumption of adequate representation may arise when the existing party is "a governmental body or officer charged by law with representing the interests of the absentee." *Forest Conservation Council*, 66 F.3d at 1499 (citation omitted). However, the presumption does not apply when the government is charged with representing a broader interest than the more narrow interests of the proposed intervenor. *Id.* The court must then look at the scope of the parties' interests to see whether the intervenor has a more personal interest than the federal government. If so, intervention should be granted. *Id.* "Inadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." *Forest Conservation Council*, 66 F.3d at 1499. Here, as explained above, the NPS and Proposed Intervenor do not share the same ultimate objective.

Proposed Intervenor asserts specific and unique personal interests and the NPS is charged with representing the public interest. PRSRA members' interests in continuing to live on the Seashore and the north district of the GGNRA is an innate personal interest. PRSRA members also operate family ranching and agricultural businesses that are not publicly owned. The general public cannot hold these interests because the ability to continue their ranching operations and live in the area is only available to particular families on the Seashore that have historically used the land for ranching, such as the PRSRA's members.

The NPS cannot be assured to align with Proposed Intervenor's interests. First, as outlined in the proposed Answer, filed herewith, Proposed Intervenor reserves the right to assert one or more cross-claims against NPS. Second, it is uncertain how NPS's intention to issue long-term leases/permits to PRSRA members may be impacted by this ongoing litigation. Currently, NPS is authorized to issue 20-year leases/permits under the terms of the current GMPA/ROD. ROD at 6. However, it is unclear at this time how NPS plans to deal with the leases going forward, given this ongoing litigation or in the event that the Court accedes to Plaintiffs' demand to enjoin NPS from approving the 20-year leases/permits, as well as other

-13-

"new commercial activities [and] expanded ranching operations." Dkt. No. 1 at 39-40.[3]  As of

March 21, 2022, it appears that NPS does not intend to follow through with the 20-year

leases/permits, due to this pending lawsuit.  *See* Fed. Defs.' Answer, Dkt. No. 20 at ¶ 138 ("NPS

denies that it will issue 20-year leases prior to the expiration of the current interim leases.  The

NPS avers that it plans to issue short-term (one or two-year) lease extensions prior to the

expiration of the interim leases.").  In short, NPS is the landlord and the opposite party to the

ranchers as they begin to negotiate new leases/permits pursuant to the GMPA/ROD and

authorizations to graze and reside on the Seashore.  Additionally, rancher Kevin Lunny who is a

member of proposed intervenor PRSRA is living proof that the NPS's interests may diverge from

Proposed Intervenor's interests.  *See Drakes Bay Oyster Co., v. Jewell*, 747 F.3d 1073 (9th Cir.

2014) (declining to enjoin NPS's decision not to renew Drakes Bay's special use permit to farm

oysters in Drakes Estero estuary).  As such, no existing party in the case adequately represents

Proposed Intervenor's unique personal interests.  Any presumption of adequate representation by

the federal government is rebutted.  No other party is capable of representing Proposed

Intervenor's unique personal interests.

## CONCLUSION

For the reasons set forth above, Proposed Intervenor satisfies the criteria to intervene in

this case as of right under Fed. R. Civ. P. 24(a).  Accordingly, the Court should grant Proposed

Intervenor's Motion to Intervene as a matter of right.  Proposed Intervenor is willing to comply

with any briefing schedule set by the Court.

---

[3] The current status of the leases is also complicated by the existence of so-called "Interim Leases" that may expire on July 14, 2022.  Such leases were authorized pursuant to a settlement agreement reached in *Resource Renewal Institute, et al. v. National Park Serv.*, Case No. 4:16-cv-00688-SBA (N.D. Cal.).  Pursuant to the agreement, NPS was required to amend the 1980 GMP and assess strategies for "future management of the lands" currently leased for ranching through preparation of an environmental impact statement and associated Record of Decision by July 14, 2021.  *Id.*, Dkt. No. 143, ¶¶ 1-3.  During this "Interim Period," NPS was able to issue so-called "Interim Leases" to ranches already operating within the Seashore through July 14, 2022.  *Id.*, Dkt. No. 143, ¶ 4 & Definition G.  The timing of these renewals may lead NPS to again issue short-term leases, to the detriment of the interests of PRSRA members.

NOTICE OF MOTION AND MOTION TO INTERVENE                    3:22-cv-00145-MMC

Respectfully submitted this 20th day of April, 2022.

/s/ Tony Francois
Tony Francois, Cal. Bar #184100
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, California, 94104
Telephone:    (415) 402-2700
Facsimile:    (415) 398-5630
Email:        tfrancois@briscoelaw.net

/s/ Caroline Lobdell
Caroline Lobdell, Ore. Bar #021236, *PHV forthcoming*

/s/ Aaron Bruner
Aaron Bruner, Ore. Bar #133113, *PHV forthcoming*
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119 #327
Portland, Oregon 97219
Telephone:    (503) 768-8500
Facsimile:    (503) 222-3255
Email:        clobdell@wrlegal.org
              abruner@wrlegal.org

Attorneys for Proposed Defendant-Intervenor

POINT REYES SEASHORE RANCHERS
ASSOCIATION

-15-

# CERTIFICATE OF SERVICE

I, Tony Francois, hereby certify that I, on April 20, 2022, I caused the foregoing to be served upon counsel of record through the Court's electronic service system.

Dated: April 20, 2022

/s/ Tony Francois
Tony Francois

NOTICE OF MOTION AND MOTION TO INTERVENE                3:22-cv-00145-MMC

# EXHIBIT C

ELLIS GEORGE CIPOLLONE
    O'BRIEN ANNAGUEY LLP
Peter Obstler (State Bar No. 171623)
    pobstler@egcfirm.com
Eric M. George (State Bar No. 166403)
    egeorge@egcfirm.com
Debi A. Ramos (State Bar No. 135373)
    dramos@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100; Facsimile: (310) 275-5697

Attorneys for Dan and Delores Evans, Julie
Evans-Rossotti, Ruth and Robert J. McClure,
Tim, Tom, Mike, Emily, Janelle, Justin, Anne and
Tim Jr. Kehoe and Betty, Tim and Jackie Nunes-Hemelt,
collectively Individual Ranchers

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL PARK SERVICE, a federal agency, <br><br> Defendant. | Case No. 3:22-cv-00145 MMC <br><br> Hon. Maxine M. Chesney <br><br> **NOTICE OF MOTION AND MOTION TO INTERVENE ON BEHALF OF:** <br> **DAN AND DOLORES EVANS AND JULIE EVANS ROSSOTTI (PRNS HISTORIC H RANCH AND K RANCH);** <br> **ROBERT J. AND RUTH McCLURE (PRNS HISTORIC I RANCH);** <br> **TIM, TOM, MIKE, EMILY, JANELLE, JUSTIN, ANNE AND TIM JR. KEHOE (PRNS HISTORIC J RANCH);** <br> **BETTY, TIM AND JACKIE NUNES-HEMELT (PRNS HISTORIC A RANCH, D RANCH AND E RANCH).** |
| DAN AND DOLORES EVANS AND JULIE EVANS ROSSOTTI (PRNS HISTORIC H RANCH AND K RANCH); ROBERT J. AND RUTH McCLURE (PRNS HISTORIC I RANCH); TIM, TOM, MIKE, EMILY, JANELLE, JUSTIN, ANNE AND TIM JR. KEHOE (PRNS HISTORIC J RANCH); BETTY, TIM AND JACKIE NUNES-HEMELT (PRNS HISTORIC A RANCH, D RANCH AND E RANCH), collectively INDIVIDUAL RANCHERS, <br><br> (Proposed) Intervenors. | **MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER.** <br><br> ***(Filed concurrently with Declarations of Julie Evans-Rossotti; Robert J. McClure; Tim Kehoe; William Nunes; and Peter Obstler; [Proposed] Order))*** <br><br> Date.:    July 1, 2022 <br> Time.:    9:00 a.m. <br> Judge:    Hon. Hon. Maxine M. Chesney <br> Crtrm.:    7 <br> Trial Date:  None Set |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION & SUMMARY OF ARGUMENT ........................................................1

      A.    Summary Of Argument ..........................................................................3

II.   BACKGROUND..........................................................................................5

      A.    The Genesis Of The PRNS..........................................................................5

      B.    The Government's Promise To Quickly Renew The Long Term RUO's.................6

      C.    The Litigation And Stand Still Agreement ................................................7

      D.    The ROD ..........................................................................................8

      E.    The Pending Action ..........................................................................9

      F.    The Individual Ranchers ..................................................................10

III.  ARGUMENT .........................................................................................12

      A.    Standard Of Review Under Rule 24........................................................12

      B.    The Individual Ranchers Are Necessary Parties Who Should Be Allowed
            To Intervene As Matter Of Right Under Rule 24(a) ...................................13

            1.    The Individual Ranchers Application To Intervene Is Timely ...................14

            2.    Individual Ranchers Possess Significantly Protectable Interests That
                  Are Affected, Impaired, and Impeded By The Action...............................15

            3.    The Disposition Of This Action Will Impair Individual Ranchers
                  Interests ..............................................................................18

            4.    The Parties May Not Adequately Protect The Interests Of The
                  Proposed Intervenors...............................................................19

      C.    Intervention Should Also Be Permitted Under Rule 24(b) ..........................23

IV.   CONCLUSION .......................................................................................24

1

# <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

**Cases**

3

4
*Bark v. Northrop,*
  No. 3:13-CV-01267-HZ, 2013 WL 6576306 (D. Or. Dec. 12, 2013)....................................... 16

5

6
*Beckman Indus., Inc. v. Int'l Ins. Co.,*
  966 F.2d 470 (9th Cir. 1992)............................................................................................ 23

7
*Cameron v. EMW Women's Surgical Ctr.,*
  P.S.C., 142 S. Ct. 1002 (2022) ......................................................................................... 15

8

9
*Cnty. of Orange v. Air Cal.,*
  799 F.2d 535 (9th Cir.1986)............................................................................................. 15

10
*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
11  No. 4:15-cv-05754-JST, 2016 WL 1394355 (N.D. Cal. Apr. 7, 2016) ............................. 4, 20

12
*Cty. of Fresno v. Andrus,*
  622 F.2d 436 (9th Cir. 1980)............................................................................................ 15

13
*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.,*
14  276 F.3d 1150 (9th Cir. 2002) .......................................................................................... 16

15
*E.E.O.C. v. Peabody W. Coal Co.,*
16  400 F.3d 774 (9th Cir. 2005) ...................................................................................... 16, 19

17
*Enter. Mgt. Consultants, Inc. v. U. S.,*
  883 F.2d 890 (10th Cir.1989)...................................................................................... 16, 19

18
*First Nat. Bank & Trust Co. v Oil Screw Olive L. Moore,*
19  379 F Supp 1382 (W.D. Mich. 1973)....................................................................... 3, 4, 17, 20

20
*Forest Conservation Council v. U.S. Forest Serv,*
21  66 F.3d 1489 (9th Cir. 1995).................................................................................. 4, 19, 20, 22

22
*Forest Guardians v. U.S. Forest Serv.,*
  No. CIV 07-1043 JB/ACT, 2008 WL 5975041 (D.N.M. Aug. 29, 2008) ............................ 16

23

24
*Freeman v. Delta Air Lines, Inc.,*
  No. C 13-04179 JSW, 2014 WL 5830246 (N.D. Cal. Nov. 10, 2014) ............................... 20

25
*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.,*
26  528 U.S. 167 (2000) ........................................................................................................ 23

27
*Idaho Farm Bureau Fed'n v. Babbitt,*
  58 F.3d 1392 (9th Cir.1995).............................................................................................. 23

28

NOTICE OF MOTION AND MOTION  TO INTERVENE ON BEHALF OF INDIVIDUAL RANCHERS

1

**TABLE OF AUTHORITIES**
(Continued)

2                                                                          **Page**

3  *Kettle Range Conservation Grp. v. U.S. Bureau Of Land Mgmt.*,
4        150 F.3d 1083 (9th Cir.1998) ............................................................ 2, 14

5  *Kootenai Tribe of Idaho v. Veneman*,
         313 F.3d 1094 (9th Cir. 2002) ...................................................... 4, 23, 24
6
   *League of United Latin Am. Citizens v. Wilson*,
7        131 F.3d 1297 (9th Cir. 1997) ......................................................... 3, 14

8  *Lujan v. Defenders of Wildlife*,
         504 U.S. 555 (1992) ............................................................................. 23
9

10 *McClendon v. U. S.*,
         885 F.2d 627 (9th Cir.1989) .......................................................... 16, 19

11 *Mille Lacs Band of Chippewa Indians v. Minnesota*,
12       989 F.2d 994 (8th Cir. 1993) ................................................................ 4

13 *Pilant v. Caesars Enter. Servs., LLC*,
         No. 3:20-cv-02043-CAB-AHG, 2021 WL 424280 (S.D. Cal. Feb. 8, 2021) ................. 2, 14
14
   *Quileute Indian Tribe v. Babbitt*,
15       18 F.3d 1456 (9th Cir.1994) .......................................................... 16, 19

16 *Res. Renewal Instit., et al. v. Nat'l Park Serv.*,
17       Case No. 3:22-cv-00145 (N.D. Cal., Jan. 10, 2022) ........................................ *passim*

18 *RRI V. NPS*,
         No. 3:16-cv-00688-SBA (N.D. Cal. Feb. 10, 2016) ................................................ 7
19
   *S. Cal. Edison Co. v. Lynch*,
20       307 F.3d 794 (9th Cir. 2002)............................................................... 13

21 *Sierra Club v. Espy*,
22       18 F.3d 1202 (5th Cir. 1994) ................................................................ 4

23 *Smith v. L. A. Unified Sch. Dist.*,
         830 F.3d 843 (9th Cir. 2016) ............................................................... 15
24
   *Sw. Ctr. for Biological Diversity v. Berg*,
25       268 F.3d 810 (9th Cir. 2001).......................................................... 13, 20

26 *U. S. v. City of L.A.*,
27       288 F.3d 391 (9th Cir. 2002)......................................................... 20, 21

28

**TABLE OF AUTHORITIES**
(Continued)

Page

*WildEearth Guardians v. U.S. Forest Serv.*,
    573 F.3d 992 (10th Cir. 2009)........................................................................... 4

*Wilderness Soc'y v. .U.S. Forest Serv.*,
    630 F.3d 1173 (9th Cir. 2011).......................................................... 3, 12, 13, 15

*Yellowstone Cnty. v. Pease*,
    96 F.3d 1169 (9th Cir. 1996)................................................................. 16, 19

**Statutes**

5 U.S.C. §701-706(2) ................................................................................... 10

16 U.S.C. §459c-5(a)................................................................................... 5, 6

33 U.S.C. §1323 ......................................................................................... 10

42 U.S.C. § 4321 et seq................................................................................. 13

42 U.S.C. §4332 ......................................................................................... 10

54 U.S.C. §100101 et seq. ............................................................................. 10

**Other Authorities**

36 C.F.R. §1.1 et seq. ................................................................................ 5, 10

40 C.F.R. §§1500.1 ..................................................................................... 10

Fed. R. Civ. P. 19 .......................................................................... 1, 14, 16, 24

Fed. R. Civ. P. Rule 19(a) ......................................................................... 12, 16

Fed. R. Civ. P. Rule 19(a)(1)(B)(i) ..................................................................... 2

Fed. R. Civ. P. Rule 19(a)(2)(i) ....................................................................... 14

Fed. R. Civ. P. Rule 19(b) ........................................................................... 2, 14

Fed. R. Civ. P. Rule 24 .................................................................... 1, 2, 12, 14

Fed. R. Civ. P. Rules 24(a)....................................................................... *passim*

Fed. R. Civ. P. Rule 24(a)(2)..................................................................... *passim*

Fed. R. Civ. P. 24(b)..................................................................... 4, 13, 23, 24

1

<h1 style="text-align:center">TABLE OF AUTHORITIES</h1>
(Continued)

2

<u>Page</u>

3

Fed. R. Civ. P. Rule 24(b)(1)(B) .................................................................................... 1, 4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 1, 2022, at 9:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 7 of the above-entitled Court, Proposed Intervenors Dan and Dolores Evans and Julie Evans Rossotti (PRNS Historic H Ranch And K Ranch); Robert J. and Ruth McClure D/B/A McClure Dairy (PRNS Historic I Ranch); Tim, Tom, Mike, Emily, Janelle, Justin, Anne and Tim Jr. Kehoe (PRNS Historic J Ranch); Betty, Tim and Jackie Nunes-Hemelt (PRNS Historic A Ranch, D Ranch and E Ranch) (collectively the "Individual Ranchers") respectfully move this Court for an order permitting the Individual Ranchers to intervene in the above captioned lawsuit (the "Action") under Rules 24(a) and/or (b) of the Federal Rules of Civil Procedure (the "MTI"). The [Proposed] Answer of Individual Ranchers is attached hereto as Exhibit "A".

The Individual Ranchers respectfully request intervention in this Action under Rule 24(a)(2) as a matter or right on the grounds that: (1) the Motion to Intervene is timely; (2) each of the Individual Ranchers is a real party in interest and a necessary party under Rule 19 of the Federal Rules of Civil Procedure who holds protectable individual legal interests, including interim, long term, and multigenerational lease hold interests, Rights of Use and Occupancy (RUO's), and land use authorizations (collectively "Land Rights") in the designated ranch lands at the Point Reyes National Seashore (the "PRNS") that are now at issue in ad the basis of this Action; (3) the disposition of the Action will affect, impede, and threatens to destroy the Individual Ranchers' Land Rights, including their ability to enforce and protect those Rights under contracts and promises entered into with Defendant National Park Service ("NPS"); and (4) each of the named parties in the Action maybe actually or potentially adverse to the some or all of the protectable interests of the Individual Ranchers, and/or the named parties cannot, and may not be able to, adequately represent and protect the historic Land Rights of the Individual Ranchers.

The Individual Ranchers should also be permitted to intervene with the Court's permission under Rule 24(b)(1)(B) on the grounds that: (1) they have and will assert defenses and claims that share and raise common questions of law and/or fact with those raised by the parties in the Action,

1  including the scope, substance, and duration of the lease hold interests, and respective rights and

2  lease obligations of the Individual Ranchers' landlord, Defendant NPS; and (2) intervention will

3  not unduly delay or prejudice the adjudication of rights and obligations of the named parties in the

4  Action, but will assist and are necessary to facilitate an efficient, full, and fair adjudication

5  proceedings, including any final resolution to the Action.

6       The Individual Ranchers base the MTI on their Notice of Motion, Memorandum of Points

7  and Authorities filed in Support, any responsive pleadings to the MTI, the Individual Ranchers'

8  [Proposed] Answer, the Declarations of Julie Evans-Rossotti, Robert J. McClure, Tim Kehoe,

9  William Nunes, and their counsel, Peter Obstler, Esq. filed in support of the Motion to Intervene,

10  and any and all other pleadings and filings in the Action, arguments and evidence, and other

11  reasons or evidence adduced or presented at a hearing, if any, on the MTI.  For the avoidance of

12  doubt, the Individual Ranchers also join in and incorporate by reference the pleadings and

13  arguments set forth in the Motion to Intervene and Memorandum of Points and Authorities filed

14  on April 20, 2022, by Intervenor Point Reyes Seashore Ranchers Association (the "Association")

15  Docket (Dkt.) #30.

16       Counsel for the Individual Ranchers met and conferred prior to the filing of the MTI with

17  the parties to this Action.  The Plaintiffs and Intervenor Association do ***not*** oppose the Individual

18  Ranchers request to intervene.  Defendant NPS "take[s] no position" on the MTI.[1]   Declaration of

19  Peter Obstler Esq attached hereto ¶¶ 13, 14 ("Obstler Dec.") and answer is filed concurrently.

20

21

22

23

24

25

---

26  [1] The Individual Ranchers appreciate the professionalism of the parties in not opposing the MTI
    and understand that the non-opposition shall not be deemed a waiver or admission regarding any
27  parties' rights to challenge any of the underlying facts or assertions in averred in the MTI, if
    necessary and appropriate, in any of the merits based proceedings that have occurred or may occur
28  during the pendency of the Action.

1    DATED:  June 8, 2022                    ELLIS GEORGE CIPOLLONE

2                                            O'BRIEN ANNAGUEY LLP

3                                            Peter Obstler

4                                      By:   _____

5                                                   Peter Obstler

6                                      Attorneys for The Individual Ranchers

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION  TO INTERVENE ON BEHALF OF INDIVIDUAL RANCHERS

## MEMORANDUM OF POINTS AND AUTHORITIES

Proposed Intervenors Dan and Dolores Evans, Julie Evans-Rossotti (PRNS Historic H & K Ranches) (the "Evans-Rossottis"), Ruth and Robert J. McClure (PRNS Historic I Ranch) (the "McClures"), Tim, Tom, Mike, Emily, Janelle, Justin, Anne and Tim Jr. Kehoe (PRNS Historic J Ranch) (the "Kehoes"), and Betty Nunes, Tim Nunes, and Jackie Nunes Hemelt  (PRNS Historic B, D, and E Ranches) (the "Nunes") (collectively the "Individual Ranchers," unless otherwise specified) respectfully submit this memorandum of points and authorities ("Mem. Sup.") in support of their Motion to Intervene in the Action (the "MTI") in the above captioned action (the "Action") under Rule 24(a) and/or (b) of the Federal Rules of Civil Procedure ("Rule 24").

## I.   <u>INTRODUCTION & SUMMARY OF ARGUMENT</u>

The Individual Ranchers are members of multi-generational families who have lived and earned their livelihoods on organic and environmentally sustainable cattle and dairy ranches on the Point Reyes Peninsula since the 19th century.  Each was granted and continues to hold interim and long term, multigenerational leasehold interests, Rights of Use and Occupancy ("RUO's"), and other specific land use authorizations and rights (collectively the "Land Rights" unless otherwise specified).  Those Land Rights run with and govern the specific ranch lands the comprise the subject matter and relief sought by and in this Action.  And whatever their scope and substance, the Land Rights, including the promises of renewed long term leases, RUO's, and use permits, were granted and promised to the Individual Ranchers as consideration and compensation for their ceding title to those lands to the United States (the "Government") and to allow for creation of the Point Reyes National Seashore (the "PRNS").

Plaintiffs and NPS have now challenged and placed these contractual and promissory Land Rights at issue in this Action.  And regardless of who prevails, those Land Rights have, are, and will continue to be affected, impaired, impeded, and interfered with by these proceedings and the disposition of this Action, whether by judgment or settlement.  Indeed, the Individual Ranchers are real parties of interest to the specific leases and other Land Rights that are the subject of the Action and are the target of the relief sought.  Consequently, they are necessary to the adjudication and resolution of the Land Rights to be resolved by this Action and should be allowed to intervene

1    in this Action to protect those Rights under Rule 24.  *See generally* Declarations of Julie Evans-

2    Rossotti ("Evans-Rossotti Dec."), Robert McClure ("McClure Dec."), Tim Kehoe ("Kehoe Dec."),

3    and Declaration of William Nunes ("Nunes Dec.")

4         This Action is the latest iteration of a dispute that continues to interfere with the sound and

5    functional management of PRNS to the direct harm and detriment of the Individual Ranchers and

6    the public.  As they did in 2016, Plaintiffs seek to set aside the Government's most recent planning

7    process and block its decision to issue 20-year leases and ranching authorizations to the Individual

8    Ranchers.  Once again, the Individual Ranchers are caught in the middle of a dispute that directly

9    affects, impairs, impedes, and seeks to terminate their Land Rights, including interim and long

10   term lease hold interests, ranching authorizations, and reservations of use and occupancy rights

11   approved and granted to them by the Government.  *See generally Res. Renewal Instit., et al. v.*

12   *Nat'l Park Serv.*, Case No. 3:22-cv-00145, Dkt # 1 (N.D. Cal., Jan. 10, 2022) ("Complaint"); *see*

13   *also* id., ¶¶ 116-141, Prayer for Relief ¶¶ B, C; General Management Plan Amendment Record of

14   Decision (dated 9/13/22) (the "ROD"), pp. 1-3, 19-21, 33-37,

15   https://www.nps.gov/pore/getinvolved/planning_gmp_amendment.htm.  Consequently, the

16   Individual Ranchers are "necessary" parties to this Action who, if not joined under Rule 19(b),

17   should be allowed to intervene as a matter of right under Rule 24(a) in order to protect and

18   vindicate their rights to live, maintain, and operate ranches on their ancestral lands.  *See*, *e.g.*,

19   *Pilant v. Caesars Enter. Servs., LLC*, No. 3:20-cv-02043-CAB-AHG, 2021 WL 424280, at *2

20   (S.D. Cal. Feb. 8, 2021) ("[t]here does not appear to be a material difference between the

21   requirement that a non-party have a "significantly protectable interest" to intervene under Rule

22   24(a) and the requirement that a non-party have a "legally protected interest" to be deemed

23   necessary under Rule 19(a)(1)(B)(i)") (citing *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984,

24   996 (9th Cir. 2020), *appeal dismissed*, No. 21-55228, 2021 WL 4075076 (9th Cir. Aug. 4, 2021));

25   *cf. also Kettle Range Conservation Grp. v. U.S. Bureau Of Land Mgmt.*, 150 F.3d 1083, 1087 (9th

26   Cir.1998) (claims for joinder and intervention are duplicative and denial of joinder motion under

27   Rule 19(b) precludes a motion for intervention under Rule 24).

28

A.    **Summary Of Argument**

*First*, the Individual Ranchers' MTI is timely and will not prejudice any of the named parties or interfere with the orderly and efficient scheduling of any proceedings in the Action.  It is filed at the initial stages of this Action, before any case management schedule, ADR, discovery, or merit based proceedings have occurred, and then only after NPS informed the Individual Ranchers that it would not issue long term leases because of the Action and discussions commenced between the Individual Ranchers, and Plaintiffs, Defendant NPS, and recent Intervenor Point Reyes Seashore Ranchers Association (the "Association")  Obstler Dec. ¶¶ 10-15.  Intervention of the Individual Ranchers will ensure that parties who are necessary to ensure the fair adjudication and remediation of the contractual or promissory lease hold and other rights at issue in this Action will be joined and present before the Court at the outset of the proceedings.  *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (citing *Cnty. of Orange v. Air Cal.*, 799 F.2d 535, 537 (9th Cir.1986)).

*Second*, the Action directly involves, challenges and threatens the protectable rights and interests arising from the Land Rights granted or promised to the Individual Ranchers.  *See* Complaint ¶¶1-141, Prayer for Relief ¶¶ B, C.  This includes the contractual, promissory, and legal Land Rights of each to live on and continue to maintain their ranch lands under the RUOs, Lease/Special Use Permits, ranching authorizations, and other promises made by the Government under and subsequent to the legislation creating and providing for PRNS.  *See Wilderness Soc'y v. .U.S. Forest Serv.*, 630 F.3d 1173, 1178, 1180 (9th Cir. 2011).

*Third*, the final resolution or disposition of this Action will necessarily affect and impair the present and future rights of the Individual Ranchers.  Each of these families continues to live and earn their livelihoods on PRNS lands that have been in their families for five generations dating back to the 19th century.  This Action specifically challenges their right to continue to do so, including the authority of NPS to issue renewals of the long term ranching authorizations and leases necessary to protect the Land Rights.  Furthermore, it continues to affect, impair, and interfere with the basic, sound, and functional management of PRNS ranch lands by NPS in compliance with its obligations to ranchers, other stake holders, and the public.  *See, e.g.,*

1  McClure Dec. ¶¶ 13-16 ; Kehoe Dec. ¶¶ 17-25; Evans Rossotti Dec. ¶¶ 15-20; Nunes Dec ¶¶

2  10,11, 19-23; *see also WildEearth Guardians v. U.S. Forest Serv.*, 573 F.3d 992 (10th Cir. 2009);

3  *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994); *Mille Lacs Band of Chippewa Indians v.*

4  *Minnesota*, 989 F.2d 994 (8th Cir. 1993); *First Nat. Bank & Trust Co. v Oil Screw Olive L. Moore*,

5  379 F Supp 1382 (W.D. Mich. 1973)) (permitting intervention of a party as a matter of right to

6  protect lease hold interests in property), *aff'd.* 521 F.2d 1401 (6th Cir.).

7        **Fourth**, the named parties may not be able to, and cannot, protect the interests of the

8  Individual Ranchers.  Both the Plaintiffs and the Defendant NPS are potentially, if not actually,

9  adverse to the legal, and equitable lease hold and other protectable interests and Land Rights of the

10  Individual Ranchers.  Furthermore, the Individual Ranchers are neither members of nor

11  represented by Intervenor Point Reyes Seashore Ranchers Association (the "Association").

12  McClure Dec. ¶ 20; Kehoe Dec. ¶ 27; Evans Rossotti Dec. ¶ 22; Nunes Dec ¶ 26.  And, because

13  the Individual Ranchers live on and hold interests in ranch lands that are geographically distinct

14  and strategically different, and implicate highly individualized, unique, and ranch specific

15  protectable interests in land that belong only to them, the Association cannot and has no standing

16  to represent or protect those interests.  *See Forest Conservation Council v. U.S. Forest Serv,* 66

17  F.3d 1489, 1498 (9th Cir. 1995) (emphasis in original); *Ctr. for Biological Diversity v. U.S. Fish &*

18  *Wildlife Serv.*, No. 4:15-cv-05754-JST, 2016 WL 1394355, at *3 (N.D. Cal. Apr. 7, 2016).

19        As a final matter, the Court should also permit the Individual Ranchers to intervene under

20  Rule 24(b)(1)(B) in its discretion.  Plaintiffs core assertions in this Action are that ranching

21  impairs the ability of NPS to manage PRNS in accordance with the law and, consequently, current

22  and future ranching operations and elsewhere must be terminated.  The adjudication of the Action,

23  therefore, involves the disposition of factual and legal claims and defenses that are common to the

24  named parties and implicates the conduct, actions, and operational management of the lands on

25  which the Individual Ranchers live and earn their livelihoods.  Fed. R. Civ. P. 24(b); *see also*

26  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111–1112 (9th Cir. 2002) ("*Veneman*"),

27  *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir.

28  2011).

## II.    **BACKGROUND**

The Action is the latest legal filing in the long, and at times dysfunctional, historical management of lands by the Government at PRNS.  That history dates back to the late 1960's when the Individual Ranchers ceded title to their ranch lands to the Government to allow for the creation of the PRNS, the first national seashore in the U.S.  In exchange for giving up title to ranch lands that each family had owned, occupied, and ranched since the 19th Century, the Individual Ranchers were granted multi-generational reservations of rights of occupancy, including lease hold interests, along with other valuable compensation.  *See* ROD pp. 1-3; McClure Dec. ¶¶ 4-14; Kehoe Dec. ¶¶ 3-6; Evans Rossotti Dec. ¶¶ 4-6; Nunes Dec ¶¶ 4-7.

It is now 2022, and the Government continues to be stymied with respect to both the short and long term management of PRNS.  Whether inadvertent or not, or the result or threat of continuing litigation, the Government has been unable to comply with its basic contractual promises to issue long term leases to the Individual Ranchers and ensure sound and consistent management and administration of their ranch lands, since before 2007.  This Action is yet another barrier.  But it also provides another opportunity for the stake holders, including the parties and the Individual Ranchers, to find and agree on a viable, and mutually acceptable path forward.

### A.    **The Genesis Of The PRNS**

In 1962, Congress passed the Point Reyes Act to create Point Reyes National Seashore. *See generally*, Pub. L. No. 87-657, 76 Stat. 538 (1962) (amended and current version codified at 16 U.S.C. §459c *et seq.*).  In recognition of the historical, cultural, and environmental contributions made by family ranchers to that Seashore, and to compensate ranchers for the acquisition of land necessary to create the Seashore, Congress provided for the continuation of family ranching on the pastoral lands of the Seashore.  *See* 16 U.S.C. §459c-5a.   Specifically, as part of the compensation for their land, the Individual Ranchers were granted long term lease holds, occupancy, and ranching authorizations (collectively "RUO's") for elective periods of 25 years or the life of the ranch owner or surviving spouse.  In addition, Congress provided Individual Ranchers with lease back rights under which the NPS was authorized to lease the

1    acquired land back to the family ranchers.  *See* ROD pp. 1-3; Complaint ¶ 28; *see also* 16 U.S.C.

2    §459c-5(a).

3        **B.        The Government's Promise To Quickly Renew The Long Term RUO's**

4        When the time period for the specific original RUO's granted to each of the Individual

5    Ranchers and other ranching families began to expire, the federal government, in compliance with

6    its promises, and in further recognition of the important and historic roles that ranching played in

7    the creation, management, and steward ship of PRNS ranch lands, the Government exercised its

8    lease back authority and directed NPS began to re-issue RUO's, including long term lease hold

9    interests to the Individual Ranchers beginning on or around 2000.  During the delay or interim

10   period between the expiration of the original RUO's and the promised issuance of new ones, the

11   Government granted the Individual Ranchers "interim" RUOs, including short term leases under

12   annual "Letters of Authorization" (LOA).  Under the LOAs, "the rents, terms, and conditions" of

13   existing leases were and continue to be extended year to year for one-year periods pending the

14   issuance of the promised 20 year leases.  *See, e.g.*, Complaint ¶¶ 60, 138; ROD pp1-3.

15       For many years now, NPS has understood, acknowledged, and recognized that the short

16   term nature of the LOA's and other "interim" renewals of Land Rights imposed serious hardships

17   on the Individual Ranchers.  Among other things, the uncertainty, dysfunctionality, and interim

18   nature of its management decisions have impaired and interfered with the Land Use Rights,

19   including the Individual Ranchers' abilities to make long term investments, residential,

20   operational, and business decisions, as well as the succession planning required to ensure that the

21   next generation of Individual Ranchers and other ranching families could continue to live, work,

22   and ranch on their ancestral lands.  McClure Dec. ¶¶ 13-16; Kehoe Dec. ¶¶ 17-25; Evans Rossotti

23   Dec. ¶¶ 15-20; Nunes Dec ¶¶ 10,11, 19-23.

24       As a result, in 2012, the Government directed NPS to issue long term leases to the ranchers

25   of up to 20 years that recognized the detriment of the delay, concerns, uncertainty, and harm

26   caused by the failure to reissue the promised long term RUOs.  *See, e.g.*, ROD p. 4.  In 2014, NPS

27   reconfirmed to the Individual Ranchers that it is "committed to move quickly to develop and

28   implement" 20 year leases via a Ranch Management Planning process (the "RMP").  Rod pp, 1-5;

see *also* Complaint¶¶ 104-110].  The RMP process was completed in 2014 and NPS began the process of issuing long term 20 year leases to ranchers at PRNS, including the Individual Ranchers.  *Id*.

C.    **The Litigation And Stand Still Agreement**

On February 10, 2016, the Plaintiffs in this Action filed a lawsuit challenging the 2014 Ranch Management Plan that provided for the immediate issuance of long term, 20-year leases and approved other renewals arising from the Land Rights.  *See generally RRI V. NPS*, No. 3:16-cv-00688-SBA, ECF No. 1, Prayer for Relief, ¶¶ B-E (N.D. Cal. Feb. 10, 2016).  Plaintiffs further sought to enjoin the issuance or operation of any ranching authorizations at PRNS and force NPS to "terminate" the existing RUO's that were given to ranchers as compensation for their lands, including the long promised 20-year leases to the Individual Ranchers.  Plaintiffs further threatened to enjoin or revoke the interim RUO's unless and until NPS completed and issued an updated General Management Plan (the "GMP") that justified the renewal of RUOs and continued ranching operations.  *Id.* ¶¶ 53-66, 100-110.

After the Court denied NPS's motion to dismiss the 2016 lawsuit, the Individual Ranchers moved and were granted limited provisional intervention to participate in a court mandated ADR and settlement conference before the Hon. Donna Ryu, U.S. Magistrate Judge for the Northern District of California.  On or about February 27, 2017, each of the Individual Ranchers executed and became parties to a multi-party settlement agreement between themselves, NPS, and the Plaintiffs in this Action.  *See* Obstler Dec. Exhibit A (Settlement Agreement dated February 27, 2017).  Under that agreement, NPS agreed to commence a GMP process and issue an amendment to the PRNS GMP and EIS to specifically address the renewals of the long term RUO's promised to the Individual Ranchers and others at PRNS.  NPS and Plaintiffs agreed to maintain the status quo of issuing interim LOAs to the Individual Ranchers and others at PRNS and to continue to manage lands, including the Tule elk, in a manner that allowed for the ranching families to continue to live and operate their ranches until the issues blocking the long term RUO renewals were resolved upon completion of the GMP.  *See also* Complaint ¶ 73; ROD p.4 ("The Settlement Agreement preserved NPS's right to give full consideration to her potential action alternatives"

1    and allows NPS to consider agricultural diversification, increased operational flexibility,

2    promotion of sustainable operational practices, succession planning, and similar ranch

3    management practices as part of any action alternative")

4        **D.    The ROD**

5        On September 13, 2021, NPS purportedly completed the GMP process and issued the

6    ROD.  Like the preceding RMP, the ROD of the GMP authorized the issuance of 20 year long

7    term leases and ranching authorizations to the Individual Ranchers.  Among other things, it

8    recognized multi-generational ranching as a "legislatively authorized use for lands" at PRNS.  In

9    so doing, NPS concluded that:

10           In 1962, nearly all of the land within the new Seashore's boundary was
             privately owned, and roughly half of it was used for beef or dairy ranching.
11           Congress initially sought to protect ranches and the pastoral landscape they
             supported by prohibiting NPS from using eminent domain as long as
12           ranchlands remained in their natural state or were used for ranching. H. Rep.
             87-1628 at 5, 8, 10 (1962). After land prices in the area escalated and
13           ranchlands were threatened with subdivision, Congress amended the park's
             legislation in 1970 by repealing the condemnation restraint. Act of Apr. 3,
14           1970, §2(b); Pub. L. No. 91-223, 84 Stat. 90. This allowed NPS to acquire
             ranchlands and authorize continued ranching through retained rights of use
15           and occupancy (as authorized under Section 5 [formerly Section 6] of the
             park's enabling legislation), or by using the leasing provisions of the Land
16           and Water Conservation Fund Act. S. Rep. 91-738, at 2, 7– 8 (1970); 116
             Cong. Rec. S7615 (March 17, 1970).

17   Rod at pp.1-2

18

19       In addition, it noted that "the legislative record reflects decades of Congressional support

20   for beef and dairy ranching on lands in the planning area, as well as a recognition of the linkage

     between ranching and maintenance of the park's scenic and pastoral qualities." "This history
21
     together with the recent reaffirmation of Congressional support for ranching confirm that ranching
22
     remains an appropriate use of park lands today."  *Id.* p.3
23
         To effectuate its approval and renewal of activities consistent with the Land Rights granted
24
     to the Individual Ranchers at PRNS, NPS requires that each [Individual Rancher] execute a
25
     renewed ROA.  According to NPS.  Each ROA "will identify ranch-specific operational details
26
     and requirements associated with (1) beef or dairy ranching (as applicable) to meet desired
27
     conditions, (2) authorized diversification activities, and (3) maintenance requirements including
28

1  historic ranch structures and operational infrastructure.  ROAs will be developed with each

2  rancher and reviewed during an annual meeting with NPS staff.  *Id.* p.19

3      NPS also issued other approvals and action plans "for maintaining a viable population of

4  free-ranging elk and, for alternatives that would allow ranching to continue, a range of ranching

5  activities including diversification, grazing, and sustainable ranch practices consistent with its

6  contractual and other promises of Land Rights.  And, with respect to Elk, "in the event of an

7  unforeseen circumstance that causes the herds to completely move from long-established core use

8  areas to other locations in the planning area, NPS will reevaluate the impacts and management

9  approaches set forth in the selected action as needed to ensure maintenance of a viable free-

10  ranging elk population in Point Reyes, which may result in the need for further environmental

11  review." *Id.* § 6.6. pp. 34-37.  This is an important and vital part of vindicating the Land Rights

12  because all of the Individual Ranchers are at risk of having Tule elk encroach and interfere with

13  their livestock, silage grazing, and organic operations and certifications. And some of the

14  Individual Ranchers have suffered damage to their lands, structures, and livestock as a result of

15  NPS's inability to manage the "Drakes Bay herd" of tule elk, an unplanned and unapproved herd

16  under the 1997 EIS that allowed only for free ranging herds on the Limantour Split, land that is

17  separated from the ranch lands by Drakes Bay. *See, e.g.*, Nunes Dec. ¶¶ 20-21.

18      **E.      The Pending Action**

19      On or about January 8, 2022, Plaintiffs filed this Action asking this Court to set aside the

20  years of public planning, including the plans and approvals certified in the ROD, and permanently

21  enjoin the issuing and renewal of any future ranching authorizations, including the promised 20

22  year lease renewals.  *See generally* Complaint.  Consequently, despite the Individual Ranchers

23  agreement to forego valuable long term lease hold rights during the six year interim planning

24  period requested by Plaintiffs in 2016 and completed by NPS, nothing has changed.  *Compare*

25  *generally* Complaint *with* 2016 Lawsuit, ECF 1.

26      Not surprisingly, the 2016 lawsuit and current Action are similar, if not identical, with the

27  only material change being that instead of challenging the 2014 RMP's renewal of Land Rights,

28  Plaintiffs now set their sights on the GMP renewal of those Rights under the six-year process they

1   requested.  Specifically Plaintiffs "challenge" what they allege is NPS's "decision to expand beef

2   and dairy ranching on public lands within Point Reyes National Seashore."  Complaint ¶ 1.  They

3   allege that sustainable, organic dairy and beef "conflicts with wildlife and public recreation" and

4   that the receipt of initial compensation of less than $1 million by each of the Individual Ranchers

5   is more than sufficient to compensate for current Land Rights that Plaintiffs concede are now

6   worth well in excess of $100 million.  Complaint ¶¶ 3, 34; *see also id.* ¶¶ 70-73.

7        On that record, Plaintiffs assert four claims for relief under Administrative Procedures Act,

8   5 U.S.C. §701-706(2) (the "APA") the on the grounds that NPS decision to issue Long Term

9   Leases and honor the Individual Ranchers Land Rights violates different statutes: (1) violations of

10   the Point Reyes Act, 16 U.S.C. §459c *et seq*. (Complaint "First Claim for Relief," ¶¶ 142-149); (2)

11   violations of the Organic Act, 54 U.S.C. §100101 et seq., and its implementing regulations, 36

12   C.F.R. §1.1 et seq. (Complaint, "Second Claim for Relief," ¶¶ 150-157); (3) violations of the

13   National Environmental Policy Act, 42 U.S.C. §4332 under 40 C.F.R. §§1500.1; 1508.7, 1508.8,

14   1502.14, 1502.16.42 U.S.C. §4332 (NEPA) (Complaint, "Third Claim for Relief," ¶¶158-165); and

15   (4) violations of section 313 of the Clean Water Act, 33 U.S.C. §1323 (Complaint, "Fourth Claim

16   for Relief," ¶¶ 166-174).  And like the 2016 lawsuit, Plaintiffs reallege a Ranchers be damned

17   narrative that requires the Court to "[s]et aside and vacate the Record of Decision, the General

18   Management Plan Amendment, and the Final Environmental Impact Statement, and remand these

19   matters to NPS," and "enjoin[] NPS from approving 20-year leases, new commercial activities,

20   expanded ranching operations, and/or from undertaking new or expanded lethal Tule elk control."

21   (Complaint, Prayer ¶¶ B, C; *see also generally id.*, ¶¶ 1-141.)

22        **F.**    **The Individual Ranchers**

23        Each of the Individual Ranchers are signatories and parties to the lease hold contracts,

24   RUO's, and other land use contracts and promises from which the Land Rights at issue in this

25   Action arise.  Each was granted intervention in the 2016 Action and is a signatory and party to the

26   2016 Settlement Agreement.  And, at least since 2020, each has been the victim of physical and

27   verbal harassment by extremists and have endured trespass and poor management enforcement of

28   core

The Evan-Rossotti, McClure, and Kehoe Families founded and operate beef and dairy ranches on the Pierce Point side of the Park.  *See* Complaint ¶ 38 and diagram, parcels 12, 13, 14, and 15.)  These are some of the oldest ranches dating back to the 19th century.  They are also regarded as models of sustainable, organic ranching and land management in Northern California and are situated on some the most beautiful and geographically strategic lands at PRNS.  McClure Dec. ¶ 3-5; Kehoe Dec. ¶¶ 3-5; Evans Rossotti Dec. ¶¶ 3-5; Nunes Dec ¶¶ 3-6.  Indeed, Cecily Muldoon the former Park Manager of NPS, used the ranches the Individual Rancher families to conduct NPS sponsored public tours of ranching history and sustainable ranching practices at PRNS.  McClure Dec. ¶ 3.  The Kehoe, McClure, and Nunes Ranches are located on the Pierce Point part pf the PRNS and their lands abut and are directly adjacent to the fenced Pierce Point elk herd.  Complaint ¶ 38 and diagram.  They are also the ranches that will be most immediately affected by NPS's water management and other land management actions items discussed in the GMP.  *See* McClure Dec. ¶¶ 13-16; Kehoe Dec. ¶¶ 17-25; Evans Rossotti Dec. ¶¶ 15-20; Nunes Dec ¶¶ 10,11, 19-23.

The Nunes family ranch lands are located on the Drakes Bay side of PRNS and are comprised of lands that have been in their family since 1919.  The Nunes family ranches are comprised of an organic dairy ranch authorized to dairy up to 350 cows, and two smaller parcels of land used for beef ranching operations.  The dairy operation known as Drakes View Dairy is located on Historic A Ranch, while the beef ranches are located on Historic D, and E Ranches.  Furthermore, the unauthorized Drakes Beach elk herd routinely encroaches on and interferes with ranching operations and has caused major damage to both the infrastructure and livestock on these ranches. Nunes Dec ¶ 3, 20, 21.

On or about, June 7, 2022, NPS has informed the Individual Ranchers that it will NOT issue the approved long term RUO's and renew the promised Land Rights, or to take any of the Elk or other approved land management actions unless and until the Action resolves. Obstler Dec ¶ 12, 13 and Exhibit A 2017 Settlement Agreement.  Consequently, the Individual Ranchers now move to intervene in the Action to protect their Land Rights and other interests that are now in jeopardy because of this Action and NPS's decision to forego the issuance of the approved and

1 | promised long term leases and other actions pending final resolution of litigation.

2 | **III.    ARGUMENT**

3 |   If Plaintiffs prevail, the Individual Ranchers will go from being the historic and cultural

4 | stewards of the pastoral lands that resulted in the PRNS to unlawful squatters on their own

5 | ranches.  Indeed, by filing this Action immediately after the issuance of the ROD and six year

6 | RMP process that confirmed and validated the long term, multi-generational right of the

7 | Individual Ranchers to live and work on their ancestral lands, Plaintiffs and NPS have effectively

8 | interpleaded the Individual Ranchers' Land Rights into the Action without formally or properly

9 | joining them as parties under Rule 19(a).  And because Plaintiffs seek to set aside the ranching

10 | authorization and leases promised to the Individual Ranchers, and NPS refuses to implement the

11 | ROD and issue the long term leases, the uncertainty that affects, impairs, and threatens to destroy

12 | the occupancy rights and interests of the Individual Ranchers continues with no foreseeable end in

13 | sight.  The Individual Ranchers, therefore, not only meet the requirements for intervention under

14 | Rule 24(a) as to all of the claims in the Action but are "necessary parties" who must be present to

15 | ensure a full and fair adjudication of their rights, as well as any final resolution of this Action

16 | sought by any of the stake holders.

17 |   **A.    Standard Of Review Under Rule 24**

18 |   Rule 24 provides for intervention by an affected party as a matter of right and/or in the

19 | Court's discretion.  With respect to intervention by right, Rule 24(a) provides that upon timely

20 | motion, intervention shall be granted to anyone who "claims an interest relating to the property or

21 | transaction that is the subject of the action, and is so situated that disposing of the action may as a

22 | practical matter impair or impede the movant's ability to protect its interest, unless existing parties

23 | adequately represent that interest." Fed. R. Civ. P. 24(a).

24 |   Under Rule 24(a)(2), a four part test applies: (1) the motion must be timely; (2) the

25 | applicant must claim a "significantly protectable" interest relating to the property or transaction

26 | which is the subject of the action; (3) the applicant must be so situated that the disposition of the

27 | action may, as a practical matter, impair or impede its ability to protect that interest; and (4) the

28 | applicant's interest must be inadequately represented by the parties to the action. *Wilderness*

1    *Soc'y*, 630 F.3d at 1178–79 (citation omitted).

2         In applying that Rule, the Court accepts the non-conclusory allegations averred in the

3    motion to intervene as true. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819-820 (9th

4    Cir. 2001).  Also of relevance here is the Ninth Circuit's abandonment of the "federal defendant"

5    rule, under which private parties and state and local governments were previously prohibited from

6    intervening of right on the merits of claims brought under the National Environmental Policy Act

7    of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq.  In *Wilderness Soc'y*, 630 F.3d at 1178–79, the Ninth

8    Circuit revisited the "so-called 'federal defendant' rule," and expressly abandoned it as "at odds

9    with the text of Federal Rule of Civil Procedure 24(a)(2) and the standards we apply in all other

10   intervention of right cases."  When, as here, putative intervenors demonstrate a "significantly

11   protectable" interest in a public lands dispute involving the Government, "the operative inquiry

12   should be, as in all cases, whether 'the interest is protectable under some law,' and whether 'there

13   is a relationship between the legally protected interest and the claims at issue.'" *Id.* (quoting

14   S*ierra Club v. EPA*, 995 F.2d 1478, 1484 (9th Cir.1993)).  Thus, an applicant who meets the

15   criteria of Rule 24(a) should be granted intervention as a matter of right in all cases, including the

16   NEPA and public lands disputes at issue in this Action.

17        With respect to permissive intervention under Rule 24(b), the applicant must demonstrate:

18   "'(1) independent grounds for jurisdiction; (2) [that] the motion is timely; and (3) [that] the

19   applicant's claim or defense, and the main action, have a question of law or a question of fact in

20   common.'" *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (quoting *U. S. v. City

21   of L.A.*, 288 F.3d 391, 403 (9th Cir. 2002)).   But unlike intervention as a matter of right, the Court

22   retains discretion to deny permissive intervention even where the applicant satisfies each of the

23   statutory elements of Rule 24(b).  *Id.* (citing *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir.

24   1998)).

25        **B.    The Individual Ranchers Are Necessary Parties Who Should Be Allowed To
26              Intervene As Matter Of Right Under Rule 24(a)**

27        The Individual Ranchers satisfy all four elements of intervention as a matter of right under

28   Rule 24(a).  Each are holders of, signatories, and beneficiaries of the lease hold property interests,

1   ranching authorizations, and other promises of long term, multigenerational occupancy and use

2   rights to their lands at issue in this Action.  Furthermore, the Government used the granting of

3   those lease hold interests, occupancy rights, and other promises to obtain ownership and

4   management of the ranch lands that created the PRNS.  Consequently, the Individual Ranchers are

5   "necessary" parties to any dispute that directly affects their contractual land rights and promises

6   and have yet to be properly joined under Rule 19(b).  In such cases, intervention is granted as a

7   matter of right.  *See Pilant*, 2021 WL 424280, at *2, ("the primary difference between these

8   requirements in Rule 19(a) and Rule 24(a) appears to concern who may bring the motion," and

9   "[f]ederal courts generally construe improper nonparty Rule 19 motions as a motion to intervene

10  under Rule 24") (citing *Arrow v. Gambler's Supply, Inc.*, 55 F.3d 407, 409 (8th Cir. 1995); *Herb

11  Reed Enter., Inc. v. Bennett,* No. 2:10-CV-1981 JCM RJJ, 2012 WL 5989632, at *5 (D. Nev. Nov.

12  29, 2012)); *cf. also Kettle Range*, 150 F.3d at 1087;  Wright and Moore §1610 (the only difference

13  between the entry of a party into a case by right of intervention rather than joinder turns on which

14  party initiates the proceedings to add a new party to the case because description in rule 24(a)(2)

15  of those allowed to intervene as of right is nearly identical to the description in rule 19(a)(2)(i) of

16  those whose joinder is compulsory).

17              1.      **The Individual Ranchers Application To Intervene Is Timely**

18          As an initial matter, Plaintiffs have informed the Individual Ranchers that the parties do

19  not intend to oppose the Motion to Intervene on timeliness grounds.  *See* Obstler Dec. ¶¶ 17, 18.

20  Furthermore, as the record demonstrates, the Individual Ranchers have not intentionally or

21  improperly delayed intervention for tactical gain.  *Id.*

22          In any event, all of the "traditional features" of timely intervention are present: (1) other

23  than the Plaintiffs' Complaint (Dkt. #1) and Defendant NPS's Answer (Dkt #20), no substantive

24  or materially procedural changed at this stage of the proceedings have occurred, the initial case

25  management conference is not scheduled until July 3, 2022, the necessary administrative record on

26  which the Action is based has yet to be lodged or filed with Court, and no discovery has occurred:

27  and, as a result, (2) there is (and can be) no prejudice to any of the current parties; and (3) the

28  length of delay and the reason for it are not material.  *See League of United Latin Am. Citizens*,

131 F.3d at 1302; *Cnty. of Orange*, 799 F.2d at 537; *see also Cameron v. EMW Women's Surgical Ctr.*, P.S.C., 142 S. Ct. 1002 (2022) (need to seek intervention does not arise and should be assessed in relation to the point in time when it becomes necessary to intervene); *Smith v. L. A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) ("[t]he crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties") (quoting *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999)).

**2.**    **Individual Ranchers Possess Significantly Protectable Interests That Are Affected, Impaired, and Impeded By The Action**

"Rule 24(a)(2) does not require an intervenor to have a specific legal or equitable interest." *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (citations omitted). Rather, "the operative inquiry" is "whether 'the interest is protectable under some law' and whether 'there is a relationship between a relationship between the legally protected interest and the claims at issue.'" *Wilderness Soc'y*, 630 F.3d at 1180 (quoting *Sierra Club*, 995 F.2d at 1484). "A putative intervenor will generally demonstrate a sufficient interest for intervention of right in a NEPA action . . . if 'it will suffer a practical impairment of its interests as a result of the pending litigation.'" *Id.* (citation omitted).

Notwithstanding the very substantial and legitimate interests of the other parties or the general public in the outcome of this Action, the stakes could not be higher for the Individual Ranchers. On its face, this Action seeks to determine whether Individual Ranchers can continue to live and earn their livelihoods from ranch lands that have been in their families for generations under their lease hold interests, contractual use and occupancy rights, and other promises entered into with and made by the Government. *See* Complaint ¶¶ 1-141; Prayer ¶¶ B-C. If Plaintiffs prevail, then the Court will be tasked with permanently enjoining and altering their property rights and other contractual and promissory interests in their ranch lands, as well as the more general right of to live, ranch, earn their livelihoods from, recreate, and enjoy the Seashore, all of which are not only "significantly protectable" interests in the property and transactions at issue in the Action, but the very subject of the claims and relief sought. *Id.*

1

2        Plaintiffs have put at issue Individual Ranchers rights and interest provided in the LOA's,

3   long term lease hold interests, RUO's, and other authorizations approved and issued by the Park

4   Service.  When, as here, a third party seeks to interfere with contractual property rights,

5   contractual interests, and authorizations to graze lands obtained in exchange for ceding title of the

6   lands to the public via the Government, the recipient and holder of those rights, interests, and

7   authorizations has a legally sufficient interest to intervene in a NEPA compliance public lands

8   action.  *Id.*; *see also, e.g.*, *Forest Guardians v. U.S. Forest Serv.*, No. CIV 07-1043 JB/ACT, 2008

9   WL 5975041, at *1 (D.N.M. Aug. 29, 2008) (livestock grazing permittees "aimed at halting

10  grazing or, at a minimum, reducing the level of their use of the National Forest Lands for livestock

11  grazing purposes"); *Bark v. Northrop*, No. 3:13-CV-01267-HZ, 2013 WL 6576306, at *3 (D. Or.

12  Dec. 12, 2013) (A company that contracted with the United States Forest Service to purchase

13  timber had a right to intervene in an action challenging a particular timber sale under NEPA).

14       In this Action, the Individual Ranchers meet the standards of a "necessary" party under

15  Rule 19 who, if not joined, may intervene as a matter of right.  *See E.E.O.C. v. Peabody W. Coal

16  Co.*, 400 F.3d 774, 780 (9th Cir. 2005) (Indian Tribe who has a land lease with defendants is a

17  necessary party who may intervene as a matter of right in fair employment action); Dawavendewa

18  *v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1156 (9th Cir. 2002) (Indian tribe

19  with land interests not only necessary but indispensable under Rule 19(a) because regardless of

20  which party prevails in litigation complete relief cannot be afforded tribe with joinder); *see also,

21  e.g., Quilete Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459–1460 (9th Cir.1994) (governing tribe of

22  reservation is necessary and indispensable party to suit challenging agency decision that fractional

23  interests in trust property escheated to governing tribe under federal statute); *McClendon v. U. S.*,

24  885 F.2d 627, 633 (9th Cir.1989) (Indian tribe is necessary party to action seeking to enforce lease

25  agreement signed by tribe); *Enter. Mgt. Consultants, Inc. v. U. S.*, 883 F.2d 890, 893 (10th

26  Cir.1989) (Indian tribe is necessary party to action seeking to validate contract with tribe); *cf. also

27  Yellowstone Cnty. v. Pease*, 96 F.3d 1169, 1173 (9th Cir. 1996) (discussing cases and noting that

28  unlike cases above where tribe not a party to treaty, lease, or other contractual agreement with one

1   of the named parties, tribe not necessary or indispensable to action).

2       Here, Plaintiffs and Defendant NPS continue to be locked in a dispute over the extent,

3   nature, and particulars of the rights and interests in land held by the Individual Ranchers under

4   contracts and other promises codified under the RUOs, interim LOAs, long term leases, and other

5   ranching or use and occupancy authorizations.  Each of the Individual Ranchers are signatories to

6   and hold the past, existing and/or succession interests in the contractual lease, RUO, and ranching

7   authorization promises entered into, granted, and approved by Defendant NPS and the

8   Government.  McClure Dec. ¶¶ 3-6, 18; Kehoe Dec. ¶19; Evans Rossotti Dec. ¶¶ 4-5; Nunes Dec

9   ¶¶ 19, 20.  Thus, like any other third party attempt to interfere with contract based land rights and

10  interests, the Individual Ranchers have a protectable interest that will necessarily be affected,

11  impaired and impeded, if not destroyed, regardless of whether Plaintiffs or Defendants prevail.

12      **First**, Plaintiff and NPS's insistence that implementation of the ROD and its approval of

13  long term leases must await resolution of this Action continues to impede the necessary

14  authorizations required to protect the promised long term lease hold interests, RUO's, and ranch

15  specific land use authorizations   And although NPS stated as far back as 2013 that it was

16  "committed to move quickly" on the issuance of those long term leases and other authorizations,

17  NPS refuses or is unable to issue those leases authorizations continuing the uncertainty, confusion,

18  and lack of legal certainty necessary for them to live and operate on their lands, both on an interim

19  and long term basis. McClure Dec. ¶¶ 13-16; Kehoe Dec. ¶¶ 5-8, 17-25; Evans Rossotti Dec. ¶¶

20  11, 13-21; Nunes Dec ¶¶ 10,11, 19-23.  And, as everyone knows, that uncertainty and lack of

21  clarity will be delayed indefinitely, if not destroyed entirely.  *Id.; see also, e.g.*, Complaint, Prayer

22  ¶¶ B, C.

23      **Second**, the ability to operate ranches have been and will be affected by Plaintiffs' claims

24  and allegations regarding the management of the Tule elk herds that were re-introduced into the

25  Seashore.  *Id.*; *see also* Rod pp. 1-5, 30-37.  Individual Ranchers have a legally protectable interest

26  in requiring NPS to manage and control approved and unapproved tule elk herds in a manner that

27  does not continue to threaten and harm their operations and Land Rights.

28      **Third**, win, or lose, the process of Action, as well as its outcome continues to implicate

and impede Defendant NPS's fundament ability and competence to fulfill its land management

obligations as the landlord to the Individual Ranchers.  Since at least the 2013, the specter of

litigation, including this Action, has resulted in numerous management snafus and missteps by

NPS, including, but not limited to, (i) the inability to establish, manage, and enforce core ranch

area protections and protect ranchers from the ongoing threats of harassment, criminal trespass,

and confrontations undertaken by extremists who physically threaten ranchers on and near their

homes, (ii) the failure to do proper EIS and prevent the tule elk from encroaching on and

destroying ranch lands and herds, (iii) mismanagement and improper regulation of septic tank

operations and maintenance, (iv) the failure to properly regulate manage water resources

infrastructure, (vi) and dysfunctional arbitrary, impulsive, or unsound land management decisions,

(v) acknowledged failures to ensure a proper review and land management processes since 2012,

and (vi) and NPS's admission that it cannot manage PRNS without relying on the Individual

Ranchers to function as the main stewards and on site managers of the PRNS ranch lands.  *Id.*

*Fourth*, the Individual Ranchers, just like Plaintiffs, have a legally protectable interest in

the preservation, continuing enjoyment, and working landscape of the pastoral lands and the

greater Point Reyes Seashore.  And like Plaintiffs, Individual Ranchers have a right to continue to

live, work, play, hike, and relax in their ancestral home.  Individual Ranchers are directly

responsible for the creation of the Seashore and have contributed to the unique historical, cultural,

and environmental characteristics that Plaintiffs allege define the lands at issue in this Action.  Id.,

*see also* McClure Dec. ¶¶ 8-11; Kehoe Dec. ¶¶ 9-16; Evans Rossotti Dec. ¶¶ 7-9; Nunes Dec ¶¶

13-16, 28.  And the scenery and landscapes, including the pastoral lands, are the direct result of

decades of stewardship, maintenance, ranching, dairying, and agricultural use by the Individual

Ranchers.  *Id.*

### 3.    The Disposition Of This Action Will Impair Individual Ranchers Interests

For similar reasons, the Individual Ranchers are also "so situated" that "the disposing of

the action may as a practical matter impair or impede the movant's ability to protect that interest."

Fed. R. Civ. P. 24(a) (emphasis added).  Indeed, the impact of this Action on the Land Rights of

the Individual Ranchers "is not limited to consequences of a strictly legal nature." *Forest Conservation Council,* 66 F.3d at 1498 (citation omitted).  The litigation and disposition of this Action affects, impedes, impairs, and interferes with the fundamental homestead, occupancy, economic, other interests and rights possessed by the Individual Ranchers.  And if Plaintiffs are able to persuade the Court to enjoin the RMP, the fate of the Individual Ranchers' right to continue to maintain homes, ranching operations, businesses, livelihoods, and a way of life that goes back more than 100 years will become extinguished and result in their extinction.  *See generally* McClure, Kehoe, Evans-Rossotti, and Nunes Decs.; *see also* Complaint Prayer for Relief ¶¶ B, C.

As set forth above, the Individual Ranchers are signatories, obligors, beneficiaries, and real parties in interest in the contractual lease hold interests, RUO's, and other promissory authorizations that are the subject of the claims and relief in this Action.  And, the impairment of those rights and interests are legal and practical.  *Id.*  Complete relief, therefore, cannot be afforded them or anyone else, regardless of who prevails, unless they are joined or permitted to intervene.  *See Peabody W. Coal Co.*, 400 F.3d at 780; *Dawavendewa*, 276 F.3d at 1156; *see also, e.g., Quileute Indian Tribe*, 18 F.3d a 1459–1460; *McClendon*, 885 F.2d at 633; *Enterprise Mgt. Consultants, Inc.*, 883 F.2d at 893; *cf. also* Yellowstone *County. v. Pease*, 96 F.3d at 1173.

Plaintiffs' direct challenge to the validity of the past, current, and future leaseholds, RUO's, and other promissory authorizations granted to the Individual Ranchers is central to every claim for relief.  This includes Plaintiffs' request that the Court permanently enjoin and terminate all of the legal and equitable land use rights that the Individual Ranchers have held since the 1850s.  It also includes Plaintiff's request that the Court attempt set aside and vacate the entire RMP process.  Complaint ¶ 174; Prayer ¶¶ B, C.

### 4. __The Parties May Not Adequately Protect The Interests Of The Proposed Intervenors__

The parties may not adequately represent the Individual Ranchers so as to protect the legal and equitable interests to live, occupy and ranch theirs lands as provided in their leaseholds,

RUO's, and other land use authorizations granted to them and/or approved by the Government. The Individual Ranchers bear a minimal burden in establishing that parties to this Action may not be able to adequately represent and protect their considerable land and occupancy interests in this Action.  Specifically, they need only show "show that representation *may* be inadequate." *Forest Conservation Council*, 66 F.3d at 1498 (emphasis in original); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 15-CV-05754-JST, 2016 WL 1394355, at *3 (N.D. Cal. Apr. 7, 2016). Indeed, regardless of who wins, complete and final judgment and relief will not be available to the Individual Ranchers unless they are allowed to intervene.  Thus regardless of whether one of the existing parties might have a similar "ultimate objective" as that of the Individual Ranchers, any presumption of adequate representation is rebutted by the mere showing that the scope and substance of the Individual Ranchers are highly individualized and uniquely distinct from that of the Plaintiffs or NPS.  *Berg,* 268 F.3d at 823.

Whether Plaintiffs or the Park Service may adequately represent the potential interests of the Individual Ranchers is subject to whether:  (1) the interest of a present party is such that it will *undoubtedly* make *all* of the arguments of the Individual Ranchers; (2) the Plaintiffs or Park Service are capable and willing to make such arguments; (3) the Individual Ranchers would not offer any necessary elements to the proceedings that other parties would neglect.  *U.S. v. City of L. A.*, 288 F.3d 391, 398 (9th Cir. 2001) (internal quotations and citations omitted); *Freeman v. Delta Air Lines, Inc.*, No. C 13-04179 JSW, 2014 WL 5830246, at *4 (N.D. Cal. Nov. 10, 2014). The answer to all three questions is no.

**First**, neither the Plaintiffs, NPS, nor the Association can or will "undoubtedly make all" of the claims for relief or arguments.  *City of L. A.*, 288 F.3d at 398.  Certainly Plaintiffs cannot be expected to make the same arguments as Individual Ranchers.  And while Defendant NPS may be aligned with the Individual Ranchers regarding the lawfulness of some its actions and conduct during the RMP and GMP processes and approvals, other NPS actions or conduct are or could render it directly adverse to it tenants, as is the nature of any landlord tenant relationship, let alone

1  one that was created in exchange for granting the Government title to and management of the

2  ranch lands at PRNS.

3       This is particularly true with respect to NPS's EIS and management of the Tule elk and the

4  extent, nature, and substance of the land use and management rights of the Individual Ranchers

5  under the Point Reyes Act and other promises made to them in exchange for ceding title to their

6  lands.  And, because those and other management, planning, and land use issues at PRNS of the

7  Seashore, neither Plaintiffs nor the Park Service are in a position to adequately represent and argue

8  for any of the rights affected by the management and planning process, including the timing,

9  terms, conditions, and duration of current and future authorizations, the impact of the management

10  of the Tule elk, or the utilization of sustainable land management practices and conditions.  *See*

11  *City of L. A.*, 288 F.3d at 398.

12       Finally, while the Individual Ranchers are not aware of any actual or potential adversity

13  with the Association, the Individual Ranchers are not members of or participants in that group or

14  entity.  Furthermore, the Association is not an individual party that holds any of the specific

15  leasehold, RUO, or land use authorizations rights of the Individual Ranchers, and, as such, has no

16  standing to assert those specific Land Rights or seek relief to protect those Rights.  Thus, while the

17  Individual Ranchers may well support, coordinate with, and have common information sharing or

18  litigation strategy interests in connection with the proceeding in this Action, the Association

19  cannot represent the Individual Ranchers and do not have standing to protect any of the specific

20  obligations, rights, and relief required to vindicate the Land Rights at issue in this Action.[2]

21       **Second**, the Individual Ranchers provide a unique voice that would bring necessary

22  evidentiary and legal argument elements to the proceedings that other parties may forego.  *See,*

23  *e.g.*, *City of L. A.*, 288 F.3d at 398.  The Individual Ranchers have resided on or around Point

24  Reyes Peninsula for generations.  They have operated ranches and dairies dating back to the 19th

25  Century.  Consequently, they bring a distinct perspective regarding sustainable use of their

---

26

27  [2] The Individual Ranchers will meet and confer and work in good faith with all the parties to coordinate ensure that their participation does not interfere with the efficient administration of this Action, including filing joinders where appropriate to avoid duplicative pleadings, discovery, or

28  adjudications.

specific lands, including the lands located on the strategic Pierce Point area of the PRNS.  They
also bring a distinct and necessary perspective as the individuals who are parties to and hold
individual private lease holds, RUO's, and land use authorizations to their individual ranch lands.
That is particularly important in this Action, because Plaintiffs have lumped specific allegations
pertaining to grazing and operational issues at the ranch land and operations of the Individual
Ranchers with a host of other allegations that have little or nothing to do with them.  As purveyors
of some of the most progressive and sophisticated sustainable land practices in California,
Individual Ranchers are uniquely situated to refute Plaintiffs' anti-environmental rhetoric and
allegations directed against them personally and should be given a full and fair opportunity to
explain to the Court why their grazing practices, operations, and Land Rights are entirely
consistent with, and necessary to, the environmental, cultural and historical preservation and
future wellbeing of PRNS.

*Third*, a presumption that a public entity serving as a landlord and land manager may
adequately represent its private tenants in this Case is easily rebuttable in this Action.
"[I]nadequate representation is most likely to be found when the applicant asserts a personal
interest that does not belong to the general public." *Forest Conservation Council,* 66 F.3d at 1499.
Unlike any NPS (or any other party), the Individual Ranchers alone have a uniquely personal stake
in this litigation: the right to continue to live and occupy their ancestral lands.  And while
Individual Ranchers share the "ultimate objective" of preserving PRNS for now and future
generations, that does not mean that there are not differences with NPS (and others) over both
short and long term visions and underlying decisions of how to best manage their specific ranch
lands.  Because the Individual Ranchers are private party tenants who reside on public land subject
to the terms and conditions negotiated with and agreed to by the Government, NPS may not
adequately represent the unique and important interest of the Individual Ranchers now at issue in
this Action.[3]

---

[3] Of course, if NPS agrees to represent the Individual Ranchers by hiring separate counsel to do so
to ensure that it has no conflicts or differences, and/or agree to indemnify (subject to a limited
right of undertaking) the Individual Ranchers in connection with any harms or costs that arise or

1

   **C.**  **Intervention Should Also Be Permitted Under Rule 24(b)**

2  The Individual Ranchers should also be permitted to intervene under Rule 24(b).

3  "Permissive intervention to litigate a claim on the merits under Rule 24(b) requires (1) an

4  independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and

5  fact between the movant's claim or defense and the main action." *Beckman Indus., Inc. v. Int'l Ins.*

6  *Co.*, 966 F.2d 470, 473 (9th Cir. 1992) (citing *Garza v. Cnty. of L. A.*, 918 F.2d 763, 777 (9th

7  Cir.1990). "A 'claim or defense' in Rule 24(b) refer only to the type of valid claim or defense that

8  can be basis for intervention in an actual or impending lawsuit." *Id; see also Veneman*, 313 F.3d

9  at 1111–1112.

10  With respect to the threshold jurisdictional element, there is no dispute that the Individual

11  Ranchers have the necessary standing to establish jurisdiction. They seek only to defend rights

12  and prevent injuries and harm that arise directly from the subject matter of the Action – the lease

13  hold interests, RUO's, and land use authorizations promises to which these ranchers were, are, and

14  will continue to be the real parties in interest and the direct beneficiaries. *Veneman*, 313 F.3d at

15  1111–1112; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 180–181

16  (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 1991)). Intervenors in environmental

17  litigation, like the Individual Ranchers in this Action, "satisfy the injury in fact requirement by

18  showing that group members have direct contact with the environmental subject matter threatened

19  by the adverse decision." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir.1995)

20  (citing *Didrickson*, 982 F.2d at 1340)).

21  Second, as set forth above, the Individual Ranchers motion to intervene is timely. No

22  discovery or merit based proceedings have commenced, the administrative record has yet to be

23  lodged or filed with the Court, and the initial case management conference is weeks away. Cite to

24  *Supra* Section III. B. 1 (and cases cited therein).

25  Finally, with respect to establishing common questions of fact related to claims and

26  defenses under Rule 24(b), "[u]nlike Rule 24(a), a 'significant protectable interest' is not required"

27  
_____

28  result from the Action, the analysis could well be different. But until NPS agrees to do so, it
cannot adequately protect rights and interests of the Individual Ranchers.

1  for intervention.  All that is necessary for permissive intervention is that intervenor's "claim or

2  defense and the main action have a question of law or fact in common."  *Veneman*, 313 F.3d at

3  1108.  And because "Rule 24(b) 'plainly dispenses with any requirement that the intervenor shall

4  have a direct personal or pecuniary interest in the subject of the litigation'", the Rule "'does not

5  specify any particular interest that will suffice for permissive intervention and, as the Supreme

6  Court has said, it plainly dispenses with any requirement that the intervenor shall have a direct

7  personal or pecuniary interest in the subject of the litigation'" when it "'appears that the

8  intervenor-by-permission does not even have to be a person who would have been a proper party

9  at the beginning of the suit....'"  *Id.* (quoting 7C Wright, Miller & Kane, Federal Practice and

10  Procedure §1911, 357–363 (2d ed.1986)).

11      Here any and all claims or defenses that are or will be asserted turn on common questions

12  of fact and law, including, but not limited to: (i) the extent, scope, and validity of the rights and

13  obligations under leasehold interests, RUO's, land use authorizations, or other Land Rights

14  granted and/or approved by the Government; (ii) whether the granting of those rights and

15  obligations, and the environmental review and planning processes used to approve them pass

16  muster under the APA, the Point Reyes Act, NEPA, the Organic Act, and representations and

17  promised made to the Individual Ranchers; and (iii) whether the other land management decisions

18  and conduct at issue, including the continuing management of the tule elk, is lawful and in

19  compliance with both the governing land use law and the contractual and other promises.  Thus,

20  while the Individual Ranchers are "necessary" parties under Rule 19 and are entitled to intervene

21  as a matter of right, they should also be permitted to intervene under Rule 24(b) because "[u]nder

22  these circumstances it is clear . . . that the presence of intervenors would assist the court in its

23  orderly procedures leading to the resolution of this case, which impacted large and varied

24  interests."  *See, e.g., id.* at 1110-1111 (discussing cases and circumstances allowing for permissive

25  intervention).

26  **IV.   <u>CONCLUSION</u>**

27      For the foregoing reasons, Individual Ranchers, Dan and Dolores Evans, Julie Evans-

28  Rossotti; Ruth and Robert McClure; Tim, Tom, Mike, Emily, Janelle, Justin, Anne and Tim Jr.

1   Kehoe; and Betty, Tim and Jackie Nunes, respectfully request that the court grant their motion to

2   intervene in the subject case and file the [Proposed] Answer of Intervenors, attached hereto.

3

4   DATED:  June 8, 2022                    ELLIS GEORGE CIPOLLONE
                                            O'BRIEN ANNAGUEY LLP
5                                               Peter Obstler

6

7                                       By: _____

8                                              Peter Obstler
                                        Attorneys for Individual Ranchers
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "A"

1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Peter Obstler (State Bar No. 171623)
   pobstler@egcfirm.com
3  Eric M. George (State Bar No. 166403)
   egeorge@egcfirm.com
4  Debi A. Ramos (State Bar No. 135373)
   dramos@egcfirm.com
5  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
6  Telephone: (310) 274-7100; Facsimile: (310) 275-5697
7
   Attorneys for Dan and Delores Evans, Julie
8  Evans-Rossotti, Ruth and Robert J. McClure,
   Tim, Tom, Mike, Emily, Janelle, Justin, Anne and
9  Tim Jr. Kehoe and Betty, Tim and Jackie Nunes-
   Hemelt, collectively Individual Ranchers
10
11                    UNITED STATES DISTRICT COURT
12        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
13  RESOURCE RENEWAL INSTITUTE;          Case No. 3:22-cv-00145 MMC
    CENTER FOR BIOLOGICAL DIVERSITY;
14  and WESTERN WATERSHEDS PROJECT,      *Assigned for All Purposes*
                                         The Hon. Hon. Maxine M. Chesney
15              Plaintiffs,              Courtroom: 7
16         vs.
17  NATIONAL PARK SERVICE, a federal     **[Proposed] ANSWER OF DEFENDANT
    agency,                              INTERVENORS DAN AND DOLORES
18                                       EVANS AND JULIE EVANS ROSSOTTI
                Defendant.               (PRNS HISTORIC H RANCH AND K
19                                       RANCH); ROBERT J. AND RUTH
    _____      McCLURE (PRNS HISTORIC I RANCH);
20  DAN AND DOLORES EVANS AND JULIE      TIM, TOM, MIKE, EMILY, JANELLE,
    EVANS ROSSOTTI (PRNS HISTORIC H      JUSTIN, ANNE AND TIM JR. KEHOE
21  RANCH AND K RANCH); ROBERT J. AND    (PRNS HISTORIC J RANCH); BETTY
    RUTH McClure (PRNS HISTORIC I        AND TIM NUNES AND JACKIE NUNES-
22  RANCH); TIM, TOM, MIKE, EMILY,       HEMELT (PRNS HISTORIC A RANCH, D
    JANELLE, JUSTIN, ANNE AND TIM JR.    AND E RANCH), collectively INDIVIDUAL
23  KEHOE (PRNS HISTORIC J RANCH);       RANCHERS**
    BETTY AND TIM NUNES AND JACKIE
24  NUNES-HEMELT (PRNS HISTORIC A
    RANCH, D AND E RANCH), collectively
25  INDIVIDUAL RANCHERS,,
26         (Proposed) Intervenors.       Trial Date:  None Set
27
28

**ANSWER**

Defendant Intervenors, Dan And Dolores Evans And Julie Evans-Rossotti (PRNS Historic H Ranch And K Ranch); Robert J. And Ruth McClure (PRNS Historic I Ranch); Tim, Tom, Mike, Emily, Janelle, Justin, Anne And Tim Jr. Kehoe (PRNA Historic J Ranch); Betty Nunes, Tim Nunes And Jackie Nunes-Hemelt (PRNS Historic A Ranch, D And E Ranch), Collectively Individual Ranchers,, hereby answer Plaintiffs' Complaint (Dkt. 1) as follows:

1.    Paragraph 1 constitutes Plaintiffs' characterization of the purposes and basis for this case, to which no response is required.  To the extent a response is required, the Individual Ranchers deny the allegations in Paragraph 1.

2.    Paragraph 2 largely characterizes the Point Reyes Act, 16 U.S.C. § 459c, and Golden Gate National Recreation Area ("GGNRA") Act, 16 U.S.C. § 460bb, which speak for themselves and require no response.  The Individual Ranchers admit that their rights and interests in their ranches exceed $100 million in today dollars.  Except as so admitted, the Individual Ranchers deny each and every other allegation, including any suggestion that the "Acts" referenced herein did not make ranching a purpose of these public lands or encourage ranching thereon.

3.    The Individual Ranchers admit that Plaintiffs sued the National Park Service (NPS) in 2016, that among other things, challenging aspects of the 1980 General Manage Plan.  Other than so admitted, the Individual Ranchers lack sufficient information to form a belief of the truth of the other allegations in Paragraph 3, all those other allegations are denied.

4.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 4.  The fourth sentence of Paragraph 4 describes the September 2021 Record of Decision ("ROD"), General Management Plan Amendment and corresponding Environmental Impact Statement ("GMPA/EIS") process, which documents speak for themselves and are the best evidence of their contents.

5.    The Individual Ranchers deny the allegations in Paragraphs 5.

6.    The Individual Ranchers deny the allegations in Paragraphs 6.

7.      The Individual Ranchers deny the allegations in the first sentence of Paragraph 7. The allegations in the second sentence of Paragraph 7 constitute Plaintiffs' requested relief, to which no response is required.  To the extent a response is required, the Individual Ranchers deny that Plaintiffs are entitled to such relief.

## JURISDICTION

8.      The allegations in Paragraphs 8 are conclusions of law, which require no response. To the extent a response is required, the Individual Ranchers deny those allegations.

9.      The allegations in Paragraphs 9 are conclusions of law, which require no response. To the extent a response is required, the Individual Ranchers deny those allegations.

10.     The allegations in Paragraphs 10 are conclusions of law, which require no response. To the extent a response is required, the Individual Ranchers deny those allegations.

## DIVISIONAL ASSIGNMENT

11.     The Individual Ranchers admit that if this Court has jurisdiction, then venue is proper in this District and assignment of this case to a judge in the San Francisco or Oakland Division is proper.  The Individual Ranchers deny any remaining allegations in paragraph 11.

## PARTIES

12.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 12, and thus deny the same.

13.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 13, and thus deny same.

14.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 14, and thus deny same.

15.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 15, and thus deny same.

16.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 16, and thus deny same.

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

17. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 17, and thus deny the same.

18. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 18, and thus deny the same.

19. The Individual Ranchers admit that the National Park Service ("NPS") is an agency within the U.S. Department of the Interior and that the Director of the NPS is vested with authority to manage units of the National Park System. The Individual Ranchers deny any remaining allegations in paragraph 19.

## LEGAL BACKGROUND

### National Park Service Organic Act

20. The allegations in Paragraph 20 purport to characterize 54 U.S.C. §100101(a), which speaks for itself and is the best evidence of its contents.

21. The allegations in Paragraph 21 purport to characterize the NPS's 2006 *Management Policies*, which speaks for itself and is the best evidence of its contents.

22. The allegations in Paragraph 22 purport to characterize the NPS's 2006 *Management Policies*, which speaks for itself and is the best evidence of its contents.

23. The allegations in Paragraph 23 purport to characterize 54 U.S.C. §100502, which speaks for itself and is the best evidence of its contents.

### Point Reyes National Seashore Act

24. The allegations in Paragraph 24 purport to characterize 16 U.S.C. §459c, which speaks for itself and is the best evidence of its contents.

25. The allegations in Paragraph 25 purport to characterize 16 U.S.C. §459c-2 and §459c-4, Pub. L. No. 87-657, § 4, 76 Stat. 538, 540 (1962), and Pub. L. No. 91-223, §2(b), 84 Stat. 90 (1970), which speak for themselves and are the best evidence of their contents.

26. The allegations in Paragraph 26 purport to characterize 16 U.S.C. §459c-6(a) (1970), which speaks for itself and is the best evidence of its contents.

27. The allegations in Paragraph 27 purport to characterize Pub. L. No. 94-567, §7(a), 90 Stat. 2692, 2695 (1976), which speaks for itself and is the best evidence of its contents.

28.     The allegations in Paragraph 28 purport to characterize Pub. L. No. 95-625, §318(b), 92 Stat. 3467, 3487 (1978), which speaks for itself and is the best evidence of its contents.

**The GGNRA Act**

29.     The allegations in Paragraph 29 purport to characterize Pub. L. No. 92-589, §1, 86 Stat. 1299, 1299 (1972), and 16 U.S.C. §460bb, which speak for themselves and are the best evidence of their contents.

30.     The allegations in Paragraph 30 purport to characterize 16 U.S.C.§460bb, which speaks for itself and is the best evidence of its contents.

31.     The allegations in Paragraph 31 purport to characterize Pub. L. No. 95-625, §317(c), 92 Stat. 3467, 3485 (1978), which speaks for itself and is the best evidence of its contents.

**FACTUAL BACKGROUND**

**History of Point Reyes National Seashore and Northern District of GGNRA**

32.     The Individual Ranchers admit the second sentence of Paragraph 32.  The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32.

33.     The Individual Ranchers admit that the Point Reyes area has a rich cultural heritage and that the Coast Miwok people have been culturally affiliated with the Point Reyes area for many years.  The Individual Ranchers deny the remaining allegations in the first sentence.  The Individual Ranchers admit the allegations in the second sentence.

34.     The Individual Ranchers admit that ranch properties on the Seashore were purchased by the United States in the 1970s.  They further admit that they were paid less than $1 million each for interests and rights in land that are worth well more that $100 million in value. With respect to each and every other allegation, the Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34, and thus deny the same.

35.     The allegations in Paragraph 35 purport to characterize the 1980 General

1    Management Plan for the Point Reyes National Seashore, which speaks for itself and is the best

2    evidence of its contents.  For the avoidance of doubt, the Individual Ranchers deny each and every

3    allegation therein.

4         36.    The allegations in Paragraphs 36 appear to purport to characterize the 2021 ROD/

5    GMPA for Point Reyes National Seashore, which speak for themselves and are the best evidence

6    of their contents.   For the avoidance of doubt, the Individual Ranchers deny each and every

7    allegation therein

8         37.    The allegations in Paragraphs 37 appear to purport to characterize the 2021 ROD/

9    GMPA for Point Reyes National Seashore, which speak for themselves and are the best evidence

10   of their contents.  For the avoidance of doubt, the Individual Ranchers deny each and every

11   allegation therein

12        38.    The Individual Ranchers admit that the allegations in Paragraph 38 include a

13   purporting to depict the location of ranching allotments on public lands managed by NPS on the

14   Seashore; the Individual Ranchers admit that the map depicts the location of 31 ranch allotments

15   and two life-estates in the Seashore and the north district of the GGNRA and that these allotments

16   are located on approximately 28,000 acres of land managed by NPS.  As to the remaining

17   allegations in Paragraph 38, including the accuracy or authenticity of the map, the Individual

18   Ranchers lack knowledge or information sufficient to form a belief as to the truth of the

19   allegations and accompanying map, and therefore deny same.

20            **National Resources and Public Uses of the National Seashore and GGNRA**

21        39.    The Individual Ranchers admit that their interests and rights in their ranch lands at

22   PRNS are worth well in excess of $100 million.  Except as so admitted, the Individual Ranchers

23   lack knowledge or information sufficient to form a belief as to the truth of the allegations in

24   Paragraph 39, and thus deny the same.

25        40.    The Individual Ranchers lack knowledge or information sufficient to form a belief

26   as to the truth of the allegations in Paragraph 40, and thus deny the same.

27        41.    Admit that the Seashore provides habitat for a rich array of wildlife.  The

28   Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 41, and thus deny the same.

42.     The Individual Ranchers admit that the tule elk were introduced into the PRNS on or around 1976 by order of the Department of the Interior.  The Individual Ranchers deny that the introduction or expansion of the tule elk herds is supported by proper EIS or other necessary environmental review and planning requirements or that NPS has managed the tule elk herds since then in compliance with existing EIS and other planning and wildlife management requirements, Except as so admitted or denied, the lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 42, and thus deny the same.  The second and third sentences of Paragraph 42 purport to characterize Pub. L. No. 94-389, 90 Stat. 1189 (1976), which speaks for itself and is the best evidence of its contents.  But for the avoidance of doubt, the Individual Ranchers deny each and every one of those allegations,

43.     The Individual Ranchers admit that there are three herds of tule elk on the Seashore that are known as the Drakes Beach herd, the Limantour herd and the Tomales Point herd; and that the Tomales Point herd is intended to be confined to a 2,600-acre elk reserve on Tomales Point that is bounded by a fence.  The Individual Ranchers deny the remaining allegations in this paragraph.

44.     The Individual Ranchers admit that the north district of GGNRA is approximately 15,000 acres and that Lagunitas Creek and Olema Creek drain to Tomales Bay.  The Individual Ranchers deny the remaining allegations in this paragraph.

**The Harmful Impacts of Ranching on National Resources on these Public Lands**

45.     The Individual Ranchers deny the allegations in Paragraph 45.

46.     The Individual Ranchers admit that cattle grazing is authorized on the Seashore and GGNRA.  The Individual Ranchers deny the remaining allegations in Paragraph 46.

47.     The Individual Ranchers deny the allegations in Paragraph 47.

48.     The Individual Ranchers deny the allegations in the first and fourth sentences of Paragraph 48.  The Individual Ranchers admit the allegations in the second sentence of Paragraph 48. With respect to the third sentence of Paragraph 48, it appears Plaintiffs' rely on unknown documents and/or conclusions of the National Marine Fisheries Service ("NMFS"), likely

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

including the March 18, 2021 Biological Opinion or its characterization in the ROD and/or GMPA/EIS; those documents speak for themselves and are the best evidence of their contents.

49. The Individual Ranchers deny the allegations in the first sentence of Paragraph 49. The Individual Ranchers admit that forage production was previously authorized on a limited number of acres. The Individual Ranchers deny the remaining allegations in Paragraph 49.

50. The Individual Ranchers deny the allegations in the first and second sentences of Paragraph 50. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 50, and thus deny same.

51. The Individual Ranchers admit that ranchers use various equipment and infrastructure, including fencing and off-road vehicles. Except as so admitted, the Individual Ranchers deny each and every allegation in Paragraph 51.

52. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 52 and, on that basis, deny each and every allegation therein.

53. The Individual Ranchers deny the allegations in the first sentence of Paragraph 53. The Individual Ranchers admit that residences on ranches often use septic systems, that some ranch residences use springs or wells, and NPS and or other local utilities are legally obligated to provide water and other necessary resources to the Individual Ranchers bsaed on contracts and promises that date back more than 50 years. Except as so admitted, the Individual Ranchers deny each and every allegation in Paragraph 53.

54. The Individual Ranchers deny the allegations in Paragraph 54.

55. The Individual Ranchers deny the allegations in Paragraph 55.

56. The Individual Ranchers deny the allegations in the first sentence of Paragraph 56. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 56, and thus deny the same.

**NPS's Failure to Timely Revise its 1980 General Management Plan**

57. The Individual Ranchers deny the allegations in Paragraph 57.

58. The Individual Ranchers admit that on February 3, 2000, NPS published a notice of

1   intent in the Federal Register to prepare an environmental impact statement and General

2   Management Plan ("GMP") for the Seashore, including the north district of GGNRA (65 Fed.

3   Reg. 5365), but deny the remaining allegations in the first sentence of Paragraph 58.  The

4   Individual Ranchers deny the allegations in the second sentence of Paragraph 58.

5       59.     The Individual Ranchers admit that NPS initiated a National Environmental Policy

6   Act ("NEPA") planning process for a Ranch Comprehensive Management Plan in 2014.  The

7   Individual Ranchers deny the remaining allegations in Paragraph 59.

8       60.     The allegations in the first sentence of Paragraph 60 purport to characterize the

9   complaint filed in Resource Renewal Inst. v. Nat'l Park Serv. (RRI v. NPS), 3:16-cv-00688-SBA

10  (N.D. Cal.).  The Individual Ranchers admit that the First Amended Complaint in RRI v. NPS

11  challenged the alleged failure of the NPS to timely revise the GMP for the Seashore and the NPS's

12  alleged failure to authorize ranching without sufficient NEPA compliance, and deny any

13  remaining allegations in the first sentence.  The Individual Ranchers admit the allegations of the

14  second and third sentences of Paragraph 60.  Except as so admitted, the Individual Ranchers deny

15  each and every allegation therein.

16                        **The Listing of the Historic Dairy Districts**

17      61.     The Individual Ranchers admit the allegations in Paragraph 61, except that they

18  lack sufficient information that the correct name is the Point Reyes Peninsula Dairy Ranches

19  Historic District, and thereby deny that lone allegation,

20      62.     The Individual Ranchers admit that the Point Reyes Peninsula Dairy Ranches

21  Historic District is comprised of 17 ranch areas, but deny the remaining allegations in the first

22  sentence of Paragraph 62.  The Individual Ranchers admit the allegations in the second and third

23  sentences.

24      63.     The Individual Ranchers admit the allegations in Paragraph 63.

25      64.     The Individual Ranchers admit that among the reasons the two districts are

26  historically significant is because of their association with the history of dairy ranching in Marin

27  County and because they contain buildings and structures that reflect that history.

28      65.     The Individual Ranchers lack knowledge or information sufficient to form a belief

as to the truth of allegations in the first sentence of Paragraph 65, and therefore deny the same. To the extent Plaintiffs characterize the National Register nomination forms for the two historic districts, those documents speak for themselves and are the best evidence of their contents. The Individual Ranchers deny the allegations in the second sentence of Paragraph 65.

66.    To the extent Plaintiffs characterize the National Register nomination forms for two historic districts within the Point Reyes area in Paragraph 66, those documents speak for themselves and are the best evidence of their contents. The Individual Ranchers deny any remaining allegations in Paragraph 66.

### NPS's Planning Process and Proposed GMPA

67.    The Individual Ranchers admit that in October, 2017, the NPS issued a newsletter seeking public input on a conceptual range of alternatives for the GMPA/EIS. The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67.

68.    The Individual Ranchers admit the allegations in Paragraph 68.

69.    The allegations in Paragraphs 69 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

70.    The allegations in Paragraphs 70 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

71.    The allegations in Paragraphs 71 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

72.    The allegations in Paragraphs 72 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

73.    The allegations in Paragraph 73 purport to characterize the settlement agreement in *RRI v. NPS*, 3:16-cv-00688-SBA (N.D. Cal.) (ECF No. 143) and the draft or final GMPA/EIS,

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

1  which documents speak for themselves and are the best evidence of their contents.

2  74.    The allegations in Paragraphs 74 purport to characterize the draft and final

3  Environmental Impact Statements for the GMPA, which documents speak for themselves and are

4  the best evidence of their contents.

5  75.    The allegations in Paragraphs 75 purport to characterize the draft and final

6  Environmental Impact Statements for the GMPA, which documents speak for themselves and are

7  the best evidence of their contents.

8  76.    The allegations in Paragraphs 76 purport to characterize the draft and final

9  Environmental Impact Statements for the GMPA, which documents speak for themselves and are

10  the best evidence of their contents.

11  77.    The Individual Ranchers lack knowledge or information sufficient to form a belief

12  as to the truth of the allegations in Paragraph 77, and thus deny the same.

13  78.    The Individual Ranchers lack knowledge or information sufficient to form a belief

14  as to the truth of the allegations in Paragraph 78, and thus deny the same.  To the extent Plaintiffs

15  characterize comment letters submitted by Plaintiffs to NPS, those documents speak for

16  themselves and are the best evidence of their contents.

17  79.    The Individual Ranchers lack knowledge or information sufficient to form a belief

18  as to the truth of the allegations in Paragraph 79, and thus deny the same. To the extent Plaintiffs

19  characterize comment letters submitted by the Environmental Protection Agency ("EPA") and San

20  Francisco Regional Water Quality Control Board ("SF Water Control Board") to NPS, those

21  documents speak for themselves and are the best evidence of their contents.

22  80.    The Individual Ranchers lack knowledge or information sufficient to form a belief

23  as to the truth of the allegations in Paragraph 80, and thus deny the same.

24  **The EIS's Incomplete Baseline Discussion and Impact Analysis**

25  81.    The allegations in Paragraphs 81 purport to characterize the Environmental Impact

26  Statement for the GMPA, which document speaks for itself and is the best evidence of its

27  contents.

28  82.    The allegations in Paragraphs 82 purport to characterize the Environmental Impact

Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

83.     The allegations in Paragraphs 83 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

84.     The allegations in Paragraphs 84 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

85.     The allegations in Paragraphs 85 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

86.     The allegations in Paragraphs 86 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

87.     The allegations in Paragraphs 87 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

88.     The allegations in Paragraphs 88 purport to characterize the Environmental Impact Statement for the GMPA, which document speaks for itself and is the best evidence of its contents.

89.     The first sentence of Paragraph 89 purports to characterize the EIS, which document speaks for itself and is the best evidence of its contents.  The Individual Ranchers admit that NPS has not completed an appraisal process for issuing leases under the GMPA, but deny the remaining allegations in the second and third sentences of Paragraph 89.

90.     The allegations in Paragraphs 90 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

91.     The allegations in Paragraphs 91 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

92.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second clauses in the first sentence of Paragraph 92.  The remainder of the allegations in Paragraph 92 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

93.     The allegations in Paragraphs 93 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

94.     The allegations in Paragraphs 94 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

95.     The allegations in Paragraphs 95 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

96.     The allegations in Paragraphs 96 purport to characterize the EIS for the GMPA, which document speaks for itself and is the best evidence of its contents.

**Water Quality Issues and Developments**

97.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97.

*Regional Water Board Regulation and Compliance*

98.     The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98.

99.     The allegations in Paragraph 99 purport to summarize the contents of the Water Quality Control Plan for the San Francisco Basin ("Basin Plan"), which document speaks for itself and is the best evidence of its contents.  The Individual Ranchers deny any remaining allegations in Paragraph 99.

100.    The Individual Ranchers admit that the Water Board issued a Conditional Waiver of Waste Discharge Requirements for Grazing Operations in the Tomales Bay Watershed, Order No. R2¬2018-0046 ("the Conditional Waiver") in 2018, but The Individual Ranchers are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first and second sentences of Paragraph 100, and therefore deny the same.  The allegations in the third sentence characterize a Conditional Waiver, which speaks for itself and is the best

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

1  evidence of its contents.

2      101.    The Individual Ranchers lack knowledge or information sufficient to form a belief

3  as to the truth of the allegations in Paragraph 101, and therefore deny the same.  To the extent

4  Paragraph 101 purports to characterize the NPS's certifications, those documents speak for

5  themselves and are the best evidence of their contents.  Any remaining allegations constitute

6  conclusions of law to which no response is required and which are, therefore, denied.

7      102.    The allegations in Paragraph 102 purport to characterize the General Waste

8  Discharge Requirements for Confined Animal Facilities Within the San Francisco Bay Region,

9  Order No. R2-2016-0031 ("CAF Order"), issued by the Water Board, which document speaks for

10  itself and is the best evidence of its contents.

11      103.    The allegations in Paragraph 103 purport to characterize the Conditional Waiver

12  and/or CAF Order, which speak for themselves and are the best evidence of their contents.

13          *California Coastal Commission*

14      104.    The Individual Ranchers admit that the NPS prepared a Consistency Determination

15  in October 2020 for the California Coastal Commission ("CCC"). The Consistency Determination

16  speaks for itself and is the best evidence of its contents.  The remaining allegations in Paragraph

17  104 constitute conclusions of law to which no response is required and which are, therefore,

18  denied.

19      105.    The allegations in this paragraph purport to characterize the Staff Report issued by

20  the CCC on March 26, 2021. The Report speaks for itself and is the best evidence of its contents.

21  To the extent the allegations are inconsistent with the Report, they are denied.

22      106.    The Individual Ranchers admit that on April 22, 2021, the CCC conditionally

23  concurred with the NPS's Consistency Determination.  The remainder of Paragraph 106 purports

24  to characterize the CCC's decision, which speaks for itself and is the best evidence of its contents,

25  as well as specific comments submitted by the public to the CCC, regarding which the Individual

26  Ranchers lack knowledge or information sufficient to form a belief as to the truth of such

27  allegations and thus deny the same.

28          *Water Quality Monitoring*

107.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 107 and thus deny the same.

108.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 108 and thus deny the same.

***Drought***

109.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 and thus deny the same.  To the extent Plaintiffs characterize a document in this Paragraph, that document speaks for itself and is the best evidence of its contents.

110.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110 and thus deny the same.

111.    The Individual Ranchers admit that Marin County declared a county-wide drought emergency on May 18, 2021, and that the Marin Municipal Water District reported that the 20-month period between January 1, 2020 and August 1, 2021 had the lowest recorded rainfall for a 20-month period in 140 years.  The Individual Ranchers deny any remaining allegations in this paragraph.

112.    The Individual Ranchers admit that Robert McClure closed his dairy operation at I Ranch and that Mr. McClure continues to raise heifers on I Ranch under his current lease.  The Individual Ranchers deny the remaining allegations in Paragraph 112.

113.    The Individual Ranchers admit that several ranchers at the Seashore trucked water to their ranches in 2021.  The Individual Ranchers deny the remaining allegations in Paragraph 113.

**Endangered Species Act Consultation**

114.    The Individual Ranchers admit that NMFS issued a Biological Opinion ("BiOp") on March 18, 2021. The NMFS BiOp speaks for itself and is the best evidence of its contents. The Individual Ranchers deny any remaining allegations in Paragraph 114.

115.    The Individual Ranchers admit that the U.S. Fish and Wildlife Service ("FWS") issued a BiOp on June 4, 2021.  The FWS BiOp speaks for itself and is the best evidence of its

contents. The Individual Ranchers deny any remaining allegations in Paragraph 115.

**NPS's Record of Decision**

116.    The Individual Ranchers admit that the Acting Regional Director, Interior Regions 8, 9, 10 and 12, signed the ROD for the GMPA/EIS on September 13, 2021. The remaining allegations characterize the contents of the ROD, which speaks for itself and is the best evidence of its contents. The Individual Ranchers deny any remaining allegations in Paragraph 116.

117.    The Individual Ranchers admit that the Superintendent of the Seashore signed a document entitled, "Succession Policy for Ranch Operations within the Ranchland Zone for Point Reyes National Seashore and the North District of Golden Gate National Recreation Area," on September 13, 2021. The Individual Ranchers deny any remaining allegations in Paragraph 117.

### *Modified Alternative B*

118.    The allegations in Paragraphs 118 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

119.    The allegations in Paragraphs 119 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

120.    The allegations in Paragraphs 120 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

121.    The allegations in Paragraphs 121 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

122.    The allegations in Paragraphs 122 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

123.    The allegations in Paragraphs 123 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

### *Primary Justifications for the GMPA*

124.    The allegations in Paragraphs 124 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. To the extent a response is required, the Individual Ranchers deny the allegations.

125.    The allegations in Paragraphs 125 purport to characterize the ROD, which speaks

1  for itself and is the best evidence of its contents.  To the extent a response is required, the

2  Individual Ranchers deny the allegations.

3       126.    The allegations in Paragraph 126 purport to characterize the ROD and EIS, which

4  speak for themselves and are the best evidence of their contents.  To the extent a response is

5  required, the Individual Ranchers deny the allegations.

6       127.    The allegations in Paragraph 127 purport to characterize the ROD, which speaks

7  for itself and is the best evidence of its contents.  To the extent a response is required, the

8  Individual Ranchers deny the allegations.

9       128.    The allegations in Paragraphs 128 purport to characterize the ROD and EIS, which

10  speak for themselves and are the best evidence of their contents.  To the extent a response is

11  required, the Individual Ranchers deny the allegations.

12       129.    The allegations in Paragraphs 129 purport to characterize the ROD and EIS, which

13  speak for themselves and are the best evidence of their contents.  To the extent a response is

14  required, the Individual Ranchers deny the allegations.

15       130.    The allegations in Paragraph 130 purport to characterize the ROD, which speaks

16  for itself and is the best evidence of its contents.  To the extent a response is required, the

17  Individual Ranchers deny the allegations.

18  ***NPS's Non-Impairment Determination***

19       131.    The allegations in Paragraphs 131 purport to characterize the ROD, which speaks

20  for itself and is the best evidence of its contents.

21       132.    The allegations in Paragraphs 132 purport to characterize the ROD, which speaks

22  for itself and is the best evidence of its contents.

23       133.    The allegations in Paragraphs 133 purport to characterize the ROD, which speaks

24  for itself and is the best evidence of its contents.

25       134.    The allegations in Paragraphs 134 purport to characterize the ROD, which speaks

26  for itself and is the best evidence of its contents.

27       135.    The allegations in Paragraphs 135 purport to characterize the ROD, which speaks

28  for itself and is the best evidence of its contents.

136.    The allegations in Paragraphs 136 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

137.    The allegations in Paragraphs 137 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents.

***ROD Implementation***

138.    The Individual Ranchers admit the allegations in the first sentence of Paragraph 138.  The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 138, and therefore deny the same.

139.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139, and therefore deny the same.

140.    The Individual Ranchers admit that that issuance of long-term leases could allow ranchers to more easily obtain loans to upgrade ranch infrastructure and provide for business security.  The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 140.

141.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF POINT REYES ACT AND APA**

142.    The Individual Ranchers hereby incorporates by reference its responses to paragraphs 1-141 as though fully set forth herein.

143.    The allegations in Paragraph 143 purport to characterize Plaintiffs' first claim for relief, to which no response is required.

144.    The allegations in Paragraph 144 purports to characterize 16 U.S.C. § 459c, 459c-6(a), and 459c-5(a), which statutes speak for themselves and are the best evidence of their contents.

145.    The allegations in Paragraphs 145 constitute conclusions of law, to which no response is required.

146.    The allegations in Paragraphs 146 constitute conclusions of law, to which no

**[Proposed] ANSWER OF DEFENDANT INTERVENORS**

1    response is required.

2         147.    The allegations in Paragraphs 147 constitute conclusions of law, to which no

3    response is required.

4         148.    The allegations in Paragraph 148 purport to characterize the ROD, which speaks

5    for itself and is the best evidence of its contents.

6         149.    The allegations in Paragraph 149 constitute conclusions of law, to which no

7    response is required.

8                          **SECOND CLAIM FOR RELIEF**

9                   **VIOLATION OF ORGANIC ACT & REGULATIONS**

10        150.    The Individual Ranchers hereby incorporates by reference its responses to

11   paragraphs 1-149 as though fully set forth herein.

12        151.    The allegations in Paragraph 151 purport to characterize Plaintiffs' second claim

13   for relief, to which no response is required.

14        152.    The allegations in Paragraph 152 purport to characterize 54 U.S.C. §100101(a) and

15   the 2006 NPS Management Policies, which speak for themselves and are the best evidence of their

16   contents.

17        153.    The allegations of Paragraph 153 purport to characterize 54 U.S.C. §102101 and

18   the 2006 NPS Management Policies, which speak for themselves and are the best evidence of their

19   contents.

20        154.    The allegations in Paragraph 154 purport to characterize the Park Service Organic

21   Act, which speaks for itself and is the best evidence of its contents.

22        155.    The allegations in Paragraph 155 purport to characterize NPS regulations, which

23   speak for themselves and are the best evidence of their contents.

24        156.    The allegations in Paragraph 156, including subparagraphs A – E, constitute legal

25   conclusions, to which no response is required.

26        157.    The allegations in Paragraph 157 constitute legal conclusions, to which no response

27   is required.

28                          **THIRD CLAIM FOR RELIEF**

**VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**

158.    The Individual Ranchers hereby incorporates by reference its responses to paragraphs 1-157 as though fully set forth herein.

159.    The allegations in Paragraph 159 purport to characterize Plaintiffs' third claim for relief, to which no response is required.

160.    The allegations in Paragraphs 160-162 purport to characterize NEPA and its implementing regulations, which speak for themselves and require no response.

161.    The allegations in Paragraphs 160-162 purport to characterize NEPA and its implementing regulations, which speak for themselves and require no response.

162.    The allegations in Paragraphs 160-162 purport to characterize NEPA and its implementing regulations, which speak for themselves and require no response.

163.    The allegations in Paragraph 163 purport to characterize *Or. Nat. Desert Ass'n. v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010).

164.    The allegations in Paragraph 164, including subparagraphs A – D, constitute legal conclusions, to which no response is required.

165.    The allegations in Paragraph 165 constitute legal conclusions, to which no response is required.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF THE CLEAN WATER ACT**

166.    The Individual Ranchers hereby incorporates by reference its responses to paragraphs 1-165 as though fully set forth herein.

167.    The allegations in Paragraph 167 purport to characterize Plaintiffs' fourth claim for relief, to which no response is required.

168.    The allegations in Paragraph 168 purport to characterize the Clean Water Act ("CWA"), which speaks for itself and requires no response.

169.    The allegations in Paragraph 169 purport to characterize the requirements of the

Basin Plan, the CAF Order, the Conditional Waiver and other unnamed requirements.  These documents speak for themselves and are the best evidence of their contents.

170.    The Individual Ranchers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 170, and thus deny the same. The Individual Ranchers deny the second sentence of Paragraph 170.  The third sentence of Paragraph 170 is too vague and generalized to permit a response and the Individual Ranchers therefore deny the same.

171.    The allegations in Paragraphs 171 constitute legal conclusions, to which no response is required.

172.    The allegations in Paragraphs 172 constitute legal conclusions, to which no response is required.

173.    The allegations in Paragraphs 173 constitute legal conclusions, to which no response is required.

174.    The allegations in Paragraphs 174 constitute legal conclusions, to which no response is required.

### PRAYER FOR RELIEF

The remainder of the complaint constitutes Plaintiff's requested relief, which requires no response and is therefore denied.

### GENERAL DENIAL

To the extent any allegations of the complaint have not been admitted or specifically responded to, the Individual Ranchers deny such allegations.

### AFFIRMATIVE DEFENSES

1.    To the extent that Plaintiffs have failed to state a claim on which relief can be granted, any such claims should be dismissed.

2.    To the extent that the Court lack jurisdiction over some or all of Plaintiffs' claims, any such claims should be dismissed.

3.    Plaintiffs may lack standing over one of more of their claims.

4.      Plaintiffs may have failed to exhaust administrative remedies over one or more of their claims.

5.      Plaintiffs' claims are barred to the extent they are not ripe for adjudication.

6.      The Individual Ranchers currently have insufficient knowledge or information as to whether they are entitled to other, separate affirmative defenses and reserve their right to later assert additional defenses to these and other claims for relief as appropriate.

7.      Plaintiffs' claims are barred to the extent that they do not come to Court with clean hands.

8.      Plaintiffs' claims are barred to the extent they result in their unjust enrichment at the expenses and to the detriment of the Individual Ranchers

9.      Plaintiffs' claims are barred to the extent they turn on conduct or actions of third parties.

10.     Plaintiffs' claims are barred to the extent that they hav failed to join any necessary party to this litigation under Rule 19 of the Federal Rules of Civil Procedure.

11.     The Individual Ranchers reserve their rights to amend this answer to assert additional affirmative defenses as facts and information become available to assert such defenses,

### CROSS-CLAIMS

Individual Ranchers anticipate asserting cross-claims against both NPS and Plaintiffs, including, but not limited to, (i) legal and injunctive claims for relief relating to remedy violations of their contractual and promissory Land Rights exchanged in return for their agreement to transfer and convey legal title of their ancestral lands to the Government, (ii) NPS's failures to manage the tule elk, water conservation issues, and (iii) affirmative relief other events or land management snafus that may threaten their governing leasehold, use and occupancy, other specific land use permits and authorizations rights.  At this time, however, a further investigation of and due diligence into the facts and law, including the Administrative Record yet to be filed by NPS in this Action, that may support such claims for relief. is underway but not complete.  Accordingly, the Individual Ranchers reserve their rights to amend any portion of this answer, including the assertion of counterclaims as permitted by law or otherwise through leave of court.

1

2          WHEREFORE, at this time, defendant-intervenors deny that Plaintiffs are entitled to the

3    relief requested, or to any relief whatsoever, and thus request that the Court dismiss Plaintiffs'

4    Complaint, Dkt. No. 1, with prejudice, that judgment be entered in favor of federal defendants and

5    defendant-intervenors, and that the Court order such other relief as it deems necessary.

6    DATED:  June 8, 2022                    Respectfully submitted,

7                                            ELLIS GEORGE CIPOLLONE
                                              O'BRIEN ANNAGUEY LLP
8

9                                            By: _____
                                                     Peter Obstler
10                                           Attorneys for Individual Ranchers

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

1  HANSON BRIDGETT LLP
   ANDREW G. GIACOMINI, SBN 154377
2  agiacomini@hansonbridgett.com
   ALENE M. TABER, SBN 218554
3  ataber@hansonbridgett.com
   BIANCA A. VELEZ, SBN 339795
4  Bvelez@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone:   (415) 777-3200
6  Facsimile:   (415) 541-9366

7  Attorneys for Proposed Intervenors
   Agricultural Workers
8  Appearing as DOES 1-8

9              UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12  RESOURCE RENEWAL INSTITUTE;          Case No. 3:22-cv-00145 MMC
    Center for Biological Diversity; and
13  Western Watersheds Project,          **NOTICE OF MOTION AND MOTION TO
                                         INTERVENE; MEMORANDUM OF
14              Plaintiffs,              POINTS AND AUTHORITIES**

15       v.                             Judge:  Hon. Judge Maxine M. Chesney
                                        Date:   November 22, 2024
16  NATIONAL PARK SERVICE, a federal    Time:   9;00 AM
    agency,                             Crtrm.: Courtroom 7, 19th Floor
17
                Defendant.              Assigned for All Pre-Trial Purposes to the
18                                      Hon. Judge Maxine M. Chesney

19                                      Trial Date:       None Set

20  **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

21       **PLEASE TAKE NOTICE THAT** on November 22, 2024, at 9:00 AM, or as soon

22  thereafter as counsel may be heard, in the Courtroom of the Honorable Judge Maxine M.

23  Chesney, located in the San Francisco Courthouse, Courtroom 7 – 19th Floor, 450

24  Golden Gate Avenue, Proposed Intervenors DOES 1-8, all of whom are residents of

25  existing housing on the ranches at issue in this litigation and some of who work on those

26  ranches ("Agricultural Workers") will and hereby do move this Court for leave to intervene

27  in the above-entitled action under Rule 24(a) of the Federal Rules of Civil Procedure. The

28  [Proposed] Answer of Agricultural Workers is attached hereto as **Exhibit A.**

                                                     Case No. 3:22-cv-00145 MMC

1    The Agricultural Workers respectfully requests intervention in this Action under

2  Rule 24(a)(2) as a matter of right on the grounds that: (1) the Motion to Intervene is

3  timely; (2) the Agricultural Workers reside on the ranch lands at the Point Reyes National

4  Seashore that are the subject of this action, and hold an individual, protectable legal

5  interest in the property upon which they reside; (3) the disposition of this action will affect,

6  impede, and threaten the Agricultural Workers' ability to enforce and protect their rights;

7  and (4) the named parties cannot adequately represent and protect the rights of the

8  Agricultural Workers.

9    This Motion is based on this Notice of Motion, the attached Memorandum of Points

10  and Authorities, the Declaration of Andrew Giacomini, the Declarations of Does 1 and 5,

11  filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all

12  other matters of which the Court may take judicial notice, and any argument or evidence

13  that may be presented to or considered by the Court prior to its ruling.

14  DATED:  October 15, 2024    HANSON BRIDGETT LLP

15

16

17  By: _____
    ANDREW G. GIACOMINI

18  ALENE M. TABER
    BIANCA A. VELEZ

19  Attorneys for Proposed Intervenors
    Agricultural Workers

20  Appearing as DOES 1-8.

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Existing parties, Plaintiffs Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project ("Plaintiffs"), Defendant the National Park Service ("NPS"), the various rancher and rancher association intervenors ("Rancher Intervenors") and potentially non-party ranchers have been engaged in a series of secret negotiations through a mediator in an effort to settle these disputes for nearly three years. Recent news reports indicate that a proposed settlement is imminent and that it will involve some or all of the Rancher Intervenors and potential additional nonparty ranchers agreeing to forfeit their leases, vacate the ranches and shut down agricultural uses within the Point Reyes National Seashore. This motion to intervene is being brought by the Agricultural Workers who currently reside in the ranches implicated by this potential settlement and who are concerned they will lose their jobs and their home if it is consummated. Their motion is also brought on behalf of  the approximately seventy-five ranch workers and their family members who we have reason to believe will be displaced by the proposed settlement, but who are too terrified of retaliation and other consequences to come forward.

Even though their homes and their jobs are on the line, the Agricultural Workers and other  similarly situated workers and families have been excluded from these discussions and negotiations and this Court must allow them to intervene under Rule 24 of the Federal Rules of Civil Procedure because they each have "an interest relating to the property…that is the subject of the action," namely each of them has a right to live in their current homes, to say nothing of the agricultural jobs many of them have held for decades.  Without legal standing in this action, the Agricultural Workers and other similarly situated individuals have no place at the table to protect their valid rights and interests.

On October 10, 2024, Counsel for Agricultural Workers emailed all counsel for existing parties to obtain a stipulation to allow intervention, but Counsel were unable to

21216888.3

1 reach agreement for such stipulation. (Declaration of Andrew Giacomini In Support of

2 Agricultural Workers' Motion to Intervene ("Giacomini Dec."), para. 4.)

## II.    BACKGROUND

4        The stated goal of the Plaintiffs in this litigation is to end all ranching in the Point

5 Reyes National Seashore.  Plaintiffs seek to disrupt the longstanding agricultural leases

6 and the court ordered requirement that NPS enter into long term leases with the ranchers

7 to allow agricultural operations to continue.  The existing parties have been involved in a

8 secret mediation process but notwithstanding their goal to hide the details of their

9 negotiations from the general public and the Agricultural Workers, according to various

10 news reports and information available from within the West Marin community. The

11 negotiations involve the proposed closure of some or all of the ranches that are the

12 subject of this litigation.   For each ranch that closes, ranch workers and their families,

13 like the Agricultural Workers, will be displaced from their jobs and are at risk of losing

14 their homes. (*See* Declaration of Doe 1, para. 3-6; *see also* Declaration of Doe 5, para. 3-

15 6.) Many families live and work on these farms and they are not currently represented at

16 the table of this large litigation and proposed settlement. We have reason to believe that

17 the proposed settlement will result in a termination of the leases to the farmers and

18 ranchers, resulting in the closure of many, if not all, of the ranches. A recent news article,

19 attached as **Exhibit B** to the Declaration of Andrew Giacomini In Support of Agricultural

20 Workers' Motion to Intervene, predicts that the proposed settlement will be entered on

21 October 18, 2024.

22        On the Point Reyes ranches, workers often live on the farm or ranch, and housing

23 is often included with the job, even if there is no official lease. If the workers were unable

24 to continue working and residing on the ranches, they would be forced to look for other

25 comparable affordable housing, in the West Marin environment, where rental housing is

26 scarce and very expensive. With the ranches closing, these workers face extreme

27 uncertainty. (*See* Declaration of Doe 1 ("Doe 1 Dec."), para. 3-6; *see also* Declaration of

28 Doe 5 (Doe 5 Dec.), para. 3-6.) The Agricultural Workers seek to intervene in this matter

1  to protect their viable interests in continuing to live on the ranches regardless of whether

2  they continue in agricultural use.

## III.    ARGUMENT

### A.    Federal Rule of Civil Procedure, Rule 24(a)(2), Entitles Agricultural Workers to Intervene As a Matter of Right.

Under Rule 24(a)(2), a nonparty is entitled to intervention as of right when it: (1) timely moves to intervene; (2) has a significantly protectable interest related to the subject of the action; (3) may have that interest impaired by the disposition of the action; and (4) will not be adequately represented by existing parties. (Fed. Rules Civ. Proc., rule 24; *Western Watersheds Project v. Haaland* (9th Cir. 2022) 22 F.4th 828, 835.) The Ninth Circuit interprets these requirements "broadly in favor of intervention." (*Western Watersheds Project, supra,* 22 F.4th at 835.)

### B.    Agricultural Workers' Motion is Timely.

The Agricultural Workers brought this motion as soon as they were able, without unnecessary delay.

To determine whether a motion for intervention is timely, courts consider three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) prejudice to other parties; and (3) the reason for and length of the delay. (*Western Watersheds Project, supra,* 22 F.4th at 835-36.) "Delay is measured from the date the proposed intervenor should have been aware that its interests would no longer be protected adequately by the parties, not the date it learned of the litigation." (*Kalbers v. United States Department of Justice* (9th Cir. 2021) 22 F.4th 816, 823; see also *Western Watersheds Project, supra,* 22 F.4th at 836.)

Besides two Motions to Intervene granted on May 10, 2022 and June 23, 2022, respectively, and Answers from the National Park Service and the Intervenors, there has been no substantive activity in this litigation.  Therefore, no information is available to the public about the disputes among the existing parties.  Instead, the parties have engaged in a secret negotiation keeping the Agricultural Workers, and other similarly situated

Case No. 3:22-cv-00145 MMC

21216888.3

individuals, in the dark about their futures.  A recent article in the Press Democrat revealed that a settlement was imminent and that it may involve the closure of the ranches and the elimination of the jobs and homes of the Agricultural Workers, and other ranch workers and their families, who do not have the resources to represent themselves. That article resulted in the Agricultural Workers obtaining pro bono representation for this motion to intervene. Prior to obtaining representation, the Agricultural Workers had *no knowledge of their rights* to the property, and no ability to assert their rights in this litigation. (Giacomini Dec., para. 2-3.)

Denial of the Agricultural Workers' motion to intervene would be improper due to the early stage of the case and lack of substantive activity.  (*See Kalbers, supra,* (9th Cir. 2021) 22 F.4th 816, 826.)

Further, the Agricultural Workers face significant prejudice if this case proceeds without their representation, while the existing parties would not be prejudiced by the Agricultural Workers' addition to the case. (*Western Watersheds Project, supra,* 22 F.4th at 838 ("'[P]rejudice' does not arise merely 'from the fact that including another party in the case might make resolution more difficult.'"].)

**C.    Agricultural Workers' Property Interest in the Subject Land is a Significant Protectable Interest.**

A proposed intervenor "has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims." (*Kalbers, supra,* 22 F.4th at 827.)

The Agricultural Workers have rights to the land that is the subject of this action. They work and reside on these ranches, and they are informed and believe that the proposed settlement may unlawfully seek to extinguish their right to continue to live on the property. (Doe 1 Dec., para 3-6; Doe 5 Dec. 3-6.) As discussed in the Rancher Intervenors' Motion to Intervene, the rancher's rights to the land arise out of long-term leases between "the United States Department of the Interior, National Park Service,

21216888.3

1   Point Reyes National Seashore, an agency of the United States of America ("Lessor")"

2   and the Ranchers, for the intended use of beef cattle ranching operations or dairy

3   operations, and "residential purposes for Lessee and Lessee's immediate family; and

4   *residential purposes of Lessee's employees and their immediate families*." (*See* National

5   Park Service, General Management Plan Amendment: Ranching and Dairying

6   Lease/Permits, https://www.nps.gov/pore/getinvolved/planning-gmp-amendment-leases-

7   permits.htm [Lease/Permits for A Ranch and H Ranch are attached to this webpage.].)

8   Some of the Agricultural Workers were hired to work these ranches, and all of them

9   currently reside on the ranches under an effective oral sublease agreement with the

10  ranchers.

11       Thus, the Agricultural Workers' interest in the property arising out of the sublease

12  agreement is a significantly protectable interest under Rule 24. (*See In re Estate of*

13  *Ferdinand E. Marcos Human Rights Litigation* (9th Cir. 2008) 536 F.3d 980, 987; see

14  *Northridge Hospital Foundation v. Pic 'N' Save No. 9 Inc.* (1986) 187 Cal.App.3d 1088,

15  1094–1095 ["The general rule is that the rights of a subtenant cannot be affected by a

16  voluntary surrender of the master lease."]

17       Under similar circumstances, in *Western Watersheds Project*, the 9th Circuit

18  observed: "in the analogous context of Rule 19, that "a party to a contract is necessary,

19  and if not susceptible to joinder, indispensable to litigation seeking to decimate that

20  contract…Although Rule 24, unlike Rule 19, does not require us to determine whether

21  [intervenor] is a necessary or indispensable party, the principle identified in the latter

22  context carries persuasive force here." (*Western Watersheds Project, supra*, 22 F.4th at

23  842; see Fed. Rules Civ. Proc., Rule 19 [A person *must* be joined as a party if that

24  person claims an interest relating to the subject of the action and is so situated that

25  disposing of the action in the person's absence may, as a practical matter, impair or

26  impede the person's ability to protect the interest.]; *see also Lomayaktewa v. Hathaway*

27  (9th Cir. 1975) 520 F.2d 1324, 1325 ["No procedural principle is more deeply imbedded in

28  the common law than that, in an action to set aside a lease or a contract, all parties who

5

Case No. 3:22-cv-00145 MMC

may be affected by the determination of the action are indispensable."]; *see also*

*Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.* (9th Cir. 2002) 276 F.3d

1150, 1157 ["[T]he instant litigation threatens to impair [intervenor's] contractual interests,

and thus, its fundamental economic relationship with [existing party]".] The *Western*

*Watersheds Project* court ultimately found that the District Court improperly denied

intervention of a leaseholder who had a substantial due process interest in the outcome

of litigation by virtue of its contract with an existing party. (*Western Watersheds Project,*

*supra,* 22 F.4th at 842.)

Therefore, this Court should permit Agricultural Workers to intervene in this action.

**D.    Agricultural Workers' Property Interest Would be Impaired by the Disposition of This Action.**

An applicant for intervention under Rule 24 (a) must be "so situated that the

disposing of the action may as a practical matter impair or impede the movant's ability to

protect that interest." (Fed. R. Civ. P. 24(a).)

Should the proposed settlement be finalized, the Agricultural Workers, and the

other ranch workers and their families that are similarly situated, may lose their

livelihoods and their homes on the ranches. The potential loss of housing on these

ranches deeply impacts the residents living on the ranches, and many fear displacement

from West Marin. The cost of living in comparable housing units in the Marin area is a

cost prohibitive barrier for the ranch worker communities, and many families do not know

how they will survive and where they will go if forced to vacate their homes. (Doe 1 Dec.,

para 3-6; Doe 5 Dec. 3-6.) The Agricultural Workers' significant protectable interest in

their homes and livelihood would be impaired by the disposition of this action such that

they should be permitted to intervene.

**E.    Agricultural Workers' Property Interest Is Not Currently Adequately Represented by the Existing Parties.**

"The burden of showing inadequacy of representation is 'minimal' and satisfied if

the applicant can demonstrate that representation of its interests 'may be' inadequate."

To evaluate adequacy of representation, courts consider three factors: "(1) whether the

Case No. 3:22-cv-00145 MMC

1  interest of a present party is such that it will undoubtedly make all of a proposed

2  intervenor's arguments; (2) whether the present party is capable and willing to make such

3  arguments; and (3) whether a proposed intervenor would offer any necessary elements

4  to the proceeding that other parties would neglect." (*Western Watersheds Project, supra,*

5  22 F.4th at 840-41 [Internal citations omitted.]; *Kalbers, supra,* 22 F.4th at 828.)

6      The existing parties cannot be expected to make the same arguments as the

7  Agricultural Workers because the existing parties' interests are clearly adverse to those

8  of the Agricultural Workers. The Plaintiffs want to close down all of the ranching

9  operations and the National Park Service has a policy of not allowing anyone to live in the

10  National Park who is not one of its employees.  Although the ranchers have

11  acknowledged the Agricultural Workers' property rights in their pleadings, once they

12  relinquish their leases, they will have no ability to preserve the Agricultural Workers'

13  housing.  No existing party is capable of making the same arguments as the Agricultural

14  Workers because no existing party has the same interests, circumstances, risks and

15  fears as the Agricultural Workers. The Agricultural Workers' rights arise out of subleases

16  to which only the Agricultural Workers may benefit.  No existing party is capable, or has

17  the economic interest, to make the same arguments.

18      A presumption that the National Park Service may adequately represent

19  Agricultural Workers is easily rebutted. A public entity serving as a landlord and land

20  manager cannot adequately represent its private tenants. "[I]nadequate representation is

21  most likely to be found when the applicant asserts a personal interest that does not

22  belong to the general public." (*Forest Conservation Council v. U.S. Forest Service* (9th

23  Cir. 1995) 66 F.3d 1489, 1499.) Because the Agricultural Workers are private tenants

24  residing on land owned by the National Park Service, the National Park Service cannot

25  be expected to adequately represent the unique and important interest of the Agricultural

26  Workers.

27  / / /

28  / / /

21216888.3

1

### IV.    CONCLUSION

2    For the foregoing reasons, Agricultural Workers respectfully request that the court

3 grant their motion to intervene in the subject case and file the [Proposed] Answer of

4 Intervenors, attached hereto.

5 DATED:  October 15, 2024                HANSON BRIDGETT LLP

6

7                                       By: _____

8                                           ANDREW G. GIACOMINI
                                            ALENE M. TABER
9                                           BIANCA A. VELEZ
                                            Attorneys for Proposed Intervenors
10                                          Agricultural Workers Appearing as
                                            DOES 1-8.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21216888.3       PROPOSED INTERVENORS AGRICULTURAL WORKERS' NOTICE OF MOTION AND MOTION TO
INTERVENE

# EXHIBIT A

1  HANSON BRIDGETT LLP
   ANDREW G. GIACOMINI, SBN 154377
2  agiacomini@hansonbridgett.com
   ALENE M. TABER, SBN 218554
3  ataber@hansonbridgett.com
   BIANCA A. VELEZ, SBN 339795
4  Bvelez@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone:    (415) 777-3200
6  Facsimile:    (415) 541-9366

7  Attorneys for Proposed Intervenors
   Agricultural Workers
8  Appearing as DOES 1-8

9           UNITED STATES DISTRICT COURT

10   NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12  RESOURCE RENEWAL INSTITUTE;          Case No. 3:22-cv-000145-MMC
    Center for Biological Diversity; and
13  Western Watersheds Project,          **[PROPOSED] ANSWER TO COMPLAINT
                                         OF DEFENDANTS PROPOSED
14            Plaintiffs,                INTERVENORS AGRICULTURAL
                                         WORKERS**
15       v.

16  NATIONAL PARK SERVICE, a federal
    agency,
17
              Defendant.
18

19

20       Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Defendants

21  Proposed Intervenors Agricultural Workers Appearing as DOE 1-8 ("Agricultural

22  Workers") answer the Complaint of Plaintiffs.  If an averment is not specifically admitted,

23  it is hereby denied.

24                  **ANSWER TO COMPLAINT**

25       Defendant Intervenors, Agricultural Workers appearing as DOES 1-8, hereby

26  answer Plaintiffs' Complaint as follows:

27       1.      Paragraph 1 constitutes Plaintiffs' characterization of the purposes and

28  basis for this case, to which no response is required. To the extent a response is

1  required, the Agricultural Workers deny the allegations in Paragraph 1.

2      2.    Paragraph 2 largely characterizes the Point Reyes Act, 16 U.S.C. § 459c,

3  and Golden Gate National Recreation Area ("GGNRA") Act, 16 U.S.C. § 460bb, which

4  speak for themselves and require no response. The Agricultural Workers admit that their

5  rights and interests in their ranches exceed $100 million in today dollars. Except as so

6  admitted, the Agricultural Workers deny each and every other allegation, including any

7  suggestion that the "Acts" referenced herein did not make ranching a purpose of these

8  public lands or encourage ranching thereon.

9      3.    The Agricultural Workers admit that Plaintiffs sued the National Park

10  Service (NPS) in 2016, that among other things, challenging aspects of the 1980 General

11  Manage Plan.  Other than so admitted, the Agricultural Workers lack sufficient information

12  to form a belief of the truth of the other allegations in Paragraph 3, all those other

13  allegations are denied.

14      4.    The Agricultural Workers lack knowledge or information sufficient to form a

15  belief as to the truth of the allegations in the first, second, and third sentences of

16  Paragraph 4. The fourth sentence of Paragraph 4 describes the September 2021 Record

17  of Decision ("ROD"), General Management Plan Amendment and corresponding

18  Environmental Impact Statement ("GMPA/EIS") process, which documents speak for

19  themselves and are the best evidence of their contents.

20      5.    The Agricultural Workers deny the allegations in Paragraphs  5.

21      6.    The Agricultural Workers deny the allegations in Paragraphs  6.

22      7.    The Agricultural Workers deny the allegations in the first sentence of

23  Paragraph 7. The allegations in the second sentence of Paragraph 7 constitute Plaintiffs'

24  requested relief, to which no response is required. To the extent a response is required,

25  the Agricultural Workers deny that Plaintiffs are entitled to such relief.

26      **<u>JURISDICTION</u>**

27      8.    The allegations in Paragraphs 8 are conclusions of law, which require no

28  response. To the extent a response is required, the Agricultural Workers deny those

allegations.

9.      The allegations in Paragraphs 9 are conclusions of law, which require no response. To the extent a response is required, the Agricultural Workers deny those allegations.

10.      The allegations in Paragraphs 10 are conclusions of law, which require no response. To the extent a response is required, the Agricultural Workers deny those allegations.

## DIVISIONAL ASSIGNMENT

11.      The Agricultural Workers admit that if this Court has jurisdiction, then venue is proper in this District and assignment of this case to a judge in the San Francisco or Oakland Division is proper. The Agricultural Workers deny any remaining allegations in paragraph 11.

## PARTIES

12.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 12, and thus deny the same.

13.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 13, and thus deny the same.

14.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 14, and thus deny the same.

15.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 15, and thus deny the same.

16.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 16, and thus deny the same.

17.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 17, and thus deny the same.

18.      The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs 18, and thus deny the same.

19.      The Agricultural Workers admit that the National Park Service ("NPS") is an

3

agency within the U.S. Department of the Interior and that the Director of the NPS is vested with authority to manage units of the National Park System. The Agricultural Workers deny any remaining allegations in paragraph 19.

## LEGAL BACKGROUND

### National Park Service Organic Act

20.     The allegations in Paragraph 20 purport to characterize 54 U.S.C. §100101(a), which speaks for itself and is the best evidence of its contents.

21.     The allegations in Paragraph 21 purport to characterize the NPS's 2006 Management Policies, which speaks for itself and is the best evidence of its contents.

22.     The allegations in Paragraph 22 purport to characterize the NPS's 2006 Management Policies, which speaks for itself and is the best evidence of its contents.

23.     The allegations in Paragraph 23 purport to characterize 54 U.S.C. §100502, which speaks for itself and is the best evidence of its contents.

### Point Reyes National Seashore Act

24.     The allegations in Paragraph 24 purport to characterize 16 U.S.C. §459c, which speaks for itself and is the best evidence of its contents.

25.     The allegations in Paragraph 25 purport to characterize 16 U.S.C. §459c-2 and §459c-4, Pub. L. No. 87-657, § 4, 76 Stat. 538, 540 (1962), and Pub. L. No. 91-223, §2(b), 84 Stat. 90 (1970), which speak for themselves and are the best evidence of their contents.

26.     The allegations in Paragraph 26 purport to characterize 16 U.S.C. §459c-6(a) (1970), which speaks for itself and is the best evidence of its contents.

27.     The allegations in Paragraph 27 purport to characterize Pub. L. No. 94-567, §7(a), 90 Stat. 2692, 2695 (1976), which speaks for itself and is the best evidence of its contents.

28.     The allegations in Paragraph 28 purport to characterize Pub. L. No. 95-625, §318(b), 92 Stat. 3467, 3487 (1978), which speaks for itself and is the best evidence of its contents.

1

**The GGNRA Act**

2      29.    The allegations in Paragraph 29 purport to characterize Pub. L. No. 92-589,

3    §1, 86 Stat. 1299, 1299 (1972), and 16 U.S.C. §460bb, which speak for themselves and

4    are the best evidence of their contents.

5      30.    The allegations in Paragraph 30 purport to characterize 16 U.S.C.§460bb,

6    which speaks for itself and is the best evidence of its contents.

7      31.    The allegations in Paragraph 31 purport to characterize Pub. L. No. 95-625,

8    §317©, 92 Stat. 3467, 3485 (1978), which speaks for itself and is the best evidence of its

9    contents.

10                              **FACTUAL BACKGROUND**

11    **History of Point Reyes National Seashore and Northern District of GGNRA**

12      32.    The Agricultural Workers admit the second sentence of Paragraph 32. The

13    Agricultural Workers lack knowledge or information sufficient to form a belief as to the

14    truth of the remaining allegations in Paragraph 32.

15      33.    The Agricultural Workers admit that the Point Reyes area has a rich cultural

16    heritage and that the Coast Miwok people have been culturally affiliated with the Point

17    Reyes area for many years. The Agricultural Workers deny the remaining allegations in

18    the first sentence. The Agricultural Workers admit the allegations in the second sentence.

19      34.    The Agricultural Workers admit that ranch properties on the Seashore were

20    purchased by the United States in the 1970s. They further admit that they were paid less

21    than $1 million each for interests and rights in land that are worth well more that $100

22    million in value. With respect to each and every other allegation, the Agricultural Workers

23    lack knowledge or information sufficient to form a belief as to the truth of the remaining

24    allegations in Paragraph 34, and thus deny the same.

25      35.    The allegations in Paragraph 35 purport to characterize the 1980 General

26    Management Plan for the Point Reyes National Seashore, which speaks for itself and is

27    the best evidence of its contents. For the avoidance of doubt, the Agricultural Workers

28    deny each and every allegation therein.

21227862.1

36.     The allegations in Paragraphs 36 appear to purport to characterize the 2021 ROD/GMPA for Point Reyes National Seashore, which speak for themselves and are the best evidence of their contents. For the avoidance of doubt, the Agricultural Workers deny each and every allegation therein.

37.     The allegations in Paragraphs 37 appear to purport to characterize the 2021 ROD/GMPA for Point Reyes National Seashore, which speak for themselves and are the best evidence of their contents. For the avoidance of doubt, the Agricultural Workers deny each and every allegation therein.

38.     The Agricultural Workers admit that the allegations in Paragraph 38 include a purporting to depict the location of ranching allotments on public lands managed by NPS on the Seashore; the Agricultural Workers admit that the map depicts the location of 31 ranch allotments and two life-estates in the Seashore and the north district of the GGNRA and that these allotments are located on approximately 28,000 acres of land managed by NPS. As to the remaining allegations in Paragraph 38, including the accuracy or authenticity of the map, the Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations and accompanying map, and therefore deny same.

**National Resources and Public Uses of the National Seashore and GGNRA**

39.     The Agricultural Workers admit that their interests and rights in their ranch lands at PRNS are worth well in excess of $100 million. Except as so admitted, the Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and thus deny the same.

40.     The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and thus deny the same.

41.     Admit that the Seashore provides habitat for a rich array of wildlife. The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41, and thus deny the same.

42.     The Agricultural Workers admit that the tule elk were introduced into the

1  PRNS on or around 1976 by order of the Department of the Interior. The Agricultural

2  Workers deny that the introduction or expansion of the tule elk herds is supported by

3  proper EIS or other necessary environmental review and planning requirements or that

4  NPS has managed the tule elk herds since then in compliance with existing EIS and

5  other planning and wildlife management requirements, Except as so admitted or denied,

6  the lack knowledge or information sufficient to form a belief as to the truth of the

7  allegations in the first sentence of Paragraph 42, and thus deny the same. The second

8  and third sentences of Paragraph 42 purport to characterize Pub. L. No. 94-389, 90 Stat.

9  1189 (1976), which speaks for itself and is the best evidence of its contents. But for the

10  avoidance of doubt, the Agricultural Workers deny each and every one of those

11  allegations.

12       43.      The Agricultural Workers admit that there are three herds of tule elk on the

13  Seashore that are known as the Drakes Beach herd, the Limantour herd and the

14  Tomales Point herd; and that the Tomales Point herd is intended to be confined to a

15  2,600-acre elk reserve on Tomales Point that is bounded by a fence. The Agricultural

16  Workers deny the remaining allegations in this paragraph.

17       44.      The Agricultural Workers admit that the north district of GGNRA is

18  approximately 15,000 acres and that Lagunitas Creek and Olema Creek drain to Tomales

19  Bay. The Agricultural Workers deny the remaining allegations in this paragraph.

20  **The Harmful Impacts of Ranching on National Resources on these Public Lands**

21       45.      The Agricultural Workers deny the allegations in Paragraph 45.

22       46.      The Agricultural Workers admit that cattle grazing is authorized on the

23  Seashore and GGNRA.  The Agricultural Workers deny the remaining allegations in

24  Paragraph 46.

25       47.      The Agricultural Workers deny the allegations in Paragraph 47.

26       48.      The Agricultural Workers deny the allegations in the first and fourth

27  sentences of Paragraph 48. The Agricultural Workers admit the allegations in the second

28  sentence of Paragraph 48. With respect to the third sentence of Paragraph 48, it appears

1    Plaintiffs' rely on unknown documents and/or conclusions of the National Marine

2    Fisheries Service ("NMFS"), likely including the March 18, 2021 Biological Opinion or its

3    characterization in the ROD and/or GMPA/EIS; those documents speak for themselves

4    and are the best evidence of their contents.

5          49.     The Agricultural Workers deny the allegations in the first sentence of

6    Paragraph 49. The Agricultural Workers admit that forage production was previously

7    authorized on a limited number of acres. The Agricultural Workers deny the remaining

8    allegations in Paragraph 49.

9          50.     The Agricultural Workers deny the allegations in the first and second

10    sentences of Paragraph 50. The Agricultural Workers lack knowledge or information

11    sufficient to form a belief as to the truth of the allegations in the third sentence of

12    Paragraph 50, and thus deny same.

13          51.     The Agricultural Workers admit that ranchers use various equipment and

14    infrastructure, including fencing and off-road vehicles. Except as so admitted, the

15    Agricultural Workers deny each and every allegation in Paragraph 51.

16          52.     The Agricultural Workers lack knowledge or information sufficient to form a

17    belief as to the truth of the allegations in the first and second sentences of Paragraph 52

18    and, on that basis, deny each and every allegation therein.

19          53.     The Agricultural Workers deny the allegations in the first sentence of

20    Paragraph 53. The Agricultural Workers admit that residences on ranches often use

21    septic systems, that some ranch residences use springs or wells, and NPS and or other

22    local utilities are legally obligated to provide water and other necessary resources to the

23    Agricultural Workers based on contracts and promises that date back more than 50

24    years. Except as so admitted, the Agricultural Workers deny each and every allegation in

25    Paragraph 53.

26          54.     The Agricultural Workers deny the allegations in Paragraph 54.

27          55.     The Agricultural Workers deny the allegations in Paragraph 55.

28          56.     The Agricultural Workers deny the allegations in the first sentence of

Paragraph 56. The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 56, and thus deny the same.

### NPS's Failure to Timely Revise its 1980 General Management Plan

57.    The Agricultural Workers deny the allegations in Paragraph 57.

58.    The Agricultural Workers admit that on February 3, 2000, NPS published a notice of 1    intent in the Federal Register to prepare an environmental impact statement and General Management Plan ("GMP") for the Seashore, including the north district of GGNRA (65 Fed. Reg. 5365), but deny the remaining allegations in the first sentence of Paragraph 58. The Agricultural Workers deny the allegations in the second sentence of Paragraph 58.

59.    The Agricultural Workers admit that NPS initiated a National Environmental Policy Act ("NEPA") planning process for a Ranch Comprehensive Management Plan in 2014. The Agricultural Workers deny the remaining allegations in Paragraph 59.

60.    The allegations in the first sentence of Paragraph 60 purport to characterize the complaint filed in Resource Renewal Inst. v. Nat'l Park Serv. (RRI v. NPS), 3:16-cv-00688-SBA (N.D. Cal.). The Agricultural Workers admit that the First Amended Complaint in RRI v. NPS challenged the alleged failure of the NPS to timely revise the GMP for the Seashore and the NPS's alleged failure to authorize ranching without sufficient NEPA compliance, and deny any remaining allegations in the first sentence. The Agricultural Workers admit the allegations of the second and third sentences of Paragraph 60. Except as so admitted, the Agricultural Workers deny each and every allegation therein.

### The Listing of the Historic Dairy Districts

61.    The Agricultural Workers admit the allegations in Paragraph 61, except that they lack sufficient information that the correct name is the Point Reyes Peninsula Dairy Ranches Historic District, and thereby deny that lone allegation.

62.    The Agricultural Workers admit that the Point Reyes Peninsula Dairy Ranches Historic District is comprised of 17 ranch areas, but deny the remaining

1  allegations in the first sentence of Paragraph 62. The Agricultural Workers admit the
2  allegations in the second and third sentences.

3      63.    The Agricultural Workers admit the allegations in Paragraph 63.

4      64.    The Agricultural Workers admit that among the reasons the two districts are
5  historically significant is because of their association with the history of dairy ranching in
6  Marin County and because they contain buildings and structures that reflect that history.

7      65.    The Agricultural Workers lack knowledge or information sufficient to form a
8  belief as to the truth of allegations in the first sentence of Paragraph 65, and therefore
9  deny the same. To the extent Plaintiffs characterize the National Register nomination
10  forms for the two historic districts, those documents speak for themselves and are the
11  best evidence of their contents. The Agricultural Workers deny the allegations in the
12  second sentence of Paragraph 65.

13      66.    To the extent Plaintiffs characterize the National Register nomination forms
14  for two historic districts within the Point Reyes area in Paragraph 66, those documents
15  speak for themselves and are the best evidence of their contents. The Agricultural
16  Workers deny any remaining allegations in Paragraph 66.

17      **NPS's Planning Process and Proposed GMPA**

18      67.    The Agricultural Workers admit that in October, 2017, the NPS issued a
19  newsletter seeking public input on a conceptual range of alternatives for the GMPA/EIS.
20  The Agricultural Workers lack knowledge or information sufficient to form a belief as to
21  the truth of the remaining allegations in Paragraph 67.

22      68.    The Agricultural Workers admit the allegations in Paragraph 68.

23      69.    The allegations in Paragraphs 69 purport to characterize the draft and final
24  Environmental Impact Statements for the GMPA, which documents speak for themselves
25  and are the best evidence of their contents.

26      70.    The allegations in Paragraphs 70 purport to characterize the draft and final
27  Environmental Impact Statements for the GMPA, which documents speak for themselves
28  and are the best evidence of their contents.

[PROPOSED] ANSWER TO COMPLAINT OF DEFENDANTS PROPOSED INTERVENORS
AGRICULTURAL WORKERS

21227862.1

71.     The allegations in Paragraphs 71 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

72.     The allegations in Paragraphs 72 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

73.     The allegations in Paragraph 73 purport to characterize the settlement agreement in RRI v. NPS, 3:16-cv-00688-SBA (N.D. Cal.) (ECF No. 143) and the draft or final GMPA/EIS, which documents speak for themselves and are the best evidence of their contents.

74.     The allegations in Paragraphs 74 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

75.     The allegations in Paragraphs 75 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

76.     The allegations in Paragraphs 76 purport to characterize the draft and final Environmental Impact Statements for the GMPA, which documents speak for themselves and are the best evidence of their contents.

77.     The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77, and thus deny the same.

78.     The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78, and thus deny the same. To the extent Plaintiffs characterize comment letters submitted by Plaintiffs to NPS, those documents speak for themselves and are the best evidence of their contents.

79.     The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79, and thus deny the same. To the extent Plaintiffs characterize comment letters submitted by the Environmental Protection

1    Agency ("EPA") and San Francisco Regional Water Quality Control Board ("SF Water

2    Control Board") to NPS, those documents speak for themselves and are the best

3    evidence of their contents.

4            80.     The Agricultural Workers lack knowledge or information sufficient to form a

5    belief as to the truth of the allegations in Paragraph 80, and thus deny the same.

6            **The EIS's Incomplete Baseline Discussion and Impact Analysis**

7            81.     The allegations in Paragraphs 81 purport to characterize the Environmental

8    Impact Statement for the GMPA, which document speaks for itself and is the best

9    evidence of its contents.

10           82.     The allegations in Paragraphs 82 purport to characterize the Environmental

11   Impact  Statement for the GMPA, which document speaks for itself and is the best

12   evidence of its contents.

13           83.     The allegations in Paragraphs 83 purport to characterize the Environmental

14   Impact Statement for the GMPA, which document speaks for itself and is the best

15   evidence of its contents.

16           84.     The allegations in Paragraphs 84 purport to characterize the Environmental

17   Impact Statement for the GMPA, which document speaks for itself and is the best

18   evidence of its contents.

19           85.     The allegations in Paragraphs 85 purport to characterize the Environmental

20   Impact Statement for the GMPA, which document speaks for itself and is the best

21   evidence of its contents.

22           86.     The allegations in Paragraphs 86 purport to characterize the Environmental

23   Impact Statement for the GMPA, which document speaks for itself and is the best

24   evidence of its contents.

25           87.     The allegations in Paragraphs 87 purport to characterize the Environmental

26   Impact Statement for the GMPA, which document speaks for itself and is the best

27   evidence of its contents.

28           88.     The allegations in Paragraphs 88 purport to characterize the Environmental

12                                    Case No. 3:22-cv-000145-MMC

[PROPOSED] ANSWER TO COMPLAINT OF DEFENDANTS PROPOSED INTERVENORS
AGRICULTURAL WORKERS

1   Impact Statement for the GMPA, which document speaks for itself and is the best

2   evidence of its contents.

3       89.    The first sentence of Paragraph 89 purports to characterize the EIS, which

4   document speaks for itself and is the best evidence of its contents. The Agricultural

5   Workers admit that NPS has not completed an appraisal process for issuing leases under

6   the GMPA, but deny the remaining allegations in the second and third sentences of

7   Paragraph 89.

8       90.    The allegations in Paragraphs 90 purport to characterize the EIS for the

9   GMPA, which document speaks for itself and is the best evidence of its contents.

10      91.    The allegations in Paragraphs 91 purport to characterize the EIS for the

11  GMPA, which document speaks for itself and is the best evidence of its contents.

12      92.    The Agricultural Workers lack knowledge or information sufficient to form a

13  belief as to the truth of the allegations in the first and second clauses in the first sentence

14  of Paragraph 92.  The remainder of the allegations in Paragraph 92 purport to

15  characterize the EIS for the GMPA, which document speaks for itself and is the best

16  evidence of its contents.

17      93.    The allegations in Paragraphs 93 purport to characterize the EIS for the

18  GMPA, which document speaks for itself and is the best evidence of its contents.

19      94.    The allegations in Paragraphs 94 purport to characterize the EIS for the

20  GMPA, which document speaks for itself and is the best evidence of its contents.

21      95.    The allegations in Paragraphs 95 purport to characterize the EIS for the

22  GMPA, which document speaks for itself and is the best evidence of its contents.

23      96.    The allegations in Paragraphs 96 purport to characterize the EIS for the

24  GMPA, which document speaks for itself and is the best evidence of its contents.

25                    **Water Quality Issues and Developments**

26      97.    The Agricultural Workers lack knowledge or information sufficient to form a

27  belief as to the truth of the allegations in Paragraph 97.

28

1

**<u>Regional Water Board Regulation and Compliance</u>**

2      98.     The Agricultural Workers lack knowledge or information sufficient to form a

3  belief as to the truth of the allegations in Paragraph 98.

4      99.     The allegations in Paragraph 99 purport to summarize the contents of the

5  Water Quality Control Plan for the San Francisco Basin ("Basin Plan"), which document

6  speaks for itself and is the best evidence of its contents. The Agricultural Workers deny

7  any remaining allegations in Paragraph 99.

8      100.    The Agricultural Workers admit that the Water Board issued a Conditional

9  Waiver of Waste Discharge Requirements for Grazing Operations in the Tomales Bay

10  Watershed, Order No. R2¬2018-0046 ("the Conditional Waiver") in 2018, but The

11  Agricultural Workers are without knowledge or information sufficient to form a belief as to

12  the truth of the remaining allegations in the first and second sentences of Paragraph 100,

13  and therefore deny the same.  The allegations in the third sentence characterize a

14  Conditional Waiver, which speaks for itself and is the best evidence of its contents.

15      101.    The Agricultural Workers lack knowledge or information sufficient to form a

16  belief as to the truth of the allegations in Paragraph 101, and therefore deny the same.

17  To the extent Paragraph 101 purports to characterize the NPS's certifications, those

18  documents speak for themselves and are the best evidence of their contents. Any

19  remaining allegations constitute conclusions of law to which no response is required and

20  which are, therefore, denied.

21      102.    The allegations in Paragraph 102 purport to characterize the General

22  Waste Discharge Requirements for Confined Animal Facilities Within the San Francisco

23  Bay Region, Order No. R2-2016-0031 ("CAF Order"), issued by the Water Board, which

24  document speaks for itself and is the best evidence of its contents.

25      103.    The allegations in Paragraph 103 purport to characterize the Conditional

26  Waiver and/or CAF Order, which speak for themselves and are the best evidence of their

27  contents.

28

Case No. 3:22-cv-000145-MMC

[PROPOSED] ANSWER TO COMPLAINT OF DEFENDANTS PROPOSED INTERVENORS
AGRICULTURAL WORKERS

21227862.1

1

## California Coastal Commission

2    104.    The Agricultural Workers admit that the NPS prepared a Consistency

3 Determination in October 2020 for the California Coastal Commission ("CCC"). The

4 Consistency Determination speaks for itself and is the best evidence of its contents. The

5 remaining allegations in Paragraph 104 constitute conclusions of law to which no

6 response is required and which are, therefore, denied.

7    105.    The allegations in this paragraph purport to characterize the Staff Report

8 issued by the CCC on March 26, 2021. The Report speaks for itself and is the best

9 evidence of its contents. To the extent the allegations are inconsistent with the Report,

10 they are denied.

11    106.    The Agricultural Workers admit that on April 22, 2021, the CCC

12 conditionally concurred with the NPS's Consistency Determination. The remainder of

13 Paragraph 106 purports to characterize the CCC's decision, which speaks for itself and is

14 the best evidence of its contents, as well as specific comments submitted by the public to

15 the CCC, regarding which the Agricultural Workers lack knowledge or information

16 sufficient to form a belief as to the truth of such allegations and thus deny the same.

17

## Water Quality Monitoring

18    107.    The Agricultural Workers lack knowledge or information sufficient to form a

19 belief as to the truth of the allegations in Paragraphs 107 and thus deny the same.

20    108.    The Agricultural Workers lack knowledge or information sufficient to form a

21 belief as to the truth of the allegations in Paragraphs 108 and thus deny the same.

22

## Drought

23    109.    The Agricultural Workers lack knowledge or information sufficient to form a

24 belief as to the truth of the allegations in Paragraph 109 and thus deny the same.  To the

25 extent Plaintiffs characterize a document in this Paragraph, that document speaks for

26 itself and is the best evidence of its contents.

27    110.    The Agricultural Workers lack knowledge or information sufficient to form a

28 belief as to the truth of the allegations in Paragraph 110 and thus deny the same.

15                          Case No. 3:22-cv-000145-MMC

111.    The Agricultural Workers admit that Marin County declared a county-wide drought emergency on May 18, 2021, and that the Marin Municipal Water District reported that the 20-month period between January 1, 2020 and August 1, 2021 had the lowest recorded rainfall for a 20-month period in 140 years. The Agricultural Workers deny any remaining allegations in this paragraph.

112.    The Agricultural Workers admit that Robert McClure closed his dairy operation at I Ranch and that Mr. McClure continues to raise heifers on I Ranch under his current lease. The Agricultural Workers deny the remaining allegations in Paragraph 112.

113.    The Agricultural Workers admit that several ranchers at the Seashore trucked water to their ranches in 2021. The Agricultural Workers deny the remaining allegations in Paragraph 113.

### Endangered Species Act Consultation

114.    The Agricultural Workers admit that NMFS issued a Biological Opinion ("BiOp") on March 18, 2021. The NMFS BiOp speaks for itself and is the best evidence of its contents. The Agricultural Workers deny any remaining allegations in Paragraph 114.

115.    The Agricultural Workers admit that the U.S. Fish and Wildlife Service ("FWS") issued a BiOp on June 4, 2021. The FWS BiOp speaks for itself and is the best evidence of its contents. The Agricultural Workers deny any remaining allegations in Paragraph 115.

### NPS's Record of Decision

116.    The Agricultural Workers admit that the Acting Regional Director, Interior Regions 8, 9, 10 and 12, signed the ROD for the GMPA/EIS on September 13, 2021. The remaining allegations characterize the contents of the ROD, which speaks for itself and is the best evidence of its contents. The Agricultural Workers deny any remaining allegations in Paragraph 116.

117.    The Agricultural Workers admit that the Superintendent of the Seashore signed a document entitled, "Succession Policy for Ranch Operations within the Ranchland Zone for Point Reyes National Seashore and the North District of Golden

16

1  Gate National Recreation Area," on September 13, 2021. The Agricultural Workers deny

2  any remaining allegations in Paragraph 117.

3  **Modified Alternative B**

4  118.  The allegations in Paragraphs 118 purport to characterize the ROD, which

5  speaks for itself and is the best evidence of its contents.

6  119.  The allegations in Paragraphs 119 purport to characterize the ROD, which

7  speaks for itself and is the best evidence of its contents.

8  120.  The allegations in Paragraphs 120 purport to characterize the ROD, which

9  speaks for itself and is the best evidence of its contents.

10  121.  The allegations in Paragraphs 121 purport to characterize the ROD, which

11  speaks for itself and is the best evidence of its contents.

12  122.  The allegations in Paragraphs 122 purport to characterize the ROD, which

13  speaks for itself and is the best evidence of its contents.

14  123.  The allegations in Paragraphs 123 purport to characterize the ROD, which

15  speaks for itself and is the best evidence of its contents.

16  **Primary Justifications for the GMPA**

17  124.  The allegations in Paragraphs 124 purport to characterize the ROD, which

18  speaks for itself and is the best evidence of its contents. To the extent a response is

19  required, the Agricultural Workers deny the allegations.

20  125.  The allegations in Paragraphs 125 purport to characterize the ROD, which

21  speaks for itself and is the best evidence of its contents. To the extent a response is

22  required, the Agricultural Workers deny the allegations.

23  126.  The allegations in Paragraph 126 purport to characterize the ROD and EIS,

24  which speak for themselves and are the best evidence of their contents. To the extent a

25  response is required, the Agricultural Workers deny the allegations.

26  127.  The allegations in Paragraph 127 purport to characterize the ROD, which

27  speaks for itself and is the best evidence of its contents. To the extent a response is

28  required, the Agricultural Workers deny the allegations.

17                                    Case No. 3:22-cv-000145-MMC

1    128.    The allegations in Paragraphs 128 purport to characterize the ROD and

2    EIS, which speak for themselves and are the best evidence of their contents. To the

3    extent a response is required, the Agricultural Workers deny the allegations.

4    129.    The allegations in Paragraphs 129 purport to characterize the ROD and

5    EIS, which speak for themselves and are the best evidence of their contents. To the

6    extent a response is required, the Agricultural Workers deny the allegations.

7    130.    The allegations in Paragraph 130 purport to characterize the ROD, which

8    speaks for itself and is the best evidence of its contents. To the extent a response is

9    required, the Agricultural Workers deny the allegations.

10   **NPS's Non-Impairment Determination**

11   131.    The allegations in Paragraphs 131 purport to characterize the ROD, which

12   speaks for itself and is the best evidence of its contents.

13   132.    The allegations in Paragraphs 132 purport to characterize the ROD, which

14   speaks for itself and is the best evidence of its contents.

15   133.    The allegations in Paragraphs 133 purport to characterize the ROD, which

16   speaks for itself and is the best evidence of its contents.

17   134.    The allegations in Paragraphs 134 purport to characterize the ROD, which

18   speaks for itself and is the best evidence of its contents.

19   135.    The allegations in Paragraphs 135 purport to characterize the ROD, which

20   speaks for itself and is the best evidence of its contents.

21   136.    The allegations in Paragraphs 136 purport to characterize the ROD, which

22   speaks for itself and is the best evidence of its contents.

23   137.    The allegations in Paragraphs 137 purport to characterize the ROD, which

24   speaks for itself and is the best evidence of its contents.

25   **ROD Implementation**

26   138.    The Agricultural Workers admit the allegations in the first sentence of

27   Paragraph 138. The Agricultural Workers lack knowledge or information sufficient to form

28   a belief as to the truth of the allegations in the second sentence of Paragraph 138, and

21227862.1

1  therefore deny the same.

2      139.   The Agricultural Workers lack knowledge or information sufficient to form a

3  belief as to the truth of the allegations in Paragraph 139, and therefore deny the same.

4      140.   The Agricultural Workers admit that that issuance of long-term leases could

5  allow ranchers to more easily obtain loans to upgrade ranch infrastructure and provide for

6  business security. The Agricultural Workers lack knowledge or information sufficient to

7  form a belief as to the truth of the remaining allegations in Paragraph 140.

8      141.   The Agricultural Workers lack knowledge or information sufficient to form a

9  belief as to the truth of the allegations in Paragraph 141.

10                          **FIRST CLAIM FOR RELIEF**

11                   **VIOLATION OF POINT REYES ACT AND APA**

12     142.   The Agricultural Workers hereby incorporates by reference its responses to

13 paragraphs 1-141 as though fully set forth herein.

14     143.   The allegations in Paragraph 143 purport to characterize Plaintiffs' first

15 claim for relief, to which no response is required.

16     144.   The allegations in Paragraph 144 purports to characterize 16 U.S.C. §

17 459c, 459c-6(a), and 459c-5(a), which statutes speak for themselves and are the best

18 evidence of their contents.

19     145.   The allegations in Paragraphs 145 constitute conclusions of law, to which

20 no response is required.

21     146.   The allegations in Paragraphs 146 constitute conclusions of law, to which

22 no response is required.

23     147.   The allegations in Paragraphs 147 constitute conclusions of law, to which

24 no response is required.

25     148.   The allegations in Paragraph 148 purport to characterize the ROD, which

26 speaks for itself and is the best evidence of its contents.

27     149.   The allegations in Paragraph 149 constitute conclusions of law, to which no

28         response is required.

1  **SECOND CLAIM FOR RELIEF**

2  **VIOLATION OF ORGANIC ACT & REGULATIONS**

3    150.   The Agricultural Workers hereby incorporates by reference its responses to

4  paragraphs 1-149 as though fully set forth herein.

5    151.   The allegations in Paragraph 151 purport to characterize Plaintiffs' second

6  claim for relief, to which no response is required.

7    152.   The allegations in Paragraph 152 purport to characterize 54 U.S.C.

8  §100101(a) and the 2006 NPS Management Policies, which speak for themselves and

9  are the best evidence of their contents.

10    153.   The allegations of Paragraph 153 purport to characterize 54 U.S.C.

11  §102101 and the 2006 NPS Management Policies, which speak for themselves and are

12  the best evidence of their contents.

13    154.   The allegations in Paragraph 154 purport to characterize the Park Service

14  Organic Act, which speaks for itself and is the best evidence of its contents.

15    155.   The allegations in Paragraph 155 purport to characterize NPS regulations,

16  which speak for themselves and are the best evidence of their contents.

17    156.   The allegations in Paragraph 156, including subparagraphs A – E,

18  constitute legal conclusions, to which no response is required.

19    157.   The allegations in Paragraph 157 constitute legal conclusions, to which no

20  response is required.

21  **THIRD CLAIM FOR RELIEF**

22  **VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**

23    158.   The Agricultural Workers hereby incorporates by reference its responses to

24    paragraphs 1-157 as though fully set forth herein.

25    159.   The allegations in Paragraph 159 purport to characterize Plaintiffs' third

26  claim for relief, to which no response is required.

27    160.   The allegations in Paragraphs 160-162 purport to characterize NEPA and

28  its implementing regulations, which speak for themselves and require no response.

161. The allegations in Paragraphs 160-162 purport to characterize NEPA and its implementing regulations, which speak for themselves and require no response.

162. The allegations in Paragraphs 160-162 purport to characterize NEPA and its implementing regulations, which speak for themselves and require no response.

163. The allegations in Paragraph 163 purport to characterize *Or. Nat. Desert Ass'n. v. 13 Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010).

164. The allegations in Paragraph 164, including subparagraphs A – D, constitute legal conclusions, to which no response is required.

165. The allegations in Paragraph 165 constitute legal conclusions, to which no response is required.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF THE CLEAN WATER ACT

166. The Agricultural Workers hereby incorporates by reference its responses to paragraphs 1-165 as though fully set forth herein.

167. The allegations in Paragraph 167 purport to characterize Plaintiffs' fourth claim for relief, to which no response is required.

168. The allegations in Paragraph 168 purport to characterize the Clean Water Act ("CWA"), which speaks for itself and requires no response.

169. The allegations in Paragraph 169 purport to characterize the requirements of the Basin Plan, the CAF Order, the Conditional Waiver and other unnamed requirements. These documents speak for themselves and are the best evidence of their contents.

170. The Agricultural Workers lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 170, and thus deny the same. The Agricultural Workers deny the second sentence of Paragraph 170. The third sentence of Paragraph 170 is too vague and generalized to permit a response and the Agricultural Workers therefore deny the same.

171. The allegations in Paragraphs 171 constitute legal conclusions, to which no

1  response is required.

2       172.   The allegations in Paragraphs 172 constitute legal conclusions, to which no

3  response is required.

4       173.   The allegations in Paragraphs 173 constitute legal conclusions, to which no

5  response is required.

6       174.   The allegations in Paragraphs 174 constitute legal conclusions, to which no

7  response is required.

8  ## PRAYER FOR RELIEF

9       The remainder of the complaint constitutes Plaintiff's requested relief, which

10  requires no response and is therefore denied.

11  ## GENERAL DENIAL

12       To the extent any allegations of the complaint have not been admitted or

13  specifically responded to, the Agricultural Workers deny such allegations.

14  ## AFFIRMATIVE DEFENSES

15       1.   To the extent that Plaintiffs have failed to state a claim on which relief can

16  be granted, any such claims should be dismissed.

17       2.   To the extent that the Court lack jurisdiction over some or all of Plaintiffs'

18  claims, any such claims should be dismissed.

19       3.   Plaintiffs may lack standing over one of more of their claims Plaintiffs may

20  have failed to exhaust administrative remedies over one or more of their claims.

21       4.   Plaintiffs may have failed to exhaust administrative remedies over one or

22  more of their claims.

23       5.   Plaintiffs' claims are barred to the extent they are not ripe for adjudication.

24       6.   The Agricultural Workers currently have insufficient knowledge or

25  information as to whether they are entitled to other, separate affirmative defenses and

26  reserve their right to later assert additional defenses to these and other claims for relief

27  as appropriate.

28       7.   Plaintiffs' claims are barred to the extent that they do not come to Court with

1  clean hands.

2      8.    Plaintiffs' claims are barred to the extent they result in their unjust

3  enrichment at the expenses and to the detriment of the Agricultural Workers

4      9.    Plaintiffs' claims are barred to the extent they turn on conduct or actions of

5  third parties.

6      10.    Plaintiffs' claims are barred to the extent that they hav failed to join any

7  necessary party to this litigation under Rule 19 of the Federal Rules of Civil Procedure.

8      11.    The Agricultural Workers reserve their rights to amend this answer to assert

9  additional affirmative defenses as facts and information become available to assert such

10  defenses.

11                          **CROSS-CLAIMS**

12      Agricultural Workers anticipate asserting cross-claims against both NPS and

13  Plaintiffs, including, but not limited to, (i) legal and injunctive claims for relief relating to

14  remedy violations of their contractual and promissory Land Rights exchanged in return for

15  their agreement to transfer and convey legal title of their ancestral lands to the

16  Government, (ii) NPS's failures to manage the tule elk, water conservation issues, and

17  (iii) affirmative relief other events or land management snafus that may threaten their

18  governing leasehold, use and occupancy, other specific land use permits and

19  authorizations rights. At this time, however, a further investigation of and due diligence

20  into the facts and law, including the Administrative Record yet to be filed by NPS in this

21  Action, that may support such claims for relief. is underway but not complete.

22  Accordingly, the Agricultural Workers reserve their rights to amend any portion of this

23  answer, including the assertion of counterclaims as permitted by law or otherwise through

24  leave of court.

25      WHEREFORE, at this time, defendant-intervenors deny that Plaintiffs are entitled

26  to the relief requested, or to any relief whatsoever, and thus request that the Court

27  dismiss Plaintiffs' Complaint, Dkt. No. 1, with prejudice, that judgment be entered in favor

28  of federal defendants and defendant-intervenors, and that the Court order such other

1 | relief as it deems necessary.

2 | DATED:  October 15, 2024              HANSON BRIDGETT LLP

3

4                                        By: _____

5                                            ANDREW G. GIACOMINI
                                             ALENE M. TABER
6                                            BIANCA A. VELEZ
                                             Attorneys for Proposed Intervenors
7                                            Agricultural Workers
                                             Appearing as DOES 1-8
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24                                                    Case No. 3:22-cv-000145-MMC

[PROPOSED] ANSWER TO COMPLAINT OF DEFENDANTS PROPOSED INTERVENORS
AGRICULTURAL WORKERS

## CERTIFICATE OF SERVICE

I hereby certify that on this 15 day of October, 2024, I electronically filed the foregoing **NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ANDREW GIACOMINI; DECLARATION OF DOE 1; DECLARATION OF DOE 5; AND [PROPOSED] ORDER** with the Clerk of the Court using the CM/ECF system

Bianca A. Velez
Attorneys for Proposed Intervenors
Agricultural Workers
Appearing as DOES 1-8.

21216888.3

# EXHIBIT E

[Names and addresses of counsel
appear on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT, | Case No. 3:22-cv-145-MMC |
| Plaintiffs, | **DEFENDANT NATIONAL PARK SERVICE'S RESPONSE TO MOTIONS TO INTERVENE AND TO FILE UNDER PSEUDONYM** |
| v. | |
| NATIONAL PARK SERVICE, a federal agency, | |
| Defendant, | |
| POINT REYES SEASHORE RANCHERS ASSOCIATION, | |
| and | |
| DAN AND DOLORES EVANS AND JULIE EVANS ROSSOTTI (PRNS HISTORIC H RANCH AND K RANCH); ROBERT J. AND RUTH McCLURE (PRNS HISTORIC I RANCH); TIM, TOM, MIKE, EMILY, JANELLE, JUSTIN, ANNE AND TIM JR. KEHOE (PRNS HISTORIC J RANCH); BETTY, TIM AND JACKIE NUNES-HEMELT (PRNS HISTORIC A RANCH, D RANCH AND E RANCH), collectively INDIVIDUAL RANCHERS, | |
| Intervenor-Defendants. | |

***Introduction***

Does 1-8 (Prospective Intervenors) seek to intervene as of right in this litigation to protect their asserted "interests in continuing to live on the ranches [within Point Reyes National Seashore], *regardless of whether [the ranches] remain in agricultural use."* ECF No. 108 at 4-5 (emphasis added); *see also* ECF No. 110 at 9 (Prospective Intervenors "request that the housing on the ranches be preserved once the ranches are closed."). Counsel for the Prospective Intervenors has explained the goal of the intervention: "[f]or every ranch that closes, I want to preserve its housing forever. Not for a little while. Not for six months. Forever." *Residents assert voice in park suit*, Point Reyes Light, Oct. 16, 2024 (attached as Exhibit A). [1]

If a settlement of this litigation results in ranchers leaving the Seashore, Defendant National Park Service (Park Service) is committed to working with the ranchers to provide timely notice and appropriate financial and other assistance to ranch employees and their families to facilitate their transition to new housing and if needed, new jobs. But because resolution of this action cannot produce long term housing that is not associated with an operating ranch, the Park Service opposes the motion to intervene. [2]

---

[1]    Counsel's law firm issued a press release reiterating that goal. *See* Hanson Bridgett Press Release, (attached as Exhibit B) ("Hanson Bridgett's proposal involves requiring the National Park Service to agree that the existing housing on any ranch that is forced to close will be preserved [as housing]").

[2]    The Prospective Intervenors also move the Court for permission to use pseudonyms. ECF No. 108. If the Court denies the motion to intervene, there is no need to reach the pseudonyms motion and it may properly be denied as moot. However, if the Court grants the motion to intervene, the Park Service reserves the right to seek to require Prospective Intervenors to file, under seal, their names, the names of the ranches they reside on, and other information related to their occupancy of Park land so that the Park Service can assess their claimed tenancy. This request is consistent with Ninth Circuit law, which requires the need for pseudonyms be continually reassessed as the litigation continues. *Does I thru XXIII v. Advanced Textile Corp.*,

Defendant's Response to Motions to Intervene and to File Under Pseudonym – Page 1

***Background***

Plaintiffs challenge the Park Service's 2021 Record of Decision (ROD) for the *General Management Plan Amendment and Environmental Impact Statement for Point Reyes National Seashore and the north district of Golden Gate National Recreation Area* (GMPA/FEIS). The ROD provides management guidance for approximately 28,000 acres of land in the Point Reyes National Seashore (Seashore) and the adjacent Golden Gate National Recreation Area (Golden Gate, collectively Parks), including all land currently leased for beef and dairy ranching.

The Parks are in one sense typical units of the National Park System. Both were established to preserve the scenic beauty and natural character of the area by protecting them from development and urbanization. *See* 16 U.S.C. § 459c and *Id.* at § 460bb. But they are also unique because Congress authorized the Park Service to issue leases for ranching activities to the families from whom the United States acquired some of the lands in the Parks, a practice known as "multi-generational ranching." *See* 16 USC 459c-5a; *id.* at § 460bb-2(j).

The GMPA/FEIS analyzed six alternatives ranging from ending all ranching to allowing all active ranches to remain in operation subject to additional requirements to protect Park resources.[3] None of the alternatives considered in the GMPA/FEIS addressed housing outside

---

214 F.3d 1058, 1069 (9th Cir. 2000); *Doe v. Texaco, Inc.*, No. C06-02820 WHA, 2006 WL 2850035, at *3–6 (N.D. Cal. Oct. 5, 2006).

[3]       Prospective Intervenors assert the Park Service operated under a "court ordered requirement that [it] enter into long term leases with the ranchers." ECF No. 110 at 4. That is not the case. The GMPA/EIS challenged in this litigation was the product of settlement of earlier litigation which required the Park Service to evaluate, *inter alia*, a "no ranching alternative, a reduced ranching alternative and a no dairy ranching alternative" as well as "alternative strategies for the future management of lands that are currently leased for ranching." *Resource Renewal Institute vs. National Park Service*, Case No. 4:16-cv-00688-SBA, Stipulated Settlement Agreement and Order, ECF No. 143 at 6 (July 14, 2017).

the context of multi-generational ranching (for ranch families and ranch workers) or residential use of vacant ranch buildings to support Park Service operations (*e.g.*, employee housing or visitor service programs). The long-term management visions presented in the environmental impact statement were the subject of public comment from diverse stakeholders; the Park Service received over 1,340 pieces of correspondence as it considered the potential scope of its proposed action and more than 7,600 pieces of correspondence during the comment period on the draft environmental impact statement.  ROD at page 44 (pertinent page attached as Exhibit C).  After considering that public input, the Park Service selected an alternative which allowed the Park Service to issue long-term agricultural lease/permits to 24 ranch families for continued beef or dairy ranching operations.  Declaration of Anne D. Altman, ¶2 (attached as Exhibit D). Those agricultural lease/permits allowed residential use of Park lands on only 14 ranches and restricted residential occupancy to members of the lessee's family and ranch workers.[4]  *Id.*

On January 10, 2022, Plaintiffs filed suit, alleging *inter alia* that the Park Service's decision violated the Seashore's Enabling Act, the National Park Service Organic Act and the Clean Water Act and that the Park Service had inadequately analyzed the environmental impacts of continued ranching under the National Environmental Policy Act. *See* ECF No. 1.  The Point Reyes Seashore Ranchers Association and individuals representing seven ranches on the Seashore then intervened.  *See* ECF Nos. 30 and 47.

For more than two years, Plaintiffs, ranchers and the Park Service have been attempting to resolve this matter through mediation.  As is the case with most settlement negotiations, the discussions have been confidential to allow the parties to speak freely and frankly.  Although the

---

[4]     Eleven of the ranches where residential occupancy is allowed are located on the Seashore. The other three are in Golden Gate, and one of those has no ranch workers living on the ranch. *Id.*

Defendant's Response to Motions to Intervene and to File Under Pseudonym – Page 3

parties have made substantial progress, no agreement on settlement terms has been reached. If an agreement is reached, it would be subject to review and approval by all the parties, including formal approval by the National Park Service, the Department of the Interior, and the Department of Justice.

The parties to the mediation offered the Prospective Intervenors the opportunity to participate in the mediation. The Prospective Intervenors declined to do so. They now seek to intervene as of right pursuant to Rule 24(a) for the stated purpose of preserving the ability of ranch tenants to remain permanently in the residential units they now occupy *if* the parties reach a settlement in which some ranching ends. The Prospective Intervenors have no interest in the issues being litigated—they "do not intend to take a position on the issues raised by the Plaintiffs or the defenses raised by the Defendant." ECF No. 110 at 9. Nor do the Prospective Intervenors object to ranchers voluntarily deciding to end ranching operations—they "do not seek to disrupt the proposed closing of the operating ranches." *Id*. Their only "request [is] that the housing on the ranches be preserved once the ranches are closed." *Id*. As set forth below, because resolution of this action cannot satisfy the Prospective Intervenor's request and the Prospective Intervenors have not met the requirements of Rule 24(a)(2), their motion to intervene should be denied.

### *Argument*

### I. Intervention Should be Denied Because Neither Litigation Nor a Settlement Can Provide the Outcome the Prospective Intervenors Seek.

Prospective Intervenors effectively concede that post-ranching housing is not at issue in the litigation. *See* ECF No. 110 at 9. Nonetheless, the Prospective Intervenors seek to intervene to advocate for a settlement of this action that would convert all ranch housing into long-term housing for themselves or members of the public. The Court should deny the motion to

1    intervene simply because this litigation cannot provide the relief the Prospective Intervenors

2    seek. *See Summer H. v. Fukino*, No. CIV 09–00047 SOM–BMK, 2009 WL 1649910 *2 (D.

3    Haw. 2009) (intervention denied because no relief could be granted on proposed claims) (citing

4    *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1994) ("Futility of amendment can, by itself,

5    justify denial of a motion for leave to amend."); *Dobson v. Vail*, No. C10-5233 RBL/KLS, 2010

6    WL 3061720, at *2 (W.D. Wash. Aug. 2, 2010) (denying motion for permissive intervention

7    because intervention would be futile).

8

9        Whether this action is ultimately resolved by settlement or litigation, resolution of the

10   litigation will not allow the Prospective Intervenors to achieve their stated goal because the

11   Seashore's enabling act prohibits the NPS from authorizing housing for members of the public

12   uncoupled to ranching. 16 U.S.C. § 459c-7 ("[N]o freehold, leasehold, or lesser interest in any

13   lands hereafter acquired within the boundaries of the Point Reyes National Seashore.... shall be

14   conveyed for residential or commercial purposes except for public accommodations, facilities,

15   and services provided pursuant to the Act of October 9, 1965. (Public Law 89–249; 79 Stat.

16   969))."[5]

17

18       Moreover, even if there were authority allowing the long-term housing sought by

19   Prospective Intervenors, resolution of this litigation still could not provide it. Long term housing

20   is not at issue and cannot be interjected into this action seeking judicial review of an agency

21

22

23

24

25   _____

26   [5]    The exception is inapplicable here. The Act of October 9, 1965, commonly known as the
     National Park Service Concessions Policy Act of 1965, allowed the Park Service to engage
27   concessioners to provide accommodations, facilities and services to Park visitors. Neither
     ranches nor long-term housing for the general public are concessions.
28

decision under the Administrative Procedure Act.[6]  *See* 5 U.S.C. § 706 (authorizing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Nor could settlement provide long term housing.  Any settlement of this action is necessarily bounded by the scope of the alternatives addressed in the EIS for the ROD—none of which addressed the possibility of the Parks providing housing to members of the public uncoupled to ranching.  *See* 43 C.F.R. § 46.20(d) (requiring decisions on a proposed action to be within the range of alternatives discussed in the relevant environmental document).  Thus, whether this action is resolved through litigation or settlement, the resolution will not produce long term housing for members of the public independent of ranching.   Consequently, the motion to intervene should be denied.

## II.    Intervention Should be Denied Because the Prospective Intervenors Have Not Shown They Hold a Significantly Protectable Interest Relating to the Property Which is the Subject of This Action.

The Ninth Circuit employs a four-part test for intervention as a matter of right.  To prevail a movant must show: (1) the motion is timely; (2) the applicant has a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest is inadequately represented by the parties to the action.  *East Bay Sanctuary Covenant v. Biden,* 102 F.4th 996, 1001 (9th Cir. 2024); *United States v. Alisal Water Corp.*, 370 F.3d 915, 920 (9th Cir. 2004).  Although Rule 24(a)(2) is construed broadly in favor of intervention, the Prospective Intervenors

---

[6]    The APA does provide courts with limited authority to compel an agency to act, but only where an agency has "failed to take a *discrete* agency action that it is *required to take.*"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).   No statute compels the Park Service to create long term housing in a Park.

1    must satisfy all four criteria; "[f]ailure to satisfy any one of the requirements is fatal to the

2    application." *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir.2009).

3        At an "irreducible minimum," to intervene as of right pursuant to Rule 24(a)(2), the party

4    seeking intervention must have an asserted interest "protectable under some law" and there must

5    be "a relationship between the legally protected interest and the claims at issue. If these two core

6    elements are not satisfied, a putative intervenor lacks any 'interest' under Rule 24(a)(2), full

7    stop." *California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1088

8    (9th Cir. 2022) (citation omitted). Prospective Intervenors fail both the "interest" and the

9    "relationship" test.

10

11       **A.    Prospective Intervenors lack a legally protected interest in housing
12               uncoupled from ranching.**

13       The "interest" test is not a clear-cut or bright-line rule. Although no "specific legal or

14   equitable interest" is required, the intervenor's interest must be, at minimum, "direct non-

15   contingent, substantial and legally protectable," *S. California Edison Co. v. Lynch*, 307 F.3d 794,

16   803 (9th Cir.), *modified,* 307 F.3d 943 (9th Cir. 2002); *Dilks v. Aloha Airlines, Inc.*, 642 F.2d

17   1155, 1157 (9th Cir. 1981). Here, the Prospective Intervenors have not even attempted to

18   establish a legally protectable interest in housing uncoupled from ranching.

19       Instead, the Prospective Intervenors assert interests wholly derived from the ranchers'

20   alleged interests in Park lands they refer to as "multigenerational leasehold interests." ECF No.

21   110 at 6-7 (asserting that the ranchers have rights to Park land arising out of their agricultural

22   lease/permits). Because this matter has been stayed, the Court has not been called upon to

23   determine whether the agricultural lease/permits constitute land rights for the ranchers (which the

24   Park Service disputes), let alone for ranch workers who would seek to remain on the land if a

25   ranch lease is surrendered by the lessee. In any event, absent continued multi-generational

26

27

28

Defendant's Response to Motions to Intervene and to File Under Pseudonym – Page 7

ranching, there is no authority for the NPS to provide the type of long-term housing sought by the Prospective Intervenors.  Further, as noted above, the Seashore's enabling act expressly *precludes* leases for solely "residential" purposes.  16 U.S.C. §459c-7.

**B.  Prospective Intervenors have not shown there is a relationship between their purported interest and the claims at issue.**

The relationship test is met "if the resolution of the plaintiff's claims actually *will* affect the applicant." *S. California Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir.), *modified,* 307 F.3d 943 (9th Cir. 2002) (emphasis added) (citing *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998)).  Here, the Prospective Intervenors have explained they "do not intend to take a position on the issues raised by the Plaintiffs or the defenses raised by the Defendant."   ECF No. 110 at 9.  That statement is tantamount to an admission that Plaintiffs' claims will not have the requisite "direct, immediate, and harmful effects upon [the Prospective Intervenors'] legally protectable interests." *Southwest Ctr. For Biological Diversity*, 268 F.3d 810, 818 (9th Cir. 2001); *accord Apple Inc. v. Iancu*, No. 5:20-CV-06128-EJD, 2021 WL 411157, at *4 (N.D. Cal. Feb. 5, 2021).  But even absent that admission, Prospective Intervenors have not shown that resolution of the claims in this case actually will affect the Prospective Intervenors' interest in long term housing.

If the Park Service prevails, the Prospective Intervenors' interests will not be affected because the Park Service will continue to be able to issue agricultural lease/permits to ranchers that will allow certain residential ranchers to provide housing to ranch workers.  If Plaintiffs prevail, any possibility the litigation actually will affect Prospective Intervenors' interest is attenuated at best.  The remedy in an APA case such as this typically sets aside the invalidated decision and requires the agency to reinitiate public review and comment prior to issuing a new

decision.[7] *See e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (directing remand to "begin the NEPA process afresh").

Here, Plaintiffs expressly seek a remand for a new Record of Decision. ECF No. 1 at 39, Paragraph B. Plaintiffs also raise the possibility of seeking injunctive relief to prevent the Park Service from "approving 20-year leases [and] *expanded* ranching operations." *Id.* at Paragraph C (emphasis added). Thus, the complaint gives no indication Plaintiffs would seek to halt all ranching. Moreover, even if they did, injunctive relief is an extraordinary remedy subject to equitable balancing. *See e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"). In short, it is entirely contingent whether Plaintiffs would seek, or could obtain, any injunctive relief limiting ranching, much less injunctive relief that would require ranch tenants to vacate. *See Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 450365, at *12–13 (N.D. Cal. Feb. 5, 2013) (finding an interest insufficient where it was "premised on a contingency that may never materialize").

Nor does any of the caselaw relied on by the Prospective Intervenors demonstrate that the claims at issue here actually will affect the Prospective Intervenors because in each of those cases the prospective intervenors held an interest that was directly at issue in the litigation. In

---

[7] The availability of public review and comment is an important consideration here. Because the use of ranch buildings outside the context of continued ranching was not addressed in the GMPA/FEIS, if ranching were to end (whether through litigation or settlement) the Park Service would have to conduct a public process to determine what to do with the ranch buildings. The Park Service anticipates that the numerous stakeholders with an interest in management of park lands would have strong and divergent views on how to use any vacated ranch buildings. *See S.F. Baykeeper v. U.S. Fish & Wildlife Serv.*, 2021 WL 3426961, at *7 (N.D. Cal. Aug. 5, 2021). The Prospective Intervenors' requested relief would effectively deny those stakeholders an opportunity to have their voices heard.

1  *W. Watersheds Project v. Haaland*, 22 F.4th 828, 833 (9th Cir. 2022), the intervenors held leases

2  that were not only directly at issue in the litigation, but also had been vacated prior to the lease-

3  holder seeking to intervene.  Similarly, in *In re Estate of Ferdinand E. Marcos Human Rights*

4  *Litigation*, 536 F.3d 980 (9th Cir. 2008), the intervenor was the subject of a judgment it sought to

5  contest, and in *Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir. 1975), the Hopi Tribe had

6

7  issued a lease which the Plaintiffs directly sought to void.

8       Here, the Prospective Intervenors stand in the same posture as the prospective intervenors

9  did in *East Bay Sanctuary*.  They seek to address a subject that is not at issue in the litigation; the

10  harm they seek to address is attenuated; and their asserted interest is not legally protected.  This

11  failure to establish a legally protected interest is alone sufficient grounds to deny intervention.

12

13  *East Bay Sanctuary*, 102 F.4th at 1002; *see also S.F. Baykeeper v. U.S. Fish & Wildlife Serv.*,

14  2021 WL 3426961, at *7 (N.D. Cal. Aug. 5, 2021) (denying intervention where the plaintiff's

15  requested relief would not directly affect the prospective intervenor).

16                        ***Conclusion***

17

18       The Park Service is committed to working with the ranchers to provide ranch employees

19  with appropriate assistance should any ranchers close their operations as part of a settlement.

20  But this litigation cannot produce the long-term housing on the Seashore that is the Prospective

21  Intervenors stated goal.   Because there is no protectable legal interest in such housing, the

22  motion to intervene should be denied and the motion to file under pseudonym denied as moot.

23

24       Dated: November 4, 2024          Respectfully submitted,

25                                Todd Kim
26                                Assistant Attorney General
                                 U.S. DEPARMENT OF JUSTICE
27                                Environment and Natural Resources Division

28

Defendant's Response to Motions to Intervene and to File Under Pseudonym – Page 10

/s/ David W. Gehlert
David W. Gehlert (CO Bar # 21852)
Trial Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
(303) 844-1386
david.gehlert@usdoj.gov

Andrew J. Doyle (FL Bar # 84948)
Trial Attorney
Environmental Defense Section
450 Golden Gate Avenue, Suite 7-6714
San Francisco, CA 94102
(415) 744-6469
andrew.doyle@usdoj.gov

*Attorneys for Defendant*
*National Park Service*

# EXHIBIT F

# OFFICE OF THE CLERK
# UNITED STATES DISTRICT COURT
### Northern District of California

### CIVIL MINUTES

**Date:** January 10, 2025          **Time:** 9:06 a.m. – 10:38 a.m.      **Judge:** MAXINE M. CHESNEY
= 1 hour 32 minutes

**Case No.**: 22-cv-00145-MMC     **Case Name:**  Resource Renewal Institute v. National Park Service

**Attorney for Plaintiff (Resource Renewal):** Elizabeth Potter
**Attorney for Defendant (NPS):** David Gehlert, Andrew Doyle
**Attorney for Intervenor Defendant (Pt. Reyes Ranchers):** Aaron Bruner (appeared by Zoom), Anthony Francois
**Attorney for Intervenor Defendant (McClure/Kehoe/Nunes):** Anthony Raimondo (appeared by Zoom)
**Proposed Intervenor Defense Counsel:** Bianca Velez, Andrew Giacomini, Blanca C. Loyola, Brenda Quintanilla

**Deputy Clerk:** Jenny Galang                              **Court Reporter:** Ana Dub

### PROCEEDINGS

**Motion Hearing re [108] Motion to Intervene, [164] Administrative Motion to Stay of Litigation - held.**

**The Court DENIES Motion to Intervene for the reasons stated on the record.**
**The Court discussed with the parties the Administrative Motion to Stay and will issue a ruling after considering the parties reason for the request.**

# EXHIBIT G

Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. 3:22-CV-00145-MMC** ) |
| NATIONAL PARK SERVICE, a federal agency, | ) ) ) |
| Defendant, | ) ) |
| POINT REYES SEASHORE RANCHERS ASSOCIATION, et al., | ) ) ) |
| Intervenor-Defendants, | ) ) |
| and | ) ) |
| AGRICULTURAL WORKERS DOES 1-8, | ) ) |
| Proposed Intervenor-Defendants. | ) ) ) |

San Francisco, California
Friday, January 10, 2025

**TRANSCRIPT OF PROCEEDINGS**

For Plaintiffs Resource Renewal Institute, Center for
Biological Diversity, and Western Watersheds Project:
                    ADVOCATES FOR THE WEST
                    Post Office Box 1682
                    Bend, Oregon 97703
          BY:  **ELIZABETH H. POTTER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

explained why that could not be provided through this

litigation.  And in their reply, they said nothing, nothing in

response to that.

So it's impossible for them to obtain long-term housing

without ranching through this litigation.  And, you know, from

day one, our position has been their proposed intervention is

futile for that very reason.

I want to also say just a little bit, Your Honor.  Two

significant things have happened since they initially moved to

intervene, one of which is they filed another lawsuit, and they

did so expressly to protect their own interest.

And the Ninth Circuit has been clear, when you have other

avenues to protect your interest, you're not impaired by not

being able to intervene.  So for that reason alone, their

motion needs to be denied.

But also, we've settled this case.  They wanted to

intervene to influence the settlement.  The case is settled.

As you said, Your Honor, it doesn't need to be approved by

the Court.  It's going to go on.  It's going to be implemented.

All of that is going to happen outside of the courtroom.

There's nothing left of this case to intervene into; so it's

moot.

**THE COURT:**  Well, as pointed out, however, by the

movants, there hasn't been a dismissal; in other words, you

still have a live case.  And if they were allowed to intervene,

# EXHIBIT H

**Pages 1 - 60**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. 3:22-CV-00145-MMC** |
| | ) |
| NATIONAL PARK SERVICE, a federal agency, | ) ) ) |
| Defendant, | ) ) |
| POINT REYES SEASHORE RANCHERS ASSOCIATION, et al., | ) ) ) |
| Intervenor-Defendants, | ) ) |
| and | ) ) |
| AGRICULTURAL WORKERS DOES 1-8, | ) ) |
| Proposed Intervenor-Defendants. | ) ) ) |

San Francisco, California
Friday, January 10, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

For Plaintiffs Resource Renewal Institute, Center for
Biological Diversity, and Western Watersheds Project:
                    ADVOCATES FOR THE WEST
                    Post Office Box 1682
                    Bend, Oregon 97703
            BY:  **ELIZABETH H. POTTER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

made out.

Now, I do want to talk about the settlement and what the parties are asking me to do with respect to staying the action for almost, like, 22 months, or something.

And, so that would really kind of segue into what would have been our case management conference.  Nothing had been filed in connection with it.  I asked Ms. Galang to let counsel know they had to file something, and the next thing I got was the notice they settled the case -- all right? -- which up until now we've all been saying:  Yes, they're talking about it but there's no settlement.  So now they said:  Okay.  We've settled the case.

I took that as the equivalent of a case management conference statement, and we're not going to have a separate Zoom case management conference.  We will just talk about where we're at at this time.

Now, the settlement provides for 15 months of, essentially, the ranchers themselves getting coordinated and figuring out how they're going to turn these leaseholds over to the Nature Conservancy.  I don't know if it's mandatory or just available, that they have that amount of time before the new tenants would come in.  It provides for various services to be provided to the workers to try to get them resettled as best as possible in a not-perfect, certainly, world.

And they apparently want me to be hanging on to the

# EXHIBIT I

Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

RESOURCE RENEWAL INSTITUTE,      )
et al.,                          )
                                 )
      Plaintiffs,                )
                                 )
  VS.                            )   NO. 3:22-CV-00145-MMC
                                 )
NATIONAL PARK SERVICE, a         )
federal agency,                  )
                                 )
      Defendant,                 )
                                 )
POINT REYES SEASHORE RANCHERS    )
ASSOCIATION, et al.,             )
                                 )
      Intervenor-Defendants,     )
                                 )
and                              )
                                 )
AGRICULTURAL WORKERS DOES 1-8,   )
                                 )
      Proposed                   )
      Intervenor-Defendants.     )
_____)

San Francisco, California
Friday, January 10, 2025

**TRANSCRIPT OF PROCEEDINGS**

For Plaintiffs Resource Renewal Institute, Center for
Biological Diversity, and Western Watersheds Project:
                    ADVOCATES FOR THE WEST
                    Post Office Box 1682
                    Bend, Oregon 97703
            BY:  **ELIZABETH H. POTTER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1  that's part of a class action or something in which the Court

2  has a role in overseeing, oftentimes they provide amongst

3  themselves that if someone has an obligation to do something,

4  they'll provide status reports to whoever's interested in

5  making sure it gets done so that there still could be a

6  control.

7      Here's another possibility.  Okay.  Another possibility.

8      And I wanted to hear from everybody first about this

9  intervention, which could have changed whatever the status of

10  your settlement was.  But since I have, having heard everyone

11  in full, decided to deny the motion to intervene, then I've

12  also thought about things that are pertinent to the settlement

13  so we could talk about everything together if it turned out I

14  was going to.

15      If I stayed the action for this extended period of time, I

16  might then do something called an administrative closure of the

17  case.  The case would not remain on the calendar as an active

18  case.  It's something that courts occasionally do when, let's

19  say, a case is stayed because it's granted a motion to compel

20  arbitration and the case goes off to arbitration and it kind of

21  lands in a void and nobody knows when it's going to come back

22  or where or how.  Under those circumstances, to just have it

23  sitting out there as a pending case when it really isn't gives

24  rise, often, to an administrative closure.  So that's an

25  alternative that I could consider, which, though, would not

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RESOURCE RENEWAL INSTITUTE, et al.,

               Plaintiffs,

     v.

NATIONAL PARK SERVICE, et al.,

               Defendants.

Case No.  22-cv-00145-MMC

**ORDER CLOSING CASE FOR STATISTICAL PURPOSES ONLY**

      In light of the "Notice of Settlement," filed January 8, 2025, the above-titled action is hereby CLOSED for statistical purposes only.

      Nothing contained in this order shall be considered a dismissal or disposition of the case or of any claim made within it, and, in accordance with the terms of their settlement agreement, the parties shall file status reports every four months, apprising the Court of their progress as to implementation of the settlement. Should further proceedings become necessary or desirable, any party may initiate them in the same manner as if this order had not been entered.

      **IT IS SO ORDERED.**

Dated: January 10, 2025

MAXINE M. CHESNEY
United States District Judge

United States District Court
Northern District of California

1

## <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on this 10th day of February, 2025, I electronically filed the

3    foregoing **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS'**

4    **OPPOSITION TO DEFENDANT NATIONAL PARK SERVICE'S ADMINISTRATIVE**

5    **MOTION TO CONSIDER WHETHER CASES 3:24-CV-09009 AND 3:25-CV-01115**

6    **SHOULD BE RELATED (Civil L.R. 3-12)** with the Clerk of the Court using the CM/ECF

7    system.

8

9

10    _____
     Bianca A. Velez
11    Attorneys for Proposed Intervenors Agricultural
     Workers Appearing as DOES 1-8

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21511647.1    REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT
               NATIONAL PARK SERVICE'S MOTION TO RELATE CASES